# EXHIBIT A

COUR INTERNATIONALE DE JUSTICE

RECUEIL DES ARRÊTS,
AVIS CONSULTATIFS ET ORDONNANCES

# CONSÉQUENCES JURIDIQUES DE L'ÉDIFICATION D'UN MUR DANS LE TERRITOIRE PALESTINIEN OCCUPÉ

AVIS CONSULTATIF DU 9 JUILLET 2004

# 2004

INTERNATIONAL COURT OF JUSTICE

REPORTS OF JUDGMENTS,
ADVISORY OPINIONS AND ORDERS

# LEGAL CONSEQUENCES OF THE CONSTRUCTION OF A WALL IN THE OCCUPIED PALESTINIAN TERRITORY

ADVISORY OPINION OF 9 JULY 2004

Mode officiel de citation:

*Conséquences juridiques de l'édification d'un mur
dans le territoire palestinien occupé,
avis consultatif, C.I.J. Recueil 2004*, p. 136

———————

Official citation:

*Legal Consequences of the Construction of a Wall
in the Occupied Palestinian Territory,
Advisory Opinion, I.C.J. Reports 2004*, p. 136

ISSN 0074-4441
ISBN 92-1-070993-4

| Nᵒ de vente:<br>Sales number | **883** |
| --- | --- |

9 JUILLET 2004

AVIS CONSULTATIF

CONSÉQUENCES JURIDIQUES
DE L'ÉDIFICATION D'UN MUR
DANS LE TERRITOIRE PALESTINIEN OCCUPÉ

————

LEGAL CONSEQUENCES
OF THE CONSTRUCTION OF A WALL
IN THE OCCUPIED PALESTINIAN TERRITORY

9 JULY 2004

ADVISORY OPINION

136

INTERNATIONAL COURT OF JUSTICE

YEAR 2004

2004
9 July
General List
No. 131

**9 July 2004**

# LEGAL CONSEQUENCES
# OF THE CONSTRUCTION OF A WALL
# IN THE OCCUPIED PALESTINIAN TERRITORY

*Jurisdiction of the Court to give the advisory opinion requested.*

*Article 65, paragraph 1, of the Statute — Article 96, paragraph 1, of the Charter — Power of General Assembly to request advisory opinions — Activities of Assembly.*

*Events leading to the adoption of General Assembly resolution ES-10/14 requesting the advisory opinion.*

*Contention that General Assembly acted* ultra vires *under the Charter — Article 12, paragraph 1, and Article 24 of the Charter — United Nations practice concerning the interpretation of Article 12, paragraph 1, of Charter — General Assembly did not exceed its competence.*

*Request for opinion adopted by the Tenth Emergency Special Session of the General Assembly — Session convened pursuant to resolution 377 A (V) ("Uniting for Peace") — Conditions set by that resolution — Regularity of procedure followed.*

*Alleged lack of clarity of the terms of the question — Purportedly abstract nature of the question — Political aspects of the question — Motives said to have inspired the request and opinion's possible implications — "Legal" nature of question unaffected.*

*Court having jurisdiction to give advisory opinion requested.*

\*   \*

*Discretionary power of Court to decide whether it should give an opinion.*

*Article 65, paragraph 1, of Statute — Relevance of lack of consent of a State concerned — Question cannot be regarded only as a bilateral matter between Israel and Palestine but is directly of concern to the United Nations — Possible effects of opinion on a political, negotiated solution to the Israeli-Palestinian conflict — Question representing only one aspect of Israeli-Palestinian conflict — Sufficiency of information and evidence available to Court — Useful purpose*

4

*of opinion — Nullus commodum capere potest de sua injuria propria — Opinion to be given to the General Assembly, not to a specific State or entity.*

*No "compelling reason" for Court to use its discretionary power not to give an advisory opinion.*

\*   \*

*"Legal consequences" of the construction of a wall in the Occupied Palestinian Territory, including in and around East Jerusalem — Scope of question posed — Request for opinion limited to the legal consequences of the construction of those parts of the wall situated in Occupied Palestinian Territory — Use of the term "wall".*
*Historical background.*
*Description of the wall.*

\*   \*

*Applicable law.*
*United Nations Charter — General Assembly resolution 2625 (XXV) — Illegality of any territorial acquisition resulting from the threat or use of force — Right of peoples to self-determination.*
*International humanitarian law — Regulations annexed to the Fourth Hague Convention of 1907 — Fourth Geneva Convention of 1949 — Applicability of Fourth Geneva Convention in the Occupied Palestinian Territory — Human rights law -- International Covenant on Civil and Political Rights — International Covenant on Economic, Social and Cultural Rights — Convention on the Rights of the Child — Relationship between international humanitarian law and human rights law — Applicability of human rights instruments outside national territory — Applicability of those instruments in the Occupied Palestinian Territory.*

\*   \*

*Settlements established by Israel in breach of international law in the Occupied Palestinian Territory — Construction of the wall and its associated régime create a "fait accompli" on the ground that could well become permanent — Risk of situation tantamount to* de facto *annexation — Construction of the wall severely impedes the exercise by the Palestinian people of its right to self-determination and is therefore a breach of Israel's obligation to respect that right.*
*Applicable provisions of international humanitarian law and human rights instruments relevant to the present case — Destruction and requisition of properties — Restrictions on freedom of movement of inhabitants of the Occupied Palestinian Territory — Impediments to the exercise by those concerned of the right to work, to health, to education and to an adequate standard of living — Demographic changes in the Occupied Palestinian Territory — Provisions of international humanitarian law enabling account to be taken of military exigencies — Clauses in human rights instruments qualifying rights guaranteed or providing for derogation — Construction of the wall and its associated régime cannot be justified by military exigencies or by the requirements of national security or public order — Breach by Israel of various of its obligations under*

5

*the applicable provisions of international humanitarian law and human rights instruments.*

*Self-defence — Article 51 of the Charter — Attacks against Israel not imputable to a foreign State — Threat invoked to justify the construction of the wall originating within a territory over which Israel exercises control — Article 51 not relevant in the present case.*
*State of necessity — Customary international law — Conditions — Construction of the wall not the only means to safeguard Israel's interests against the peril invoked.*
*Construction of the wall and its associated régime are contrary to international law.*

\* \*

*Legal consequences of the violation by Israel of its obligations.*
*Israel's international responsibility — Israel obliged to comply with the international obligations it has breached by the construction of the wall — Israel obliged to put an end to the violation of its international obligations — Obligation to cease forthwith the works of construction of the wall, to dismantle it forthwith and to repeal or render ineffective forthwith the legislative and regulatory acts relating to its construction, save where relevant for compliance by Israel with its obligation to make reparation for the damage caused — Israel obliged to make reparation for the damage caused to all natural or legal persons affected by construction of the wall.*

*Legal consequences for States other than Israel —* Erga omnes *character of certain obligations violated by Israel — Obligation for all States not to recognize the illegal situation resulting from construction of the wall and not to render aid or assistance in maintaining the situation created by such construction — Obligation for all States, while respecting the Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end — Obligation for all States parties to the Fourth Geneva Convention, while respecting the Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention — Need for the United Nations, and especially the General Assembly and the Security Council, to consider what further action is required to bring to an end the illegal situation resulting from the construction of the wall and its associated régime, taking due account of the Advisory Opinion.*

\* \*

*Construction of the wall must be placed in a more general context — Obligation of Israel and Palestine scrupulously to observe international humanitarian law — Implementation in good faith of all relevant Security Council resolutions, in particular resolutions 242 (1967) and 338 (1973) — "Roadmap" — Need for efforts to be encouraged with a view to achieving as soon as possible, on the basis of international law, a negotiated solution to the outstanding problems and the establishment of a Palestinian State, with peace and security for all in the region.*

6

## ADVISORY OPINION

*Present: President* SHI; *Vice-President* RANJEVA; *Judges* GUILLAUME, KOROMA, VERESHCHETIN, HIGGINS, PARRA-ARANGUREN, KOOIJMANS, REZEK, AL-KHASAWNEH, BUERGENTHAL, ELARABY, OWADA, SIMMA, TOMKA; *Registrar* COUVREUR.

On the legal consequences of the construction of a wall in the Occupied Palestinian Territory,

THE COURT,

composed as above,

*gives the following Advisory Opinion:*

1. The question on which the advisory opinion of the Court has been requested is set forth in resolution ES-10/14 adopted by the General Assembly of the United Nations (hereinafter the "General Assembly") on 8 December 2003 at its Tenth Emergency Special Session. By a letter dated 8 December 2003 and received in the Registry by facsimile on 10 December 2003, the original of which reached the Registry subsequently, the Secretary-General of the United Nations officially communicated to the Court the decision taken by the General Assembly to submit the question for an advisory opinion. Certified true copies of the English and French versions of resolution ES-10/14 were enclosed with the letter. The resolution reads as follows:

"*The General Assembly,*

*Reaffirming* its resolution ES-10/13 of 21 October 2003,

*Guided* by the principles of the Charter of the United Nations,

*Aware* of the established principle of international law on the inadmissibility of the acquisition of territory by force,

*Aware also* that developing friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples is among the purposes and principles of the Charter of the United Nations,

*Recalling* relevant General Assembly resolutions, including resolution 181 (II) of 29 November 1947, which partitioned mandated Palestine into two States, one Arab and one Jewish,

*Recalling also* the resolutions of the tenth emergency special session of the General Assembly,

*Recalling further* relevant Security Council resolutions, including resolutions 242 (1967) of 22 November 1967, 338 (1973) of 22 October 1973, 267 (1969) of 3 July 1969, 298 (1971) of 25 September 1971, 446 (1979) of 22 March 1979, 452 (1979) of 20 July 1979, 465 (1980) of 1 March 1980, 476 (1980) of 30 June 1980, 478 (1980) of 20 August 1980, 904 (1994) of 18 March 1994, 1073 (1996) of 28 September 1996, 1397 (2002) of 12 March 2002 and 1515 (2003) of 19 November 2003,

7

CONSTRUCTION OF A WALL (ADVISORY OPINION)          140

*Reaffirming* the applicability of the Fourth Geneva Convention[1] as well as Additional Protocol I to the Geneva Conventions[2] to the Occupied Palestinian Territory, including East Jerusalem,

*Recalling* the Regulations annexed to the Hague Convention Respecting the Laws and Customs of War on Land of 1907[3],

*Welcoming* the convening of the Conference of High Contracting Parties to the Fourth Geneva Convention on measures to enforce the Convention in the Occupied Palestinian Territory, including Jerusalem, at Geneva on 15 July 1999,

*Expressing its support* for the declaration adopted by the reconvened Conference of High Contracting Parties at Geneva on 5 December 2001,

*Recalling in particular* relevant United Nations resolutions affirming that Israeli settlements in the Occupied Palestinian Territory, including East Jerusalem, are illegal and an obstacle to peace and to economic and social development as well as those demanding the complete cessation of settlement activities,

*Recalling* relevant United Nations resolutions affirming that actions taken by Israel, the occupying Power, to change the status and demographic composition of Occupied East Jerusalem have no legal validity and are null and void,

*Noting* the agreements reached between the Government of Israel and the Palestine Liberation Organization in the context of the Middle East peace process,

*Gravely concerned* at the commencement and continuation of construction by Israel, the occupying Power, of a wall in the Occupied Palestinian Territory, including in and around East Jerusalem, which is in departure from the Armistice Line of 1949 (Green Line) and which has involved the confiscation and destruction of Palestinian land and resources, the disruption of the lives of thousands of protected civilians and the de facto annexation of large areas of territory, and underlining the unanimous opposition by the international community to the construction of that wall,

*Gravely concerned also* at the even more devastating impact of the projected parts of the wall on the Palestinian civilian population and on the prospects for solving the Palestinian-Israeli conflict and establishing peace in the region,

*Welcoming* the report of 8 September 2003 of the Special Rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967[4], in particular the section regarding the wall,

---

[1] United Nations, *Treaty Series*, Vol. 75, No. 973.
[2] *Ibid.*, Vol. 1125, No. 17512.
[3] See Carnegie Endowment for International Peace, *The Hague Conventions and Declarations of 1899 and 1907* (New York, Oxford University Press, 1915).
[4] E/CN.4/2004/6.

8

*Affirming* the necessity of ending the conflict on the basis of the two-State solution of Israel and Palestine living side by side in peace and security based on the Armistice Line of 1949, in accordance with relevant Security Council and General Assembly resolutions,

*Having received with appreciation* the report of the Secretary-General, submitted in accordance with resolution ES-10/13[5],

*Bearing in mind* that the passage of time further compounds the difficulties on the ground, as Israel, the occupying Power, continues to refuse to comply with international law vis-à-vis its construction of the above-mentioned wall, with all its detrimental implications and consequences,

*Decides*, in accordance with Article 96 of the Charter of the United Nations, to request the International Court of Justice, pursuant to Article 65 of the Statute of the Court, to urgently render an advisory opinion on the following question:

What are the legal consequences arising from the construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, as described in the report of the Secretary-General, considering the rules and principles of international law, including the Fourth Geneva Convention of 1949, and relevant Security Council and General Assembly resolutions?

---

[5] A/ES-10/248."

Also enclosed with the letter were the certified English and French texts of the report of the Secretary-General dated 24 November 2003, prepared pursuant to General Assembly resolution ES-10/13 (A/ES-10/248), to which resolution ES-10/14 makes reference.

2. By letters dated 10 December 2003, the Registrar notified the request for an advisory opinion to all States entitled to appear before the Court, in accordance with Article 66, paragraph 1, of the Statute.

3. By a letter dated 11 December 2003, the Government of Israel informed the Court of its position on the request for an advisory opinion and on the procedure to be followed.

4. By an Order of 19 December 2003, the Court decided that the United Nations and its Member States were likely, in accordance with Article 66, paragraph 2, of the Statute, to be able to furnish information on all aspects raised by the question submitted to the Court for an advisory opinion and fixed 30 January 2004 as the time-limit within which written statements might be submitted to it on the question in accordance with Article 66, paragraph 4, of the Statute. By the same Order, the Court further decided that, in the light of resolution ES-10/14 and the report of the Secretary-General transmitted with the request, and taking into account the fact that the General Assembly had granted Palestine a special status of observer and that the latter was co-sponsor of the draft resolution requesting the advisory opinion, Palestine might also submit a written statement on the question within the above time-limit.

5. By the aforesaid Order, the Court also decided, in accordance with

Article 105, paragraph 4, of the Rules of Court, to hold public hearings during which oral statements and comments might be presented to it by the United Nations and its Member States, regardless of whether or not they had submitted written statements, and fixed 23 February 2004 as the date for the opening of the said hearings. By the same Order, the Court decided that, for the reasons set out above (see paragraph 4), Palestine might also take part in the hearings. Lastly, it invited the United Nations and its Member States, as well as Palestine, to inform the Registry, by 13 February 2004 at the latest, if they were intending to take part in the above-mentioned hearings. By letters of 19 December 2004, the Registrar informed them of the Court's decisions and transmitted to them a copy of the Order.

6. Ruling on requests submitted subsequently by the League of Arab States and the Organization of the Islamic Conference, the Court decided, in accordance with Article 66 of its Statute, that those two international organizations were likely to be able to furnish information on the question submitted to the Court, and that consequently they might for that purpose submit written statements within the time-limit fixed by the Court in its Order of 19 December 2003 and take part in the hearings.

7. Pursuant to Article 65, paragraph 2, of the Statute, the Secretary-General of the United Nations communicated to the Court a dossier of documents likely to throw light upon the question.

8. By a reasoned Order of 30 January 2004 regarding its composition in the case, the Court decided that the matters brought to its attention by the Government of Israel in a letter of 31 December 2003, and in a confidential letter of 15 January 2004 addressed to the President pursuant to Article 34, paragraph 2, of the Rules of Court, were not such as to preclude Judge Elaraby from sitting in the case.

9. Within the time-limit fixed by the Court for that purpose, written statements were filed by, in order of their receipt: Guinea, Saudi Arabia, League of Arab States, Egypt, Cameroon, Russian Federation, Australia, Palestine, United Nations, Jordan, Kuwait, Lebanon, Canada, Syria, Switzerland, Israel, Yemen, United States of America, Morocco, Indonesia, Organization of the Islamic Conference, France, Italy, Sudan, South Africa, Germany, Japan, Norway, United Kingdom, Pakistan, Czech Republic, Greece, Ireland on its own behalf, Ireland on behalf of the European Union, Cyprus, Brazil, Namibia, Malta, Malaysia, Netherlands, Cuba, Sweden, Spain, Belgium, Palau, Federated States of Micronesia, Marshall Islands, Senegal, Democratic People's Republic of Korea. Upon receipt of those statements, the Registrar transmitted copies thereof to the United Nations and its Member States, to Palestine, to the League of Arab States and to the Organization of the Islamic Conference.

10. Various communications were addressed to these latter by the Registry, concerning in particular the measures taken for the organization of the oral proceedings. By communications of 20 February 2004, the Registry transmitted a detailed timetable of the hearings to those of the latter who, within the time-limit fixed for that purpose by the Court, had expressed their intention of taking part in the aforementioned proceedings.

11. Pursuant to Article 106 of the Rules of Court, the Court decided to make the written statements accessible to the public, with effect from the opening of the oral proceedings.

12. In the course of hearings held from 23 to 25 February 2004, the Court heard oral statements, in the following order, by:

*for Palestine:*  H.E. Mr. Nasser Al-Kidwa, Ambassador, Permanent Observer of Palestine to the United Nations,

Ms Stephanie Koury, Member, Negotiations Support Unit, Counsel,
Mr. James Crawford, S.C., Whewell Professor of International Law, University of Cambridge, Member of the Institute of International Law, Counsel and Advocate,
Mr. Georges Abi-Saab, Professor of International Law, Graduate Institute of International Studies, Geneva, Member of the Institute of International Law, Counsel and Advocate,
Mr. Vaughan Lowe, Chichele Professor of International Law, University of Oxford, Counsel and Advocate,
Mr. Jean Salmon, Professor Emeritus of International Law, Université libre de Bruxelles, Member of the Institute of International Law, Counsel and Advocate;

*for the Republic of South Africa:*  H.E. Mr. Aziz Pahad, Deputy Minister for Foreign Affairs, Head of Delegation,
Judge M. R. W. Madlanga, S.C.;

*for the People's Democratic Republic of Algeria:*  Mr. Ahmed Laraba, Professor of International Law;

*for the Kingdom of Saudi Arabia:*  H.E. Mr. Fawzi A. Shobokshi, Ambassador and Permanent Representative of the Kingdom of Saudi Arabia to the United Nations in New York, Head of Delegation;

*for the People's Republic of Bangladesh:*  H.E. Mr. Liaquat Ali Choudhury, Ambassador of the People's Republic of Bangladesh to the Kingdom of the Netherlands;

*for Belize:*  Mr. Jean-Marc Sorel, Professor at the University of Paris I (Panthéon-Sorbonne);

*for the Republic of Cuba:*  H.E. Mr. Abelardo Moreno Fernández, Deputy Minister for Foreign Affairs;

*for the Republic of Indonesia:*  H.E. Mr. Mohammad Jusuf, Ambassador of the Republic of Indonesia to the Kingdom of the Netherlands, Head of Delegation;

*for the Hashemite Kingdom of Jordan:*  H.R.H. Ambassador Zeid Ra'ad Zeid Al-Hussein, Permanent Representative of the Hashemite Kingdom of Jordan to the United Nations, New York, Head of Delegation,
Sir Arthur Watts, K.C.M.G., Q.C., Senior Legal

11

CONSTRUCTION OF A WALL (ADVISORY OPINION)           144

|  |  |
|---|---|
|  | Adviser to the Government of the Hashemite Kingdom of Jordan; |
| *for the Republic of Madagascar:* | H.E. Mr. Alfred Rambeloson, Permanent Representative of Madagascar to the Office of the United Nations at Geneva and to the Specialized Agencies, Head of Delegation; |
| *for Malaysia:* | H.E. Datuk Seri Syed Hamid Albar, Foreign Minister of Malaysia, Head of Delegation; |
| *for the Republic of Senegal:* | H.E. Mr. Saliou Cissé, Ambassador of the Republic of Senegal to the Kingdom of the Netherlands, Head of Delegation; |
| *for the Republic of the Sudan:* | H.E. Mr. Abuelgasim A. Idris, Ambassador of the Republic of the Sudan to the Kingdom of the Netherlands; |
| *for the League of Arab States:* | Mr. Michael Bothe, Professor of Law, Head of the Legal Team; |
| *for the Organization of the Islamic Conference:* | H.E. Mr. Abdelouahed Belkeziz, Secretary General of the Organization of the Islamic Conference, <br> Ms Monique Chemillier-Gendreau, Professor of Public Law, University of Paris VII-Denis Diderot, as Counsel. |

\* \* \*

13. When seised of a request for an advisory opinion, the Court must first consider whether it has jurisdiction to give the opinion requested and whether, should the answer be in the affirmative, there is any reason why it should decline to exercise any such jurisdiction (see *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 232, para. 10).

\* \*

14. The Court will thus first address the question whether it possesses jurisdiction to give the advisory opinion requested by the General Assembly on 8 December 2003. The competence of the Court in this regard is based on Article 65, paragraph 1, of its Statute, according to which the Court "may give an advisory opinion on any legal question at the request of whatever body may be authorized by or in accordance with the Charter of the United Nations to make such a request". The Court has already had occasion to indicate that:

"It is . . . a precondition of the Court's competence that the advisory opinion be requested by an organ duly authorized to seek it under the Charter, that it be requested on a legal question, and that, except in the case of the General Assembly or the Security Council, that question should be one arising within the scope of the activities of the requesting organ." (*Application for Review of Judgement No. 273 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1982*, pp. 333-334, para. 21.)

12

15. It is for the Court to satisfy itself that the request for an advisory opinion comes from an organ or agency having competence to make it. In the present instance, the Court notes that the General Assembly, which seeks the advisory opinion, is authorized to do so by Article 96, paragraph 1, of the Charter, which provides: "The General Assembly or the Security Council may request the International Court of Justice to give an advisory opinion on any legal question."

16. Although the above-mentioned provision states that the General Assembly may seek an advisory opinion "on any legal question", the Court has sometimes in the past given certain indications as to the relationship between the question the subject of a request for an advisory opinion and the activities of the General Assembly (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, I.C.J. Reports 1950*, p. 70; *Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, pp. 232 and 233, paras. 11 and 12).

17. The Court will so proceed in the present case. The Court would observe that Article 10 of the Charter has conferred upon the General Assembly a competence relating to "any questions or any matters" within the scope of the Charter, and that Article 11, paragraph 2, has specifically provided it with competence on "questions relating to the maintenance of international peace and security brought before it by any Member of the United Nations . . ." and to make recommendations under certain conditions fixed by those Articles. As will be explained below, the question of the construction of the wall in the Occupied Palestinian Territory was brought before the General Assembly by a number of Member States in the context of the Tenth Emergency Special Session of the Assembly, convened to deal with what the Assembly, in its resolution ES-10/2 of 25 April 1997, considered to constitute a threat to international peace and security.

\*

18. Before further examining the problems of jurisdiction that have been raised in the present proceedings, the Court considers it necessary to describe the events that led to the adoption of resolution ES-10/14, by which the General Assembly requested an advisory opinion on the legal consequences of the construction of the wall in the Occupied Palestinian Territory.

19. The Tenth Emergency Special Session of the General Assembly, at which that resolution was adopted, was first convened following the rejection by the Security Council, on 7 March and 21 March 1997, as a result of negative votes by a permanent member, of two draft resolutions concerning certain Israeli settlements in the Occupied Palestinian Territory (see, respectively, S/1997/199 and S/PV.3747, and S/1997/241 and S/PV.3756). By a letter of 31 March 1997, the Chairman of the Arab Group then requested "that an emergency special session of the General Assembly be convened pursuant to resolution 377 A (V) entitled 'Uniting

for Peace' " with a view to discussing "Illegal Israeli actions in occupied East Jerusalem and the rest of the Occupied Palestinian Territory" (letter dated 31 March 1997 from the Permanent Representative of Qatar to the United Nations addressed to the Secretary-General, A/ES-10/1, 22 April 1997, Annex). The majority of Members of the United Nations having concurred in this request, the first meeting of the Tenth Emergency Special Session of the General Assembly took place on 24 April 1997 (see A/ES-10/1, 22 April 1997). Resolution ES-10/2 was adopted the following day; the General Assembly thereby expressed its conviction that:

> "the repeated violation by Israel, the occupying Power, of international law and its failure to comply with relevant Security Council and General Assembly resolutions and the agreements reached between the parties undermine the Middle East peace process and constitute a threat to international peace and security",

and condemned the "illegal Israeli actions" in occupied East Jerusalem and the rest of the Occupied Palestinian Territory, in particular the construction of settlements in that territory. The Tenth Emergency Special Session was then adjourned temporarily and has since been reconvened 11 times (on 15 July 1997, 13 November 1997, 17 March 1998, 5 February 1999, 18 October 2000, 20 December 2001, 7 May 2002, 5 August 2002, 19 September 2003, 20 October 2003 and 8 December 2003).

20. By a letter dated 9 October 2003, the Chairman of the Arab Group, on behalf of the States Members of the League of Arab States, requested an immediate meeting of the Security Council to consider the "grave and ongoing Israeli violations of international law, including international humanitarian law, and to take the necessary measures in this regard" (letter of 9 October 2003 from the Permanent Representative of the Syrian Arab Republic to the United Nations to the President of the Security Council, S/2003/973, 9 October 2003). This letter was accompanied by a draft resolution for consideration by the Council, which condemned as illegal the construction by Israel of a wall in the Occupied Palestinian Territory departing from the Armistice Line of 1949. The Security Council held its 4841st and 4842nd meetings on 14 October 2003 to consider the item entitled "The situation in the Middle East, including the Palestine question". It then had before it another draft resolution proposed on the same day by Guinea, Malaysia, Pakistan and the Syrian Arab Republic, which also condemned the construction of the wall. This latter draft resolution was put to a vote after an open debate and was not adopted owing to the negative vote of a permanent member of the Council (S/PV.4841 and S/PV.4842).

On 15 October 2003, the Chairman of the Arab Group, on behalf of

the States Members of the League of Arab States, requested the resumption of the Tenth Emergency Special Session of the General Assembly to consider the item of "Illegal Israeli actions in Occupied East Jerusalem and the rest of the Occupied Palestinian Territory" (A/ES-10/242); this request was supported by the Non-Aligned Movement (A/ES-10/243) and the Organization of the Islamic Conference Group at the United Nations (A/ES-10/244). The Tenth Emergency Special Session resumed its work on 20 October 2003.

21. On 27 October 2003, the General Assembly adopted resolution ES-10/13, by which it demanded that

> "Israel stop and reverse the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, which is in departure of the Armistice Line of 1949 and is in contradiction to relevant provisions of international law" (para. 1).

In paragraph 3, the Assembly requested the Secretary-General

> "to report on compliance with the . . . resolution periodically, with the first report on compliance with paragraph 1 [of that resolution] to be submitted within one month . . .".

The Tenth Emergency Special Session was temporarily adjourned and, on 24 November 2003, the report of the Secretary-General prepared pursuant to General Assembly resolution ES-10/13 (hereinafter the "report of the Secretary-General") was issued (A/ES-10/248).

22. Meanwhile, on 19 November 2003, the Security Council adopted resolution 1515 (2003), by which it "*Endorse[d]* the Quartet Performance-based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict". The Quartet consists of representatives of the United States of America, the European Union, the Russian Federation and the United Nations. That resolution

> "*Call[ed] on* the parties to fulfil their obligations under the Roadmap in cooperation with the Quartet and to achieve the vision of two States living side by side in peace and security."

Neither the "Roadmap" nor resolution 1515 (2003) contained any specific provision concerning the construction of the wall, which was not discussed by the Security Council in this context.

23. Nineteen days later, on 8 December 2003, the Tenth Emergency Special Session of the General Assembly again resumed its work, following a new request by the Chairman of the Arab Group, on behalf of the States Members of the League of Arab States, and pursuant to resolution ES-10/13 (letter dated 1 December 2003 to the President of the General Assembly from the Chargé d'affaires a.i. of the Permanent Mission

of Kuwait to the United Nations, A/ES-10/249, 2 December 2003). It was during the meeting convened on that day that resolution ES-10/14 requesting the present advisory opinion was adopted.

*

24. Having thus recalled the sequence of events that led to the adoption of resolution ES-10/14, the Court will now turn to the questions of jurisdiction that have been raised in the present proceedings. First, Israel has alleged that, given the active engagement of the Security Council with the situation in the Middle East, including the Palestinian question, the General Assembly acted *ultra vires* under the Charter when it requested an advisory opinion on the legal consequences of the construction of the wall in the Occupied Palestinian Territory.

25. The Court has already indicated that the subject of the present request for an advisory opinion falls within the competence of the General Assembly under the Charter (see paragraphs 15-17 above). However, Article 12, paragraph 1, of the Charter provides that:

> "While the Security Council is exercising in respect of any dispute or situation the functions assigned to it in the present Charter, the General Assembly shall not make any recommendation with regard to that dispute or situation unless the Security Council so requests."

A request for an advisory opinion is not in itself a "recommendation" by the General Assembly "with regard to [a] dispute or situation". It has however been argued in this case that the adoption by the General Assembly of resolution ES-10/14 was *ultra vires* as not in accordance with Article 12. The Court thus considers that it is appropriate for it to examine the significance of that Article, having regard to the relevant texts and the practice of the United Nations.

26. Under Article 24 of the Charter the Security Council has "primary responsibility for the maintenance of international peace and security". In that regard it can impose on States "an explicit obligation of compliance if for example it issues an order or command . . . under Chapter VII" and can, to that end, "require enforcement by coercive action" (*Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, p. 163). However, the Court would emphasize that Article 24 refers to a primary, but not necessarily exclusive, competence. The General Assembly does have the power, *inter alia*, under Article 14 of the Charter, to "recommend measures for the peaceful adjustment" of various situations (*ibid.*).

> "[T]he only limitation which Article 14 imposes on the General

CONSTRUCTION OF A WALL (ADVISORY OPINION)          149

Assembly is the restriction found in Article 12, namely, that the Assembly should not recommend measures while the Security Council is dealing with the same matter unless the Council requests it to do so." *(I.C.J. Reports 1962,* p. 163.)

27. As regards the practice of the United Nations, both the General Assembly and the Security Council initially interpreted and applied Article 12 to the effect that the Assembly could not make a recommendation on a question concerning the maintenance of international peace and security while the matter remained on the Council's agenda. Thus the Assembly during its fourth session refused to recommend certain measures on the question of Indonesia, on the ground, *inter alia,* that the Council remained seised of the matter *(Official Records of the General Assembly, Fourth Session,* Ad Hoc *Political Committee, Summary Records of Meetings, 27 September-7 December 1949,* 56th Meeting, 3 December 1949, p. 339, para. 118). As for the Council, on a number of occasions it deleted items from its agenda in order to enable the Assembly to deliberate on them (for example, in respect of the Spanish question *(Official Records of the Security Council, First Year: Second Series, No. 21,* 79th Meeting, 4 November 1946, p. 498), in connection with incidents on the Greek border *(Official Records of the Security Council, Second Year, No. 89,* 202nd Meeting, 15 September 1947, pp. 2404-2405) and in regard to the Island of Taiwan (Formosa) *(Official Records of the Security Council, Fifth Year, No. 48,* 506th Meeting, 29 September 1950, p. 5)). In the case of the Republic of Korea, the Council decided on 31 January 1951 to remove the relevant item from the list of matters of which it was seised in order to enable the Assembly to deliberate on the matter *(Official Records of the Security Council, Sixth Year,* S/PV.531, 531st Meeting, 31 January 1951, pp. 11-12, para. 57).

However, this interpretation of Article 12 has evolved subsequently. Thus the General Assembly deemed itself entitled in 1961 to adopt recommendations in the matter of the Congo (resolutions 1955 (XV) and 1600 (XVI)) and in 1963 in respect of the Portuguese colonies (resolution 1913 (XVIII)) while those cases still appeared on the Council's agenda, without the Council having adopted any recent resolution concerning them. In response to a question posed by Peru during the twenty-third session of the General Assembly, the Legal Counsel of the United Nations confirmed that the Assembly interpreted the words "is exercising the functions" in Article 12 of the Charter as meaning "is exercising the functions at this moment" (General Assembly, Twenty-third Session, Third Committee, 1637th meeting, A/C.3/SR.1637, para. 9). Indeed, the Court notes that there has been an increasing tendency over time for the General Assembly and the Security Council to deal in parallel with the same matter concerning the maintenance of international peace and security (see, for example, the matters involving Cyprus, South Africa, Angola, Southern Rhodesia and more recently Bosnia and Herzegovina and

CONSTRUCTION OF A WALL (ADVISORY OPINION)          150

Somalia). It is often the case that, while the Security Council has tended to focus on the aspects of such matters related to international peace and security, the General Assembly has taken a broader view, considering also their humanitarian, social and economic aspects.

28. The Court considers that the accepted practice of the General Assembly, as it has evolved, is consistent with Article 12, paragraph 1, of the Charter.

The Court is accordingly of the view that the General Assembly, in adopting resolution ES-10/14, seeking an advisory opinion from the Court, did not contravene the provisions of Article 12, paragraph 1, of the Charter. The Court concludes that by submitting that request the General Assembly did not exceed its competence.

29. It has however been contended before the Court that the present request for an advisory opinion did not fulfil the essential conditions set by resolution 377 A (V), under which the Tenth Emergency Special Session was convened and has continued to act. In this regard, it has been said, first, that "The Security Council was never seised of a draft resolution proposing that the Council itself should request an advisory opinion from the Court on the matters now in contention", and, that specific issue having thus never been brought before the Council, the General Assembly could not rely on any inaction by the Council to make such a request. Secondly, it has been claimed that, in adopting resolution 1515 (2003), which endorsed the "Roadmap", before the adoption by the General Assembly of resolution ES-10/14, the Security Council continued to exercise its responsibility for the maintenance of international peace and security and that, as a result, the General Assembly was not entitled to act in its place. The validity of the procedure followed by the Tenth Emergency Special Session, especially the Session's "rolling character" and the fact that its meeting was convened to deliberate on the request for the advisory opinion at the same time as the General Assembly was meeting in regular session, has also been questioned.

30. The Court would recall that resolution 377 A (V) states that:

"if the Security Council, because of lack of unanimity of the permanent members, fails to exercise its primary responsibility for the maintenance of international peace and security in any case where there appears to be a threat to the peace, breach of the peace, or act of aggression, the General Assembly shall consider the matter immediately with a view to making appropriate recommendations to Members for collective measures . . .".

The procedure provided for by that resolution is premised on two conditions, namely that the Council has failed to exercise its primary responsibility for the maintenance of international peace and security as a result of a negative vote of one or more permanent members, and that the situa-

18

tion is one in which there appears to be a threat to the peace, breach of the peace, or act of aggression. The Court must accordingly ascertain whether these conditions were fulfilled as regards the convening of the Tenth Emergency Special Session of the General Assembly, in particular at the time when the Assembly decided to request an advisory opinion from the Court.

31. In the light of the sequence of events described in paragraphs 18 to 23 above, the Court observes that, at the time when the Tenth Emergency Special Session was convened in 1997, the Council had been unable to take a decision on the case of certain Israeli settlements in the Occupied Palestinian Territory, due to negative votes of a permanent member; and that, as indicated in resolution ES-10/2 (see paragraph 19 above), there existed a threat to international peace and security.

The Court further notes that, on 20 October 2003, the Tenth Emergency Special Session of the General Assembly was reconvened on the same basis as in 1997 (see the statements by the representatives of Palestine and Israel, A/ES-10/PV.21, pp. 2 and 5), after the rejection by the Security Council, on 14 October 2003, again as a result of the negative vote of a permanent member, of a draft resolution concerning the construction by Israel of the wall in the Occupied Palestinian Territory. The Court considers that the Security Council again failed to act as contemplated in resolution 377 A (V). It does not appear to the Court that the situation in this regard changed between 20 October 2003 and 8 December 2003, since the Council neither discussed the construction of the wall nor adopted any resolution in that connection. Thus, the Court is of the view that, up to 8 December 2003, the Council had not reconsidered the negative vote of 14 October 2003. It follows that, during that period, the Tenth Emergency Special Session was duly reconvened and could properly be seised, under resolution 377 A (V), of the matter now before the Court.

32. The Court would also emphasize that, in the course of this Emergency Special Session, the General Assembly could adopt any resolution falling within the subject-matter for which the Session had been convened, and otherwise within its powers, including a resolution seeking the Court's opinion. It is irrelevant in that regard that no proposal had been made to the Security Council to request such an opinion.

33. Turning now to alleged further procedural irregularities of the Tenth Emergency Special Session, the Court does not consider that the "rolling" character of that Session, namely the fact of its having been convened in April 1997 and reconvened 11 times since then, has any relevance with regard to the validity of the request by the General Assembly. The Court observes in that regard that the Seventh Emergency Special Session of the General Assembly, having been convened on 22 July 1980, was subsequently reconvened four times (on 20 April 1982, 25 June 1982, 16 August 1982 and 24 September 1982), and that the validity of

resolutions or decisions of the Assembly adopted under such cir-
cumstances was never disputed. Nor has the validity of any previous
resolutions adopted during the Tenth Emergency Special Session been
challenged.

34. The Court also notes the contention by Israel that it was improper
to reconvene the Tenth Emergency Special Session at a time when the
regular session of the General Assembly was in progress. The Court con-
siders that, while it may not have been originally contemplated that it
would be appropriate for the General Assembly to hold simultaneous
emergency and regular sessions, no rule of the Organization has been
identified which would be thereby violated, so as to render invalid the
resolution adopting the present request for an advisory opinion.

35. Finally, the Tenth Emergency Special Session appears to have
been convened in accordance with Rule 9 *(b)* of the Rules of Procedure
of the General Assembly, and the relevant meetings have been convened
in pursuance of the applicable rules. As the Court stated in its Advisory
Opinion of 21 June 1971 concerning the *Legal Consequences for States of
the Continued Presence of South Africa in Namibia (South West Africa)
notwithstanding Security Council Resolution 276 (1970)*, a

> "resolution of a properly constituted organ of the United Nations
> which is passed in accordance with that organ's rules of procedure,
> and is declared by its President to have been so passed, must be
> presumed to have been validly adopted" (*I.C.J. Reports 1971*, p. 22,
> para. 20).

In view of the foregoing, the Court cannot see any reason why that
presumption is to be rebutted in the present case.

\*

36. The Court now turns to a further issue related to jurisdiction in the
present proceedings, namely the contention that the request for an advi-
sory opinion by the General Assembly is not on a "legal question" within
the meaning of Article 96, paragraph 1, of the Charter and Article 65,
paragraph 1, of the Statute of the Court. It has been contended in this
regard that, for a question to constitute a "legal question" for the pur-
poses of these two provisions, it must be reasonably specific, since other-
wise it would not be amenable to a response by the Court. With regard to
the request made in the present advisory proceedings, it has been argued
that it is not possible to determine with reasonable certainty the legal
meaning of the question asked of the Court for two reasons.

First, it has been argued that the question regarding the "legal conse-
quences" of the construction of the wall only allows for two possible
interpretations, each of which would lead to a course of action that is

precluded for the Court. The question asked could first be interpreted as a request for the Court to find that the construction of the wall is illegal, and then to give its opinion on the legal consequences of that illegality. In this case, it has been contended, the Court should decline to respond to the question asked for a variety of reasons, some of which pertain to jurisdiction and others rather to the issue of propriety. As regards juris-diction, it is said that, if the General Assembly had wished to obtain the view of the Court on the highly complex and sensitive question of the legality of the construction of the wall, it should have expressly sought an opinion to that effect (cf. *Exchange of Greek and Turkish Populations, Advisory Opinion, 1925, P.C.I.J., Series B, No. 10*, p. 17). A second pos-sible interpretation of the request, it is said, is that the Court should assume that the construction of the wall is illegal, and then give its opinion on the legal consequences of that assumed illegality. It has been contended that the Court should also decline to respond to the question on this hypothesis, since the request would then be based on a question-able assumption and since, in any event, it would be impossible to rule on the legal consequences of illegality without specifying the nature of that illegality.

Secondly, it has been contended that the question asked of the Court is not of a "legal" character because of its imprecision and abstract nature. In particular, it has been argued in this regard that the question fails to specify whether the Court is being asked to address legal consequences for "the General Assembly or some other organ of the United Nations", "Member States of the United Nations", "Israel", "Palestine" or "some combination of the above, or some different entity".

37. As regards the alleged lack of clarity of the terms of the General Assembly's request and its effect on the "legal nature" of the question referred to the Court, the Court observes that this question is directed to the legal consequences arising from a given factual situation considering the rules and principles of international law, including the Geneva Con-vention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 (hereinafter the "Fourth Geneva Convention") and rele-vant Security Council and General Assembly resolutions. The question submitted by the General Assembly has thus, to use the Court's phrase in its Advisory Opinion on *Western Sahara*, "been framed in terms of law and raise[s] problems of international law"; it is by its very nature susceptible of a reply based on law; indeed it is scarcely susceptible of a reply otherwise than on the basis of law. In the view of the Court, it is indeed a question of a legal character (see *Western Sahara, Advisory Opinion, I.C.J. Reports 1975*, p. 18, para. 15).

38. The Court would point out that lack of clarity in the drafting of a question does not deprive the Court of jurisdiction. Rather, such uncer-

tainty will require clarification in interpretation, and such necessary clarifications of interpretation have frequently been given by the Court.

In the past, both the Permanent Court and the present Court have observed in some cases that the wording of a request for an advisory opinion did not accurately state the question on which the Court's opinion was being sought (*Interpretation of the Greco-Turkish Agreement of 1 December 1926 (Final Protocol, Article IV), Advisory Opinion, 1928, P.C.I.J., Series B, No. 16 (I)*, pp. 14-16), or did not correspond to the "true legal question" under consideration (*Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt, Advisory Opinion, I.C.J. Reports 1980*, pp. 87-89, paras. 34-36). The Court noted in one case that "the question put to the Court is, on the face of it, at once infelicitously expressed and vague" (*Application for Review of Judgement No. 273 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1982*, p. 348, para. 46).

Consequently, the Court has often been required to broaden, interpret and even reformulate the questions put (see the three Opinions cited above; see also *Jaworzina, Advisory Opinion, 1923, P.C.I.J., Series B, No. 8*; *Admissibility of Hearings of Petitioners by the Committee on South West Africa, Advisory Opinion, I.C.J. Reports 1956*, p. 25; *Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, pp. 157-162).

In the present instance, the Court will only have to do what it has often done in the past, namely "identify the existing principles and rules, interpret them and apply them . . ., thus offering a reply to the question posed based on law" (*Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, p. 234, para. 13).

39. In the present instance, if the General Assembly requests the Court to state the "legal consequences" arising from the construction of the wall, the use of these terms necessarily encompasses an assessment of whether that construction is or is not in breach of certain rules and principles of international law. Thus, the Court is first called upon to determine whether such rules and principles have been and are still being breached by the construction of the wall along the planned route.

40. The Court does not consider that what is contended to be the abstract nature of the question posed to it raises an issue of jurisdiction. Even when the matter was raised as an issue of propriety rather than one of jurisdiction, in the case concerning the *Legality of the Threat or Use of Nuclear Weapons*, the Court took the position that to contend that it should not deal with a question couched in abstract terms is "a mere affirmation devoid of any justification" and that "the Court may give an advisory opinion on any legal question, abstract or otherwise" (*I.C.J. Reports 1996 (I)*, p. 236, para. 15, referring to *Conditions of Admission of a State to Membership in the United Nations (Article 4 of the Charter), Advisory Opinion, 1948, I.C.J. Reports 1947-1948*, p. 61; *Effect of Awards of Compensation Made by the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1954*, p. 51; and *Legal Con-*

*sequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 27, para. 40). In any event, the Court considers that the question posed to it in relation to the legal consequences of the construction of the wall is not an abstract one, and moreover that it would be for the Court to determine for whom any such consequences arise.

41. Furthermore, the Court cannot accept the view, which has also been advanced in the present proceedings, that it has no jurisdiction because of the "political" character of the question posed. As is clear from its long-standing jurisprudence on this point, the Court considers that the fact that a legal question also has political aspects,

> "as, in the nature of things, is the case with so many questions which arise in international life, does not suffice to deprive it of its character as a 'legal question' and to 'deprive the Court of a competence expressly conferred on it by its Statute' *(Application for Review of Judgement No. 158 of the United Nations Administrative Tribunal, Advisory Opinion, I.C.J. Reports 1973*, p. 172, para. 14). Whatever its political aspects, the Court cannot refuse to admit the legal character of a question which invites it to discharge an essentially judicial task, namely, an assessment of the legality of the possible conduct of States with regard to the obligations imposed upon them by international law (cf. *Conditions of Admission of a State to Membership in the United Nations (Article 4 of the Charter), Advisory Opinion, 1948, I.C.J. Reports 1947-1948*, pp. 61-62; *Competence of the General Assembly for the Admission of a State to the United Nations, Advisory Opinion, I.C.J. Reports 1950*, pp. 6-7; *Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, p. 155)." *(Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 234, para. 13.)

In its Opinion concerning the *Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt*, the Court indeed emphasized that,

> "in situations in which political considerations are prominent it may be particularly necessary for an international organization to obtain an advisory opinion from the Court as to the legal principles applicable with respect to the matter under debate . . ." *(I.C.J. Reports 1980*, p. 87, para. 33).

Moreover, the Court has affirmed in its Opinion on the *Legality of the Threat or Use of Nuclear Weapons* that

> "the political nature of the motives which may be said to have inspired the request and the political implications that the opinion given might have are of no relevance in the establishment of its jurisdiction to give such an opinion" *(I.C.J. Reports 1996 (I)*, p. 234, para. 13).

23

The Court is of the view that there is no element in the present proceedings which could lead it to conclude otherwise.

*

42. The Court accordingly has jurisdiction to give the advisory opinion requested by resolution ES-10/14 of the General Assembly.

*    *

43. It has been contended in the present proceedings, however, that the Court should decline to exercise its jurisdiction because of the presence of specific aspects of the General Assembly's request that would render the exercise of the Court's jurisdiction improper and inconsistent with the Court's judicial function.

44. The Court has recalled many times in the past that Article 65, paragraph 1, of its Statute, which provides that "The Court *may* give an advisory opinion . . ." (emphasis added), should be interpreted to mean that the Court has a discretionary power to decline to give an advisory opinion even if the conditions of jurisdiction are met (*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, pp. 234-235, para. 14). The Court however is mindful of the fact that its answer to a request for an advisory opinion "represents its participation in the activities of the Organization, and, in principle, should not be refused" (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J. Reports 1950*, p. 71; see also, for example, *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights, Advisory Opinion, I.C.J. Reports 1999 (I)*, pp. 78-79, para. 29.) Given its responsibilities as the "principal judicial organ of the United Nations" (Article 92 of the Charter), the Court should in principle not decline to give an advisory opinion. In accordance with its consistent jurisprudence, only "compelling reasons" should lead the Court to refuse its opinion (*Certain Expenses of the United Nations (Article 17, paragraph 2, of the Charter), Advisory Opinion, I.C.J. Reports 1962*, p. 155; see also, for example, *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights, Advisory Opinion, I.C.J. Reports 1999 (I)*, pp. 78-79, para. 29.)

The present Court has never, in the exercise of this discretionary power, declined to respond to a request for an advisory opinion. Its decision not to give the advisory opinion on the *Legality of the Use by a State of Nuclear Weapons in Armed Conflict* requested by the World Health Organization was based on the Court's lack of jurisdiction, and not on considerations of judicial propriety (see *I.C.J. Reports 1996 (I)*, p. 235, para. 14). Only on one occasion did the Court's predecessor, the Permanent Court of International Justice, take the view that it should

not reply to a question put to it (*Status of Eastern Carelia, Advisory Opinion, 1923, P.C.I.J., Series B, No. 5*), but this was due to

> "the very particular circumstances of the case, among which were that the question directly concerned an already existing dispute, one of the States parties to which was neither a party to the Statute of the Permanent Court nor a Member of the League of Nations, objected to the proceedings, and refused to take part in any way" (*Legality of the Threat or Use of Nuclear Weapons, I.C.J. Reports 1996 (I)*, pp. 235-236, para. 14).

45. These considerations do not release the Court from the duty to satisfy itself, each time it is seised of a request for an opinion, as to the propriety of the exercise of its judicial function, by reference to the criterion of "compelling reasons" as cited above. The Court will accordingly examine in detail and in the light of its jurisprudence each of the arguments presented to it in this regard.

*

46. The first such argument is to the effect that the Court should not exercise its jurisdiction in the present case because the request concerns a contentious matter between Israel and Palestine, in respect of which Israel has not consented to the exercise of that jurisdiction. According to this view, the subject-matter of the question posed by the General Assembly "is an integral part of the wider Israeli-Palestinian dispute concerning questions of terrorism, security, borders, settlements, Jerusalem and other related matters". Israel has emphasized that it has never consented to the settlement of this wider dispute by the Court or by any other means of compulsory adjudication; on the contrary, it contends that the parties repeatedly agreed that these issues are to be settled by negotiation, with the possibility of an agreement that recourse could be had to arbitration. It is accordingly contended that the Court should decline to give the present Opinion, on the basis *inter alia* of the precedent of the decision of the Permanent Court of International Justice on the *Status of Eastern Carelia*.

47. The Court observes that the lack of consent to the Court's contentious jurisdiction by interested States has no bearing on the Court's jurisdiction to give an advisory opinion. In an Advisory Opinion of 1950, the Court explained that:

> "The consent of States, parties to a dispute, is the basis of the Court's jurisdiction in contentious cases. The situation is different in regard to advisory proceedings even where the Request for an Opinion relates to a legal question actually pending between States. The Court's reply is only of an advisory character: as such, it has no binding force. It follows that no State, whether a Member of the

United Nations or not, can prevent the giving of an Advisory Opinion which the United Nations considers to be desirable in order to obtain enlightenment as to the course of action it should take. The Court's Opinion is given not to the States, but to the organ which is entitled to request it; the reply of the Court, itself an 'organ of the United Nations', represents its participation in the activities of the Organization, and, in principle, should not be refused." (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J. Reports 1950*, p. 71; see also *Western Sahara, I.C.J. Reports 1975*, p. 24, para. 31.)

It followed from this that, in those proceedings, the Court did not refuse to respond to the request for an advisory opinion on the ground that, in the particular circumstances, it lacked jurisdiction. The Court did however examine the opposition of certain interested States to the request by the General Assembly in the context of issues of judicial propriety. Commenting on its 1950 decision, the Court explained in its Advisory Opinion on *Western Sahara* that it had "Thus . . . recognized that lack of consent might constitute a ground for declining to give the opinion requested if, in the circumstances of a given case, considerations of judicial propriety should oblige the Court to refuse an opinion." The Court continued:

> "In certain circumstances . . . the lack of consent of an interested State may render the giving of an advisory opinion incompatible with the Court's judicial character. An instance of this would be when the circumstances disclose that to give a reply would have the effect of circumventing the principle that a State is not obliged to allow its disputes to be submitted to judicial settlement without its consent." (*Western Sahara, I.C.J. Reports 1975*, p. 25, paras. 32-33.)

In applying that principle to the request concerning *Western Sahara*, the Court found that a legal controversy did indeed exist, but one which had arisen during the proceedings of the General Assembly and in relation to matters with which the Assembly was dealing. It had not arisen independently in bilateral relations (*ibid.*, p. 25, para. 34).

48. As regards the request for an advisory opinion now before it, the Court acknowledges that Israel and Palestine have expressed radically divergent views on the legal consequences of Israel's construction of the wall, on which the Court has been asked to pronounce. However, as the Court has itself noted, "Differences of views . . . on legal issues have existed in practically every advisory proceeding" (*Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 24, para. 34).

49. Furthermore, the Court does not consider that the subject-matter

of the General Assembly's request can be regarded as only a bilateral matter between Israel and Palestine. Given the powers and responsibilities of the United Nations in questions relating to international peace and security, it is the Court's view that the construction of the wall must be deemed to be directly of concern to the United Nations. The responsibility of the United Nations in this matter also has its origin in the Mandate and the Partition Resolution concerning Palestine (see paragraphs 70 and 71 below). This responsibility has been described by the General Assembly as "a permanent responsibility towards the question of Palestine until the question is resolved in all its aspects in a satisfactory manner in accordance with international legitimacy" (General Assembly resolution 57/107 of 3 December 2002). Within the institutional framework of the Organization, this responsibility has been manifested by the adoption of many Security Council and General Assembly resolutions, and by the creation of several subsidiary bodies specifically established to assist in the realization of the inalienable rights of the Palestinian people.

50. The object of the request before the Court is to obtain from the Court an opinion which the General Assembly deems of assistance to it for the proper exercise of its functions. The opinion is requested on a question which is of particularly acute concern to the United Nations, and one which is located in a much broader frame of reference than a bilateral dispute. In the circumstances, the Court does not consider that to give an opinion would have the effect of circumventing the principle of consent to judicial settlement, and the Court accordingly cannot, in the exercise of its discretion, decline to give an opinion on that ground.

\*

51. The Court now turns to another argument raised in the present proceedings in support of the view that it should decline to exercise its jurisdiction. Some participants have argued that an advisory opinion from the Court on the legality of the wall and the legal consequences of its construction could impede a political, negotiated solution to the Israeli-Palestinian conflict. More particularly, it has been contended that such an opinion could undermine the scheme of the "Roadmap" (see paragraph 22 above), which requires Israel and Palestine to comply with certain obligations in various phases referred to therein. The requested opinion, it has been alleged, could complicate the negotiations envisaged in the "Roadmap", and the Court should therefore exercise its discretion and decline to reply to the question put.

This is a submission of a kind which the Court has already had to consider several times in the past. For instance, in its Advisory Opinion on the *Legality of the Threat or Use of Nuclear Weapons*, the Court stated:

CONSTRUCTION OF A WALL (ADVISORY OPINION)          160

"It has . . . been submitted that a reply from the Court in this case might adversely affect disarmament negotiations and would, therefore, be contrary to the interest of the United Nations. The Court is aware that, no matter what might be its conclusions in any opinion it might give, they would have relevance for the continuing debate on the matter in the General Assembly and would present an additional element in the negotiations on the matter. Beyond that, the effect of the opinion is a matter of appreciation. The Court has heard contrary positions advanced and there are no evident criteria by which it can prefer one assessment to another." *(I.C.J. Reports 1996 (I)*, p. 237, para. 17; see also *Western Sahara, I.C.J. Reports 1975*, p. 37, para. 73.)

52. One participant in the present proceedings has indicated that the Court, if it were to give a response to the request, should in any event do so keeping in mind

"two key aspects of the peace process: the fundamental principle that permanent status issues must be resolved through negotiations; and the need during the interim period for the parties to fulfil their security responsibilities so that the peace process can succeed".

53. The Court is conscious that the "Roadmap", which was endorsed by the Security Council in resolution 1515 (2003) (see paragraph 22 above), constitutes a negotiating framework for the resolution of the Israeli-Palestinian conflict. It is not clear, however, what influence the Court's opinion might have on those negotiations: participants in the present proceedings have expressed differing views in this regard. The Court cannot regard this factor as a compelling reason to decline to exercise its jurisdiction.

54. It was also put to the Court by certain participants that the question of the construction of the wall was only one aspect of the Israeli-Palestinian conflict, which could not be properly addressed in the present proceedings. The Court does not however consider this a reason for it to decline to reply to the question asked. The Court is indeed aware that the question of the wall is part of a greater whole, and it would take this circumstance carefully into account in any opinion it might give. At the same time, the question that the General Assembly has chosen to ask of the Court is confined to the legal consequences of the construction of the wall, and the Court would only examine other issues to the extent that they might be necessary to its consideration of the question put to it.

\*

55. Several participants in the proceedings have raised the further

28

argument that the Court should decline to exercise its jurisdiction because it does not have at its disposal the requisite facts and evidence to enable it to reach its conclusions. In particular, Israel has contended, referring to the Advisory Opinion on the *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania*, that the Court could not give an opinion on issues which raise questions of fact that cannot be elucidated without hearing all parties to the conflict. According to Israel, if the Court decided to give the requested opinion, it would be forced to speculate about essential facts and make assumptions about arguments of law. More specifically, Israel has argued that the Court could not rule on the legal consequences of the construction of the wall without enquiring, first, into the nature and scope of the security threat to which the wall is intended to respond and the effectiveness of that response, and, second, into the impact of the construction for the Palestinians. This task, which would already be difficult in a contentious case, would be further complicated in an advisory proceeding, particularly since Israel alone possesses much of the necessary information and has stated that it chooses not to address the merits. Israel has concluded that the Court, confronted with factual issues impossible to clarify in the present proceedings, should use its discretion and decline to comply with the request for an advisory opinion.

56. The Court observes that the question whether the evidence available to it is sufficient to give an advisory opinion must be decided in each particular instance. In its Opinion concerning the *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania (I.C.J. Reports 1950*, p. 72) and again in its Opinion on the *Western Sahara*, the Court made it clear that what is decisive in these circumstances is

> "whether the Court has before it sufficient information and evidence to enable it to arrive at a judicial conclusion upon any disputed questions of fact the determination of which is necessary for it to give an opinion in conditions compatible with its judicial character" (*Western Sahara, I.C.J. Reports 1975*, pp. 28-29, para. 46).

Thus, for instance, in the proceedings concerning the *Status of Eastern Carelia*, the Permanent Court of International Justice decided to decline to give an Opinion *inter alia* because the question put "raised a question of fact which could not be elucidated without hearing both parties" (*Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, I.C.J. Reports 1950*, p. 72; see *Status of Eastern Carelia, P.C.I.J., Series B, No. 5*, p. 28). On the other hand, in the *Western Sahara* Opinion, the Court observed that it had been provided with very extensive documentary evidence of the relevant facts (*I.C.J. Reports 1975*, p. 29, para. 47).

57. In the present instance, the Court has at its disposal the report of the Secretary-General, as well as a voluminous dossier submitted by him to the Court, comprising not only detailed information on the route of

the wall but also on its humanitarian and socio-economic impact on the Palestinian population. The dossier includes several reports based on on-site visits by special rapporteurs and competent organs of the United Nations. The Secretary-General has further submitted to the Court a written statement updating his report, which supplemented the information contained therein. Moreover, numerous other participants have submitted to the Court written statements which contain information relevant to a response to the question put by the General Assembly. The Court notes in particular that Israel's Written Statement, although limited to issues of jurisdiction and judicial propriety, contained observations on other matters, including Israel's concerns in terms of security, and was accompanied by corresponding annexes; many other documents issued by the Israeli Government on those matters are in the public domain.

58. The Court finds that it has before it sufficient information and evidence to enable it to give the advisory opinion requested by the General Assembly. Moreover, the circumstance that others may evaluate and interpret these facts in a subjective or political manner can be no argument for a court of law to abdicate its judicial task. There is therefore in the present case no lack of information such as to constitute a compelling reason for the Court to decline to give the requested opinion.

\*

59. In their written statements, some participants have also put forward the argument that the Court should decline to give the requested opinion on the legal consequences of the construction of the wall because such opinion would lack any useful purpose. They have argued that the advisory opinions of the Court are to be seen as a means to enable an organ or agency in need of legal clarification for its future action to obtain that clarification. In the present instance, the argument continues, the General Assembly would not need an opinion of the Court because it has already declared the construction of the wall to be illegal and has already determined the legal consequences by demanding that Israel stop and reverse its construction, and further, because the General Assembly has never made it clear how it intended to use the opinion.

60. As is clear from the Court's jurisprudence, advisory opinions have the purpose of furnishing to the requesting organs of the law necessary for them in their action. In its Opinion concerning *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, the Court observed: "The object of this request for an Opinion is to guide the United Nations in respect of its own action." (*I.C.J. Reports 1951*, p. 19.) Likewise, in its Opinion on the *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South*

*West Africa) notwithstanding Security Council Resolution 276 (1970)*, the Court noted: "The request is put forward by a United Nations organ with reference to its own decisions and it seeks legal advice from the Court on the consequences and implications of these decisions." (*I.C.J. Reports 1971*, p. 24, para. 32.) The Court found on another occasion that the advisory opinion it was to give would "furnish the General Assembly with elements of a legal character relevant to its further treatment of the decolonization of Western Sahara" (*Western Sahara, I.C.J. Reports 1975*, p. 37, para. 72).

61. With regard to the argument that the General Assembly has not made it clear what use it would make of an advisory opinion on the wall, the Court would recall, as equally relevant in the present proceedings, what it stated in its Opinion on the *Legality of the Threat or Use of Nuclear Weapons*:

> "Certain States have observed that the General Assembly has not explained to the Court for what precise purposes it seeks the advisory opinion. Nevertheless, it is not for the Court itself to purport to decide whether or not an advisory opinion is needed by the Assembly for the performance of its functions. The General Assembly has the right to decide for itself on the usefulness of an opinion in the light of its own needs." (*I.C.J. Reports 1996 (I)*, p. 237, para. 16.)

62. It follows that the Court cannot decline to answer the question posed based on the ground that its opinion would lack any useful purpose. The Court cannot substitute its assessment of the usefulness of the opinion requested for that of the organ that seeks such opinion, namely the General Assembly. Furthermore, and in any event, the Court considers that the General Assembly has not yet determined all the possible consequences of its own resolution. The Court's task would be to determine in a comprehensive manner the legal consequences of the construction of the wall, while the General Assembly — and the Security Council — may then draw conclusions from the Court's findings.

\*

63. Lastly, the Court will turn to another argument advanced with regard to the propriety of its giving an advisory opinion in the present proceedings. Israel has contended that Palestine, given its responsibility for acts of violence against Israel and its population which the wall is aimed at addressing, cannot seek from the Court a remedy for a situation resulting from its own wrongdoing. In this context, Israel has invoked the maxim *nullus commodum capere potest de sua injuria propria*, which it considers to be as relevant in advisory proceedings as it is in contentious cases. Therefore, Israel concludes, good faith and the principle of "clean hands" provide a compelling reason that should lead the Court to refuse the General Assembly's request.

64. The Court does not consider this argument to be pertinent. As was emphasized earlier, it was the General Assembly which requested the advisory opinion, and the opinion is to be given to the General Assembly, and not to a specific State or entity.

\*  \*

65. In the light of the foregoing, the Court concludes not only that it has jurisdiction to give an opinion on the question put to it by the General Assembly (see paragraph 42 above), but also that there is no compelling reason for it to use its discretionary power not to give that opinion.

\*  \*  \*

66. The Court will now address the question put to it by the General Assembly in resolution ES-10/14. The Court recalls that the question is as follows:

> "What are the legal consequences arising from the construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, as described in the report of the Secretary-General, considering the rules and principles of international law, including the Fourth Geneva Convention of 1949, and relevant Security Council and General Assembly resolutions?"

67. As explained in paragraph 82 below, the "wall" in question is a complex construction, so that that term cannot be understood in a limited physical sense. However, the other terms used, either by Israel ("fence") or by the Secretary-General ("barrier"), are no more accurate if understood in the physical sense. In this Opinion, the Court has therefore chosen to use the terminology employed by the General Assembly.

The Court notes furthermore that the request of the General Assembly concerns the legal consequences of the wall being built "in the Occupied Palestinian Territory, including in and around East Jerusalem". As also explained below (see paragraphs 79-84 below), some parts of the complex are being built, or are planned to be built, on the territory of Israel itself; the Court does not consider that it is called upon to examine the legal consequences arising from the construction of those parts of the wall.

68. The question put by the General Assembly concerns the legal consequences of the construction of the wall in the Occupied Palestinian Territory. However, in order to indicate those consequences to the General Assembly the Court must first determine whether or not the construction of that wall breaches international law (see paragraph 39 above). It will

therefore make this determination before dealing with the consequences of the construction.

69. To do so, the Court will first make a brief analysis of the status of the territory concerned, and will then describe the works already constructed or in course of construction in that territory. It will then indicate the applicable law before seeking to establish whether that law has been breached.

\* \*

70. Palestine was part of the Ottoman Empire. At the end of the First World War, a class "A" Mandate for Palestine was entrusted to Great Britain by the League of Nations, pursuant to paragraph 4 of Article 22 of the Covenant, which provided that:

> "Certain communities, formerly belonging to the Turkish Empire have reached a stage of development where their existence as independent nations can be provisionally recognized subject to the rendering of administrative advice and assistance by a Mandatory until such time as they are able to stand alone."

The Court recalls that in its Advisory Opinion on the *International Status of South West Africa*, speaking of mandates in general, it observed that "The Mandate was created, in the interest of the inhabitants of the territory, and of humanity in general, as an international institution with an international object — a sacred trust of civilization." (*I.C.J. Reports 1950*, p. 132.) The Court also held in this regard that "two principles were considered to be of paramount importance: the principle of non-annexation and the principle that the well-being and development of . . . peoples [not yet able to govern themselves] form[ed] 'a sacred trust of civilization' " (*ibid.*, p. 131).

The territorial boundaries of the Mandate for Palestine were laid down by various instruments, in particular on the eastern border by a British memorandum of 16 September 1922 and an Anglo-Transjordanian Treaty of 20 February 1928.

71. In 1947 the United Kingdom announced its intention to complete evacuation of the mandated territory by 1 August 1948, subsequently advancing that date to 15 May 1948. In the meantime, the General Assembly had on 29 November 1947 adopted resolution 181 (II) on the future government of Palestine, which "*Recommends* to the United Kingdom . . . and to all other Members of the United Nations the adoption and implementation . . . of the Plan of Partition" of the territory, as set forth in the resolution, between two independent States, one Arab, the other Jewish, as well as the creation of a special international régime for the City of Jerusalem. The Arab population of Palestine and the Arab States rejected this plan, contending that it was unbalanced; on 14 May

33

1948, Israel proclaimed its independence on the strength of the General Assembly resolution; armed conflict then broke out between Israel and a number of Arab States and the Plan of Partition was not implemented.

72.  By resolution 62 (1948) of 16 November 1948, the Security Council decided that "an armistice shall be established in all sectors of Palestine" and called upon the parties directly involved in the conflict to seek agreement to this end. In conformity with this decision, general armistice agreements were concluded in 1949 between Israel and the neighbouring States through mediation by the United Nations. In particular, one such agreement was signed in Rhodes on 3 April 1949 between Israel and Jordan. Articles V and VI of that Agreement fixed the armistice demarcation line between Israeli and Arab forces (often later called the "Green Line" owing to the colour used for it on maps; hereinafter the "Green Line"). Article III, paragraph 2, provided that "No element of the . . . military or para-military forces of either Party . . . shall advance beyond or pass over for any purpose whatsoever the Armistice Demarcation Lines . . ." It was agreed in Article VI, paragraph 8, that these provisions would not be "interpreted as prejudicing, in any sense, an ultimate political settlement between the Parties". It was also stated that "the Armistice Demarcation Lines defined in articles V and VI of [the] Agreement [were] agreed upon by the Parties without prejudice to future territorial settlements or boundary lines or to claims of either Party relating thereto". The Demarcation Line was subject to such rectification as might be agreed upon by the parties.

73.  In the 1967 armed conflict, Israeli forces occupied all the territories which had constituted Palestine under British Mandate (including those known as the West Bank, lying to the east of the Green Line).

74.  On 22 November 1967, the Security Council unanimously adopted resolution 242 (1967), which emphasized the inadmissibility of acquisition of territory by war and called for the "Withdrawal of Israel armed forces from territories occupied in the recent conflict", and "Termination of all claims or states of belligerency".

75.  From 1967 onwards, Israel took a number of measures in these territories aimed at changing the status of the City of Jerusalem. The Security Council, after recalling on a number of occasions "the principle that acquisition of territory by military conquest is inadmissible", condemned those measures and, by resolution 298 (1971) of 25 September 1971, confirmed in the clearest possible terms that:

> "all legislative and administrative actions taken by Israel to change the status of the City of Jerusalem, including expropriation of land and properties, transfer of populations and legislation aimed at the incorporation of the occupied section, are totally invalid and cannot change that status".

Later, following the adoption by Israel on 30 July 1980 of the Basic Law making Jerusalem the "complete and united" capital of Israel, the Security Council, by resolution 478 (1980) of 20 August 1980, stated that the enactment of that Law constituted a violation of international law and that "all legislative and administrative measures and actions taken by Israel, the occupying Power, which have altered or purport to alter the character and status of the Holy City of Jerusalem . . . are null and void". It further decided "not to recognize the 'basic law' and such other actions by Israel that, as a result of this law, seek to alter the character and status of Jerusalem".

76. Subsequently, a peace treaty was signed on 26 October 1994 between Israel and Jordan. That treaty fixed the boundary between the two States "with reference to the boundary definition under the Mandate as is shown in Annex I *(a)* . . . without prejudice to the status of any territories that came under Israeli military government control in 1967" (Article 3, paragraphs 1 and 2). Annex I provided the corresponding maps and added that, with regard to the "territory that came under Israeli military government control in 1967", the line indicated "is the administrative boundary" with Jordan.

77. Lastly, a number of agreements have been signed since 1993 between Israel and the Palestine Liberation Organization imposing various obligations on each party. Those agreements *inter alia* required Israel to transfer to Palestinian authorities certain powers and responsibilities exercised in the Occupied Palestinian Territory by its military authorities and civil administration. Such transfers have taken place, but, as a result of subsequent events, they remained partial and limited.

78. The Court would observe that, under customary international law as reflected (see paragraph 89 below) in Article 42 of the Regulations Respecting the Laws and Customs of War on Land annexed to the Fourth Hague Convention of 18 October 1907 (hereinafter "the Hague Regulations of 1907"), territory is considered occupied when it is actually placed under the authority of the hostile army, and the occupation extends only to the territory where such authority has been established and can be exercised.

The territories situated between the Green Line (see paragraph 72 above) and the former eastern boundary of Palestine under the Mandate were occupied by Israel in 1967 during the armed conflict between Israel and Jordan. Under customary international law, these were therefore occupied territories in which Israel had the status of occupying Power. Subsequent events in these territories, as described in paragraphs 75 to 77 above, have done nothing to alter this situation. All these territories (including East Jerusalem) remain occupied territories and Israel has continued to have the status of occupying Power.

\*

79. It is essentially in these territories that Israel has constructed or plans to construct the works described in the report of the Secretary-General. The Court will now describe those works, basing itself on that report. For developments subsequent to the publication of that report, the Court will refer to complementary information contained in the Written Statement of the United Nations, which was intended by the Secretary-General to supplement his report (hereinafter "Written Statement of the Secretary-General").

80. The report of the Secretary-General states that "The Government of Israel has since 1996 considered plans to halt infiltration into Israel from the central and northern West Bank . . ." (para. 4). According to that report, a plan of this type was approved for the first time by the Israeli Cabinet in July 2001. Then, on 14 April 2002, the Cabinet adopted a decision for the construction of works, forming what Israel describes as a "security fence", 80 kilometres in length, in three areas of the West Bank.

The project was taken a stage further when, on 23 June 2002, the Israeli Cabinet approved the first phase of the construction of a "continuous fence" in the West Bank (including East Jerusalem). On 14 August 2002, it adopted the line of that "fence" for the work in Phase A, with a view to the construction of a complex 123 kilometres long in the northern West Bank, running from the Salem checkpoint (north of Jenin) to the settlement at Elkana. Phase B of the work was approved in December 2002. It entailed a stretch of some 40 kilometres running east from the Salem checkpoint towards Beth Shean along the northern part of the Green Line as far as the Jordan Valley. Furthermore, on 1 October 2003, the Israeli Cabinet approved a full route, which, according to the report of the Secretary-General, "will form one continuous line stretching 720 kilometres along the West Bank". A map showing completed and planned sections was posted on the Israeli Ministry of Defence website on 23 October 2003. According to the particulars provided on that map, a continuous section (Phase C) encompassing a number of large settlements will link the north-western end of the "security fence" built around Jerusalem with the southern point of Phase A construction at Elkana. According to the same map, the "security fence" will run for 115 kilometres from the Har Gilo settlement near Jerusalem to the Carmel settlement south-east of Hebron (Phase D). According to Ministry of Defence documents, work in this sector is due for completion in 2005. Lastly, there are references in the case file to Israel's planned construction of a "security fence" following the Jordan Valley along the mountain range to the west.

81. According to the Written Statement of the Secretary-General, the first part of these works (Phase A), which ultimately extends for a distance of 150 kilometres, was declared completed on 31 July 2003. It is reported that approximately 56,000 Palestinians would be encompassed in enclaves. During this phase, two sections totalling 19.5 kilometres

were built around Jerusalem. In November 2003 construction of a new section was begun along the Green Line to the west of the Nazlat Issa-Baqa al-Sharqiya enclave, which in January 2004 was close to completion at the time when the Secretary-General submitted his Written Statement.

According to the Written Statement of the Secretary-General, the works carried out under Phase B were still in progress in January 2004. Thus an initial section of this stretch, which runs near or on the Green Line to the village of al-Mutilla, was almost complete in January 2004. Two additional sections diverge at this point. Construction started in early January 2004 on one section that runs due east as far as the Jordanian border. Construction of the second section, which is planned to run from the Green Line to the village of Taysir, has barely begun. The United Nations has, however, been informed that this second section might not be built.

The Written Statement of the Secretary-General further states that Phase C of the work, which runs from the terminus of Phase A, near the Elkana settlement, to the village of Nu'man, south-east of Jerusalem, began in December 2003. This section is divided into three stages. In Stage C1, between *inter alia* the villages of Rantis and Budrus, approximately 4 kilometres out of a planned total of 40 kilometres have been constructed. Stage C2, which will surround the so-called "Ariel Salient" by cutting 22 kilometres into the West Bank, will incorporate 52,000 Israeli settlers. Stage C3 is to involve the construction of two "depth barriers"; one of these is to run north-south, roughly parallel with the section of Stage C1 currently under construction between Rantis and Budrus, whilst the other runs east-west along a ridge said to be part of the route of Highway 45, a motorway under construction. If construction of the two barriers were completed, two enclaves would be formed, encompassing 72,000 Palestinians in 24 communities.

Further construction also started in late November 2003 along the south-eastern part of the municipal boundary of Jerusalem, following a route that, according to the Written Statement of the Secretary-General, cuts off the suburban village of El-Ezariya from Jerusalem and splits the neighbouring Abu Dis in two.

As at 25 January 2004, according to the Written Statement of the Secretary-General, some 190 kilometres of construction had been completed, covering Phase A and the greater part of Phase B. Further construction in Phase C had begun in certain areas of the central West Bank and in Jerusalem. Phase D, planned for the southern part of the West Bank, had not yet begun.

The Israeli Government has explained that the routes and timetable as described above are subject to modification. In February 2004, for example, an 8-kilometre section near the town of Baqa al-Sharqiya was

37

demolished, and the planned length of the wall appears to have been slightly reduced.

82. According to the description in the report and the Written Statement of the Secretary-General, the works planned or completed have resulted or will result in a complex consisting essentially of:

(1) a fence with electronic sensors;
(2) a ditch (up to 4 metres deep);
(3) a two-lane asphalt patrol road;
(4) a trace road (a strip of sand smoothed to detect footprints) running parallel to the fence;
(5) a stack of six coils of barbed wire marking the perimeter of the complex.

The complex has a width of 50 to 70 metres, increasing to as much as 100 metres in some places. "Depth barriers" may be added to these works.

The approximately 180 kilometres of the complex completed or under construction as of the time when the Secretary-General submitted his report included some 8.5 kilometres of concrete wall. These are generally found where Palestinian population centres are close to or abut Israel (such as near Qalqiliya and Tulkarm or in parts of Jerusalem).

83. According to the report of the Secretary-General, in its northernmost part, the wall as completed or under construction barely deviates from the Green Line. It nevertheless lies within occupied territories for most of its course. The works deviate more than 7.5 kilometres from the Green Line in certain places to encompass settlements, while encircling Palestinian population areas. A stretch of 1 to 2 kilometres west of Tulkarm appears to run on the Israeli side of the Green Line. Elsewhere, on the other hand, the planned route would deviate eastward by up to 22 kilometres. In the case of Jerusalem, the existing works and the planned route lie well beyond the Green Line and even in some cases beyond the eastern municipal boundary of Jerusalem as fixed by Israel.

84. On the basis of that route, approximately 975 square kilometres (or 16.6 per cent of the West Bank) would, according to the report of the Secretary-General, lie between the Green Line and the wall. This area is stated to be home to 237,000 Palestinians. If the full wall were completed as planned, another 160,000 Palestinians would live in almost completely encircled communities, described as enclaves in the report. As a result of the planned route, nearly 320,000 Israeli settlers (of whom 178,000 in East Jerusalem) would be living in the area between the Green Line and the wall.

85. Lastly, it should be noted that the construction of the wall has been accompanied by the creation of a new administrative régime. Thus in October 2003 the Israeli Defence Forces issued Orders establishing the

part of the West Bank lying between the Green Line and the wall as a
"Closed Area". Residents of this area may no longer remain in it, nor
may non-residents enter it, unless holding a permit or identity card issued
by the Israeli authorities. According to the report of the Secretary-
General, most residents have received permits for a limited period. Israeli
citizens, Israeli permanent residents and those eligible to immigrate
to Israel in accordance with the Law of Return may remain in, or move
freely to, from and within the Closed Area without a permit. Access to
and exit from the Closed Area can only be made through access gates,
which are opened infrequently and for short periods.

\*   \*

86. The Court will now determine the rules and principles of inter-
national law which are relevant in assessing the legality of the measures
taken by Israel. Such rules and principles can be found in the United
Nations Charter and certain other treaties, in customary international
law and in the relevant resolutions adopted pursuant to the Charter by
the General Assembly and the Security Council. However, doubts have
been expressed by Israel as to the applicability in the Occupied Palestin-
ian Territory of certain rules of international humanitarian law and
human rights instruments. The Court will now consider these various
questions.

87. The Court first recalls that, pursuant to Article 2, paragraph 4, of
the United Nations Charter:

"All Members shall refrain in their international relations from
the threat or use of force against the territorial integrity or political
independence of any State, or in any other manner inconsistent with
the Purposes of the United Nations."

On 24 October 1970, the General Assembly adopted resolution 2625
(XXV), entitled "Declaration on Principles of International Law con-
cerning Friendly Relations and Co-operation among States" (hereinafter
"resolution 2625 (XXV)"), in which it emphasized that "No territorial
acquisition resulting from the threat or use of force shall be recognized as
legal." As the Court stated in its Judgment in the case concerning *Mili-
tary and Paramilitary Activities in and against Nicaragua (Nicaragua* v.
*United States of America)*, the principles as to the use of force incorpo-
rated in the Charter reflect customary international law (see *I.C.J. Reports
1986*, pp. 98-101, paras. 187-190); the same is true of its corollary entail-
ing the illegality of territorial acquisition resulting from the threat or use
of force.

88. The Court also notes that the principle of self-determination of
peoples has been enshrined in the United Nations Charter and reaffirmed
by the General Assembly in resolution 2625 (XXV) cited above, pursuant

CONSTRUCTION OF A WALL (ADVISORY OPINION)       172

to which "Every State has the duty to refrain from any forcible action which deprives peoples referred to [in that resolution] . . . of their right to self-determination." Article 1 common to the International Covenant on Economic, Social and Cultural Rights and the International Covenant on Civil and Political Rights reaffirms the right of all peoples to self-determination, and lays upon the States parties the obligation to promote the realization of that right and to respect it, in conformity with the provisions of the United Nations Charter.

The Court would recall that in 1971 it emphasized that current developments in "international law in regard to non-self-governing territories, as enshrined in the Charter of the United Nations, made the principle of self-determination applicable to all [such territories]". The Court went on to state that "These developments leave little doubt that the ultimate objective of the sacred trust" referred to in Article 22, paragraph 1, of the Covenant of the League of Nations "was the self-determination . . . of the peoples concerned" (*Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971*, p. 31, paras. 52-53). The Court has referred to this principle on a number of occasions in its jurisprudence (*ibid.*; see also *Western Sahara, Advisory Opinion, I.C.J. Reports 1975*, p. 68, para. 162). The Court indeed made it clear that the right of peoples to self-determination is today a right *erga omnes* (see *East Timor (Portugal* v. *Australia), Judgment, I.C.J. Reports 1995*, p. 102, para. 29).

89. As regards international humanitarian law, the Court would first note that Israel is not a party to the Fourth Hague Convention of 1907, to which the Hague Regulations are annexed. The Court observes that, in the words of the Convention, those Regulations were prepared "to revise the general laws and customs of war" existing at that time. Since then, however, the International Military Tribunal of Nuremberg has found that the "rules laid down in the Convention were recognised by all civilised nations, and were regarded as being declaratory of the laws and customs of war" (Judgment of the International Military Tribunal of Nuremberg, 30 September and 1 October 1946, p. 65). The Court itself reached the same conclusion when examining the rights and duties of belligerents in their conduct of military operations (*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (I)*, p. 256, para. 75). The Court considers that the provisions of the Hague Regulations have become part of customary law, as is in fact recognized by all the participants in the proceedings before the Court.

The Court also observes that, pursuant to Article 154 of the Fourth Geneva Convention, that Convention is supplementary to Sections II and III of the Hague Regulations. Section III of those Regulations, which concerns "Military authority over the territory of the hostile State", is particularly pertinent in the present case.

40

90. Secondly, with regard to the Fourth Geneva Convention, differing views have been expressed by the participants in these proceedings. Israel, contrary to the great majority of the other participants, disputes the applicability *de jure* of the Convention to the Occupied Palestinian Territory. In particular, in paragraph 3 of Annex I to the report of the Secretary-General, entitled "Summary Legal Position of the Government of Israel", it is stated that Israel does not agree that the Fourth Geneva Convention "is applicable to the occupied Palestinian Territory", citing "the lack of recognition of the territory as sovereign prior to its annexation by Jordan and Egypt" and inferring that it is "not a territory of a High Contracting Party as required by the Convention".

91. The Court would recall that the Fourth Geneva Convention was ratified by Israel on 6 July 1951 and that Israel is a party to that Convention. Jordan has also been a party thereto since 29 May 1951. Neither of the two States has made any reservation that would be pertinent to the present proceedings.

Furthermore, Palestine gave a unilateral undertaking, by declaration of 7 June 1982, to apply the Fourth Geneva Convention. Switzerland, as depositary State, considered that unilateral undertaking valid. It concluded, however, that it "[was] not — as a depositary — in a position to decide whether" "the request [dated 14 June 1989] from the Palestine Liberation Movement in the name of the 'State of Palestine' to accede" *inter alia* to the Fourth Geneva Convention "can be considered as an instrument of accession".

92. Moreover, for the purpose of determining the scope of application of the Fourth Geneva Convention, it should be recalled that under common Article 2 of the four Conventions of 12 August 1949:

> "In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.
>
> The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.
>
> Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof."

93. After the occupation of the West Bank in 1967, the Israeli authorities issued an order No. 3 stating in its Article 35 that:

> "the Military Court . . . must apply the provisions of the Geneva Convention dated 12 August 1949 relative to the Protection of

CONSTRUCTION OF A WALL (ADVISORY OPINION)          174

Civilian Persons in Time of War with respect to judicial procedures.
In case of conflict between this Order and the said Convention,
the Convention shall prevail."

Subsequently, the Israeli authorities have indicated on a number of occasions that in fact they generally apply the humanitarian provisions of the Fourth Geneva Convention within the occupied territories. However, according to Israel's position as briefly recalled in paragraph 90 above, that Convention is not applicable *de jure* within those territories because, under Article 2, paragraph 2, it applies only in the case of occupation of territories falling under the sovereignty of a High Contracting Party involved in an armed conflict. Israel explains that Jordan was admittedly a party to the Fourth Geneva Convention in 1967, and that an armed conflict broke out at that time between Israel and Jordan, but it goes on to observe that the territories occupied by Israel subsequent to that conflict had not previously fallen under Jordanian sovereignty. It infers from this that that Convention is not applicable *de jure* in those territories. According however to the great majority of other participants in the proceedings, the Fourth Geneva Convention is applicable to those territories pursuant to Article 2, paragraph 1, whether or not Jordan had any rights in respect thereof prior to 1967.

94. The Court would recall that, according to customary international law as expressed in Article 31 of the Vienna Convention on the Law of Treaties of 23 May 1969, a treaty must be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose. Article 32 provides that:

"Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31 . . . leaves the meaning ambiguous or obscure; or . . . leads to a result which is manifestly obscure or unreasonable." (See *Oil Platforms (Islamic Republic of Iran* v. *United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996 (II)*, p. 812, para. 23; see, similarly, *Kasikili/Sedudu Island (Botswana/Namibia), Judgment, I.C.J. Reports 1999 (II)*, p. 1059, para. 18, and *Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia), Judgment, I.C.J. Reports 2002*, p. 645, para. 37.)

95. The Court notes that, according to the first paragraph of Article 2 of the Fourth Geneva Convention, that Convention is applicable when two conditions are fulfilled: that there exists an armed conflict (whether or not a state of war has been recognized); and that the conflict has arisen between two contracting parties. If those two conditions are satis-

42

fied, the Convention applies, in particular, in any territory occupied in the course of the conflict by one of the contracting parties.

The object of the second paragraph of Article 2 is not to restrict the scope of application of the Convention, as defined by the first paragraph, by excluding therefrom territories not falling under the sovereignty of one of the contracting parties. It is directed simply to making it clear that, even if occupation effected during the conflict met no armed resistance, the Convention is still applicable.

This interpretation reflects the intention of the drafters of the Fourth Geneva Convention to protect civilians who find themselves, in whatever way, in the hands of the occupying Power. Whilst the drafters of the Hague Regulations of 1907 were as much concerned with protecting the rights of a State whose territory is occupied, as with protecting the inhabitants of that territory, the drafters of the Fourth Geneva Convention sought to guarantee the protection of civilians in time of war, regardless of the status of the occupied territories, as is shown by Article 47 of the Convention.

That interpretation is confirmed by the Convention's *travaux préparatoires*. The Conference of Government Experts convened by the International Committee of the Red Cross (hereinafter, "ICRC") in the aftermath of the Second World War for the purpose of preparing the new Geneva Conventions recommended that these conventions be applicable to any armed conflict "whether [it] is or is not recognized as a state of war by the parties" and "in cases of occupation of territories in the absence of any state of war" (*Report on the Work of the Conference of Government Experts for the Study of the Conventions for the Protection of War Victims, Geneva, 14-26 April 1947*, p. 8). The drafters of the second paragraph of Article 2 thus had no intention, when they inserted that paragraph into the Convention, of restricting the latter's scope of application. They were merely seeking to provide for cases of occupation without combat, such as the occupation of Bohemia and Moravia by Germany in 1939.

96. The Court would moreover note that the States parties to the Fourth Geneva Convention approved that interpretation at their Conference on 15 July 1999. They issued a statement in which they "reaffirmed the applicability of the Fourth Geneva Convention to the Occupied Palestinian Territory, including East Jerusalem". Subsequently, on 5 December 2001, the High Contracting Parties, referring in particular to Article 1 of the Fourth Geneva Convention of 1949, once again reaffirmed the "applicability of the Fourth Geneva Convention to the Occupied Palestinian Territory, including East Jerusalem". They further reminded the Contracting Parties participating in the Conference, the parties to the conflict, and the State of Israel as occupying Power, of their respective obligations.

97. Moreover, the Court would observe that the ICRC, whose special position with respect to execution of the Fourth Geneva Convention must be "recognized and respected at all times" by the parties pursuant

to Article 142 of the Convention, has also expressed its opinion on the interpretation to be given to the Convention. In a declaration of 5 December 2001, it recalled that "the ICRC has always affirmed the *de jure* applicability of the Fourth Geneva Convention to the territories occupied since 1967 by the State of Israel, including East Jerusalem".

98. The Court notes that the General Assembly has, in many of its resolutions, taken a position to the same effect. Thus on 10 December 2001 and 9 December 2003, in resolutions 56/60 and 58/97, it reaffirmed

> "that the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, is applicable to the Occupied Palestinian Territory, including East Jerusalem, and other Arab territories occupied by Israel since 1967".

99. The Security Council, for its part, had already on 14 June 1967 taken the view in resolution 237 (1967) that "all the obligations of the Geneva Convention relative to the Treatment of Prisoners of War . . . should be complied with by the parties involved in the conflict". Subsequently, on 15 September 1969, the Security Council, in resolution 271 (1969), called upon "Israel scrupulously to observe the provisions of the Geneva Conventions and international law governing military occupation".

Ten years later, the Security Council examined "the policy and practices of Israel in establishing settlements in the Palestinian and other Arab territories occupied since 1967". In resolution 446 (1979) of 22 March 1979, the Security Council considered that those settlements had "no legal validity" and affirmed "*once more* that the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, is applicable to the Arab territories occupied by Israel since 1967, including Jerusalem". It called "*once more upon* Israel, as the occupying Power, to abide scrupulously" by that Convention.

On 20 December 1990, the Security Council, in resolution 681 (1990), urged "the Government of Israel to accept the *de jure* applicability of the Fourth Geneva Convention . . . to all the territories occupied by Israel since 1967 and to abide scrupulously by the provisions of the Convention". It further called upon "the high contracting parties to the said Fourth Geneva Convention to ensure respect by Israel, the occupying Power, for its obligations under the Convention in accordance with article 1 thereof".

Lastly, in resolutions 799 (1992) of 18 December 1992 and 904 (1994) of 18 March 1994, the Security Council reaffirmed its position concerning the applicability of the Fourth Geneva Convention in the occupied territories.

100. The Court would note finally that the Supreme Court of Israel, in a judgment dated 30 May 2004, also found that:

> "The military operations of the [Israeli Defence Forces] in Rafah,

to the extent they affect civilians, are governed by Hague Convention IV Respecting the Laws and Customs of War on Land 1907 . . . and the Geneva Convention relative to the Protection of Civilian Persons in Time of War 1949."

101. In view of the foregoing, the Court considers that the Fourth Geneva Convention is applicable in any occupied territory in the event of an armed conflict arising between two or more High Contracting Parties. Israel and Jordan were parties to that Convention when the 1967 armed conflict broke out. The Court accordingly finds that that Convention is applicable in the Palestinian territories which before the conflict lay to the east of the Green Line and which, during that conflict, were occupied by Israel, there being no need for any enquiry into the precise prior status of those territories.

*

102. The participants in the proceedings before the Court also disagree whether the international human rights conventions to which Israel is party apply within the Occupied Palestinian Territory. Annex I to the report of the Secretary-General states:

> "4. Israel denies that the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights, both of which it has signed, are applicable to the occupied Palestinian territory. It asserts that humanitarian law is the protection granted in a conflict situation such as the one in the West Bank and Gaza Strip, whereas human rights treaties were intended for the protection of citizens from their own Government in times of peace."

Of the other participants in the proceedings, those who addressed this issue contend that, on the contrary, both Covenants are applicable within the Occupied Palestinian Territory.

103. On 3 October 1991 Israel ratified both the International Covenant on Economic, Social and Cultural Rights of 19 December 1966 and the International Covenant on Civil and Political Rights of the same date, as well as the United Nations Convention on the Rights of the Child of 20 November 1989. It is a party to these three instruments.

104. In order to determine whether these texts are applicable in the Occupied Palestinian Territory, the Court will first address the issue of the relationship between international humanitarian law and human rights law and then that of the applicability of human rights instruments outside national territory.

105. In its Advisory Opinion of 8 July 1996 on the *Legality of the Threat or Use of Nuclear Weapons*, the Court had occasion to address the first of these issues in relation to the International Covenant on Civil

and Political Rights. In those proceedings certain States had argued that "the Covenant was directed to the protection of human rights in peace-time, but that questions relating to unlawful loss of life in hostilities were governed by the law applicable in armed conflict" (*I.C.J. Reports 1996 (I)*, p. 239, para. 24).

The Court rejected this argument, stating that:

> "the protection of the International Covenant of Civil and Political Rights does not cease in times of war, except by operation of Article 4 of the Covenant whereby certain provisions may be derogated from in a time of national emergency. Respect for the right to life is not, however, such a provision. In principle, the right not arbitrarily to be deprived of one's life applies also in hostilities. The test of what is an arbitrary deprivation of life, however, then falls to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict which is designed to regulate the conduct of hostilities." (*Ibid.*, p. 240, para. 25.)

106. More generally, the Court considers that the protection offered by human rights conventions does not cease in case of armed conflict, save through the effect of provisions for derogation of the kind to be found in Article 4 of the International Covenant on Civil and Political Rights. As regards the relationship between international humanitarian law and human rights law, there are thus three possible situations: some rights may be exclusively matters of international humanitarian law; others may be exclusively matters of human rights law; yet others may be matters of both these branches of international law. In order to answer the question put to it, the Court will have to take into consideration both these branches of international law, namely human rights law and, as *lex specialis*, international humanitarian law.

107. It remains to be determined whether the two international Covenants and the Convention on the Rights of the Child are applicable only on the territories of the States parties thereto or whether they are also applicable outside those territories and, if so, in what circumstances.

108. The scope of application of the International Covenant on Civil and Political Rights is defined by Article 2, paragraph 1, thereof, which provides:

> "Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

This provision can be interpreted as covering only individuals who are both present within a State's territory and subject to that State's jurisdiction. It can also be construed as covering both individuals present within a State's territory and those outside that territory but subject to that State's jurisdiction. The Court will thus seek to determine the meaning to be given to this text.

109. The Court would observe that, while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions.

The constant practice of the Human Rights Committee is consistent with this. Thus, the Committee has found the Covenant applicable where the State exercises its jurisdiction on foreign territory. It has ruled on the legality of acts by Uruguay in cases of arrests carried out by Uruguayan agents in Brazil or Argentina (case No. 52/79, *López Burgos* v. *Uruguay*; case No. 56/79, *Lilian Celiberti de Casariego* v. *Uruguay*). It decided to the same effect in the case of the confiscation of a passport by a Uruguayan consulate in Germany (case No. 106/81, *Montero* v. *Uruguay*).

The *travaux préparatoires* of the Covenant confirm the Committee's interpretation of Article 2 of that instrument. These show that, in adopting the wording chosen, the drafters of the Covenant did not intend to allow States to escape from their obligations when they exercise jurisdiction outside their national territory. They only intended to prevent persons residing abroad from asserting, vis-à-vis their State of origin, rights that do not fall within the competence of that State, but of that of the State of residence (see the discussion of the preliminary draft in the Commission on Human Rights, E/CN.4/SR.194, para. 46; and United Nations, *Official Records of the General Assembly, Tenth Session, Annexes*, A/2929, Part II, Chap. V, para. 4 (1955)).

110. The Court takes note in this connection of the position taken by Israel, in relation to the applicability of the Covenant, in its communications to the Human Rights Committee, and of the view of the Committee.

In 1998, Israel stated that, when preparing its report to the Committee, it had had to face the question "whether individuals resident in the occupied territories were indeed subject to Israel's jurisdiction" for purposes of the application of the Covenant (CCPR/C/SR.1675, para. 21). Israel took the position that "the Covenant and similar instruments did not apply directly to the current situation in the occupied territories" (*ibid.*, para. 27).

The Committee, in its concluding observations after examination of the report, expressed concern at Israel's attitude and pointed "to the long-standing presence of Israel in [the occupied] territories, Israel's

ambiguous attitude towards their future status, as well as the exercise of effective jurisdiction by Israeli security forces therein" (CCPR/C/79/Add.93, para. 10). In 2003 in face of Israel's consistent position, to the effect that "the Covenant does not apply beyond its own territory, notably in the West Bank and Gaza . . .", the Committee reached the following conclusion:

> "in the current circumstances, the provisions of the Covenant apply to the benefit of the population of the Occupied Territories, for all conduct by the State party's authorities or agents in those territories that affect the enjoyment of rights enshrined in the Covenant and fall within the ambit of State responsibility of Israel under the principles of public international law" (CCPR/CO/78/ISR, para. 11).

111. In conclusion, the Court considers that the International Covenant on Civil and Political Rights is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory.

112. The International Covenant on Economic, Social and Cultural Rights contains no provision on its scope of application. This may be explicable by the fact that this Covenant guarantees rights which are essentially territorial. However, it is not to be excluded that it applies both to territories over which a State party has sovereignty and to those over which that State exercises territorial jurisdiction. Thus Article 14 makes provision for transitional measures in the case of any State which "at the time of becoming a Party, has not been able to secure in its metropolitan territory or other territories under its jurisdiction compulsory primary education, free of charge".

It is not without relevance to recall in this regard the position taken by Israel in its reports to the Committee on Economic, Social and Cultural Rights. In its initial report to the Committee of 4 December 1998, Israel provided "statistics indicating the enjoyment of the rights enshrined in the Covenant by Israeli settlers in the occupied Territories". The Committee noted that, according to Israel, "the Palestinian population within the same jurisdictional areas were excluded from both the report and the protection of the Covenant" (E/C.12/1/Add.27, para. 8). The Committee expressed its concern in this regard, to which Israel replied in a further report of 19 October 2001 that it has "consistently maintained that the Covenant does not apply to areas that are not subject to its sovereign territory and jurisdiction" (a formula inspired by the language of the International Covenant on Civil and Political Rights). This position, continued Israel, is "based on the well-established distinction between human rights and humanitarian law under international law". It added: "the Committee's mandate cannot relate to events in the West Bank and the Gaza Strip, inasmuch as they are part and parcel of the context of armed conflict as distinct from a relationship of human rights" (E/1990/6/Add.32, para. 5). In view of these observations, the Committee reiterated

its concern about Israel's position and reaffirmed "its view that the State party's obligations under the Covenant apply to all territories and populations under its effective control" (E/C.12/1/Add.90, paras. 15 and 31).

For the reasons explained in paragraph 106 above, the Court cannot accept Israel's view. It would also observe that the territories occupied by Israel have for over 37 years been subject to its territorial jurisdiction as the occupying Power. In the exercise of the powers available to it on this basis, Israel is bound by the provisions of the International Covenant on Economic, Social and Cultural Rights. Furthermore, it is under an obligation not to raise any obstacle to the exercise of such rights in those fields where competence has been transferred to Palestinian authorities.

113. As regards the Convention on the Rights of the Child of 20 November 1989, that instrument contains an Article 2 according to which "States Parties shall respect and ensure the rights set forth in the . . . Convention to each child within their jurisdiction . . .". That Convention is therefore applicable within the Occupied Palestinian Territory.

\*   \*

114. Having determined the rules and principles of international law relevant to reply to the question posed by the General Assembly, and having ruled in particular on the applicability within the Occupied Palestinian Territory of international humanitarian law and human rights law, the Court will now seek to ascertain whether the construction of the wall has violated those rules and principles.

\*

115. In this regard, Annex II to the report of the Secretary-General, entitled "Summary Legal Position of the Palestine Liberation Organization", states that "The construction of the Barrier is an attempt to annex the territory contrary to international law" and that "The de facto annexation of land interferes with the territorial sovereignty and consequently with the right of the Palestinians to self-determination." This view was echoed in certain of the written statements submitted to the Court and in the views expressed at the hearings. *Inter alia*, it was contended that:

> "The wall severs the territorial sphere over which the Palestinian people are entitled to exercise their right of self-determination and constitutes a violation of the legal principle prohibiting the acquisition of territory by the use of force."

In this connection, it was in particular emphasized that "[t]he route of the wall is designed to change the demographic composition of the Occupied Palestinian Territory, including East Jerusalem, by reinforcing the Israeli

settlements" illegally established on the Occupied Palestinian Territory. It was further contended that the wall aimed at "reducing and parcelling out the territorial sphere over which the Palestinian people are entitled to exercise their right of self-determination".

116. For its part, Israel has argued that the wall's sole purpose is to enable it effectively to combat terrorist attacks launched from the West Bank. Furthermore, Israel has repeatedly stated that the Barrier is a temporary measure (see report of the Secretary-General, para. 29). It did so *inter alia* through its Permanent Representative to the United Nations at the Security Council meeting of 14 October 2003, emphasizing that "[the fence] does not annex territories to the State of Israel", and that Israel is "ready and able, at tremendous cost, to adjust or dismantle a fence if so required as part of a political settlement" (S/PV.4841, p. 10). Israel's Permanent Representative restated this view before the General Assembly on 20 October and 8 December 2003. On this latter occasion, he added:

> "As soon as the terror ends, the fence will no longer be necessary. The fence is not a border and has no political significance. It does not change the legal status of the territory in any way." (A/ES-10/PV.23, p. 6.)

117. The Court would recall that both the General Assembly and the Security Council have referred, with regard to Palestine, to the customary rule of "the inadmissibility of the acquisition of territory by war" (see paragraphs 74 and 87 above). Thus in resolution 242 (1967) of 22 November 1967, the Security Council, after recalling this rule, affirmed that:

> "the fulfilment of Charter principles requires the establishment of a just and lasting peace in the Middle East which should include the application of both the following principles:
>
> (i) Withdrawal of Israel armed forces from territories occupied in the recent conflict;
> (ii) Termination of all claims or states of belligerency and respect for and acknowledgement of the sovereignty, territorial integrity and political independence of every State in the area and their right to live in peace within secure and recognized boundaries free from threats or acts of force".

It is on this same basis that the Council has several times condemned the measures taken by Israel to change the status of Jerusalem (see paragraph 75 above).

118. As regards the principle of the right of peoples to self-determination, the Court observes that the existence of a "Palestinian people" is no

longer in issue. Such existence has moreover been recognized by Israel in the exchange of letters of 9 September 1993 between Mr. Yasser Arafat, President of the Palestine Liberation Organization (PLO) and Mr. Yitzhak Rabin, Israeli Prime Minister. In that correspondence, the President of the PLO recognized "the right of the State of Israel to exist in peace and security" and made various other commitments. In reply, the Israeli Prime Minister informed him that, in the light of those commitments, "the Government of Israel has decided to recognize the PLO as the representative of the Palestinian people". The Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip of 28 September 1995 also refers a number of times to the Palestinian people and its "legitimate rights" (Preamble, paras. 4, 7, 8; Article II, para. 2; Article III, paras. 1 and 3; Article XXII, para. 2). The Court considers that those rights include the right to self-determination, as the General Assembly has moreover recognized on a number of occasions (see, for example, resolution 58/163 of 22 December 2003).

119. The Court notes that the route of the wall as fixed by the Israeli Government includes within the "Closed Area" (see paragraph 85 above) some 80 per cent of the settlers living in the Occupied Palestinian Territory. Moreover, it is apparent from an examination of the map mentioned in paragraph 80 above that the wall's sinuous route has been traced in such a way as to include within that area the great majority of the Israeli settlements in the occupied Palestinian Territory (including East Jerusalem).

120. As regards these settlements, the Court notes that Article 49, paragraph 6, of the Fourth Geneva Convention provides: "The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies." That provision prohibits not only deportations or forced transfers of population such as those carried out during the Second World War, but also any measures taken by an occupying Power in order to organize or encourage transfers of parts of its own population into the occupied territory.

In this respect, the information provided to the Court shows that, since 1977, Israel has conducted a policy and developed practices involving the establishment of settlements in the Occupied Palestinian Territory, contrary to the terms of Article 49, paragraph 6, just cited.

The Security Council has thus taken the view that such policy and practices "have no legal validity". It has also called upon "Israel, as the occupying Power, to abide scrupulously" by the Fourth Geneva Convention and:

> "to rescind its previous measures and to desist from taking any action which would result in changing the legal status and geographical nature and materially affecting the demographic composition of the Arab territories occupied since 1967, including Jerusalem

and, in particular, not to transfer parts of its own civilian population into the occupied Arab territories" (resolution 446 (1979) of 22 March 1979).

The Council reaffirmed its position in resolutions 452 (1979) of 20 July 1979 and 465 (1980) of 1 March 1980. Indeed, in the latter case it described "Israel's policy and practices of settling parts of its population and new immigrants in [the occupied] territories" as a "flagrant violation" of the Fourth Geneva Convention.

The Court concludes that the Israeli settlements in the Occupied Palestinian Territory (including East Jerusalem) have been established in breach of international law.

121. Whilst the Court notes the assurance given by Israel that the construction of the wall does not amount to annexation and that the wall is of a temporary nature (see paragraph 116 above), it nevertheless cannot remain indifferent to certain fears expressed to it that the route of the wall will prejudge the future frontier between Israel and Palestine, and the fear that Israel may integrate the settlements and their means of access. The Court considers that the construction of the wall and its associated régime create a "fait accompli" on the ground that could well become permanent, in which case, and notwithstanding the formal characterization of the wall by Israel, it would be tantamount to *de facto* annexation.

122. The Court recalls moreover that, according to the report of the Secretary-General, the planned route would incorporate in the area between the Green Line and the wall more than 16 per cent of the territory of the West Bank. Around 80 per cent of the settlers living in the Occupied Palestinian Territory, that is 320,000 individuals, would reside in that area, as well as 237,000 Palestinians. Moreover, as a result of the construction of the wall, around 160,000 other Palestinians would reside in almost completely encircled communities (see paragraphs 84, 85 and 119 above).

In other terms, the route chosen for the wall gives expression *in loco* to the illegal measures taken by Israel with regard to Jerusalem and the settlements, as deplored by the Security Council (see paragraphs 75 and 120 above). There is also a risk of further alterations to the demographic composition of the Occupied Palestinian Territory resulting from the construction of the wall inasmuch as it is contributing, as will be further explained in paragraph 133 below, to the departure of Palestinian populations from certain areas. That construction, along with measures taken previously, thus severely impedes the exercise by the Palestinian people of its right to self-determination, and is therefore a breach of Israel's obligation to respect that right.

*

123. The construction of the wall also raises a number of issues in rela-

tion to the relevant provisions of international humanitarian law and of human rights instruments.

124. With regard to the Hague Regulations of 1907, the Court would recall that these deal, in Section II, with hostilities and in particular with "means of injuring the enemy, sieges, and bombardments". Section III deals with military authority in occupied territories. Only Section III is currently applicable in the West Bank and Article 23 *(g)* of the Regulations, in Section II, is thus not pertinent.

Section III of the Hague Regulations includes Articles 43, 46 and 52, which are applicable in the Occupied Palestinian Territory. Article 43 imposes a duty on the occupant to "take all measures within his power to restore, and, as far as possible, to insure public order and life, respecting the laws in force in the country". Article 46 adds that private property must be "respected" and that it cannot "be confiscated". Lastly, Article 52 authorizes, within certain limits, requisitions in kind and services for the needs of the army of occupation.

125. A distinction is also made in the Fourth Geneva Convention between provisions applying during military operations leading to occupation and those that remain applicable throughout the entire period of occupation. It thus states in Article 6:

> "The present Convention shall apply from the outset of any conflict or occupation mentioned in Article 2.
>
> In the territory of Parties to the conflict, the application of the present Convention shall cease on the general close of military operations.
>
> In the case of occupied territory, the application of the present Convention shall cease one year after the general close of military operations; however, the Occupying Power shall be bound, for the duration of the occupation, to the extent that such Power exercises the functions of government in such territory, by the provisions of the following Articles of the present Convention: 1 to 12, 27, 29 to 34, 47, 49, 51, 52, 53, 59, 61 to 77, 143.
>
> Protected persons whose release, repatriation or re-establishment may take place after such dates shall meanwhile continue to benefit by the present Convention."

Since the military operations leading to the occupation of the West Bank in 1967 ended a long time ago, only those Articles of the Fourth Geneva Convention referred to in Article 6, paragraph 3, remain applicable in that occupied territory.

126. These provisions include Articles 47, 49, 52, 53 and 59 of the Fourth Geneva Convention.

According to Article 47:

> "Protected persons who are in occupied territory shall not be

Case 1:18-cv-01884-RGA   Document 10-1   Filed 01/29/19   Page 55 of 145 PageID #: 147

CONSTRUCTION OF A WALL (ADVISORY OPINION)       186

deprived, in any case or in any manner whatsoever, of the benefits of the present Convention by any change introduced, as the result of the occupation of a territory, into the institutions or government of the said territory, nor by any agreement concluded between the authorities of the occupied territories and the Occupying Power, nor by any annexation by the latter of the whole or part of the occupied territory."

Article 49 reads as follows:

"Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, are prohibited, regardless of their motive.

Nevertheless, the Occupying Power may undertake total or partial evacuation of a given area if the security of the population or imperative military reasons so demand. Such evacuations may not involve the displacement of protected persons outside the bounds of the occupied territory except when for material reasons it is impossible to avoid such displacement. Persons thus evacuated shall be transferred back to their homes as soon as hostilities in the area in question have ceased.

The Occupying Power undertaking such transfers or evacuations shall ensure, to the greatest practicable extent, that proper accommodation is provided to receive the protected persons, that the removals are effected in satisfactory conditions of hygiene, health, safety and nutrition, and that members of the same family are not separated.

The Protecting Power shall be informed of any transfers and evacuations as soon as they have taken place.

The Occupying Power shall not detain protected persons in an area particularly exposed to the dangers of war unless the security of the population or imperative military reasons so demand.

The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies."

According to Article 52:

"No contract, agreement or regulation shall impair the right of any worker, whether voluntary or not and wherever he may be, to apply to the representatives of the Protecting Power in order to request the said Power's intervention.

All measures aiming at creating unemployment or at restricting the opportunities offered to workers in an occupied territory, in order to induce them to work for the Occupying Power, are prohibited."

54

Article 53 provides that:

> "Any destruction by the Occupying Power of real or personal property belonging individually or collectively to private persons, or to the State, or to other public authorities, or to social or co-operative organizations, is prohibited, except where such destruction is rendered absolutely necessary by military operations."

Lastly, according to Article 59:

> "If the whole or part of the population of an occupied territory is inadequately supplied, the Occupying Power shall agree to relief schemes on behalf of the said population, and shall facilitate them by all the means at its disposal.
>
> Such schemes, which may be undertaken either by States or by impartial humanitarian organizations such as the International Committee of the Red Cross, shall consist, in particular, of the provision of consignments of foodstuffs, medical supplies and clothing.
>
> All Contracting Parties shall permit the free passage of these consignments and shall guarantee their protection.
>
> A Power granting free passage to consignments on their way to territory occupied by an adverse Party to the conflict shall, however, have the right to search the consignments, to regulate their passage according to prescribed times and routes, and to be reasonably satisfied through the Protecting Power that these consignments are to be used for the relief of the needy population and are not to be used for the benefit of the Occupying Power."

127. The International Covenant on Civil and Political Rights also contains several relevant provisions. Before further examining these, the Court will observe that Article 4 of the Covenant allows for derogation to be made, under various conditions, to certain provisions of that instrument. Israel made use of its right of derogation under this Article by addressing the following communication to the Secretary-General of the United Nations on 3 October 1991:

> "Since its establishment, the State of Israel has been the victim of continuous threats and attacks on its very existence as well as on the life and property of its citizens.
>
> These have taken the form of threats of war, of actual armed attacks, and campaigns of terrorism resulting in the murder of and injury to human beings.
>
> In view of the above, the State of Emergency which was proclaimed in May 1948 has remained in force ever since. This situation constitutes a public emergency within the meaning of article 4 (1) of the Covenant.
>
> The Government of Israel has therefore found it necessary, in accordance with the said article 4, to take measures to the extent strictly required by the exigencies of the situation, for the defence of

the State and for the protection of life and property, including the
exercise of powers of arrest and detention.

In so far as any of these measures are inconsistent with article 9 of
the Covenant, Israel thereby derogates from its obligations under
that provision."

The Court notes that the derogation so notified concerns only Article 9
of the International Covenant on Civil and Political Rights, which deals
with the right to liberty and security of person and lays down the rules
applicable in cases of arrest or detention. The other Articles of the
Covenant therefore remain applicable not only on Israeli territory, but
also on the Occupied Palestinian Territory.

128. Among these mention must be made of Article 17, paragraph 1 of
which reads as follows: "No one shall be subjected to arbitrary or un-
lawful interference with his privacy, family, home or correspondence, nor
to unlawful attacks on his honour and reputation."

Mention must also be made of Article 12, paragraph 1, which pro-
vides: "Everyone lawfully within the territory of a State shall, within that
territory, have the right to liberty of movement and freedom to choose
his residence."

129. In addition to the general guarantees of freedom of movement
under Article 12 of the International Covenant on Civil and Political
Rights, account must also be taken of specific guarantees of access to the
Christian, Jewish and Islamic Holy Places. The status of the Christian
Holy Places in the Ottoman Empire dates far back in time, the latest pro-
visions relating thereto having been incorporated into Article 62 of the
Treaty of Berlin of 13 July 1878. The Mandate for Palestine given to the
British Government on 24 July 1922 included an Article 13, under which:

"All responsibility in connection with the Holy Places and reli-
gious buildings or sites in Palestine, including that of preserving
existing rights and of securing free access to the Holy Places, reli-
gious buildings and sites and the free exercise of worship, while
ensuring the requirements of public order and decorum, is assumed
by the Mandatory . . ."

Article 13 further stated: "nothing in this mandate shall be construed as
conferring . . . authority to interfere with the fabric or the management of
purely Moslem sacred shrines, the immunities of which are guaranteed".

In the aftermath of the Second World War, the General Assembly, in
adopting resolution 181 (II) on the future government of Palestine,
devoted an entire chapter of the Plan of Partition to the Holy Places, reli-
gious buildings and sites. Article 2 of this Chapter provided, in so far as
the Holy Places were concerned:

"the liberty of access, visit and transit shall be guaranteed, in con-
formity with existing rights, to all residents and citizens [of the Arab

State, of the Jewish State] and of the City of Jerusalem, as well as to aliens, without distinction as to nationality, subject to requirements of national security, public order and decorum".

Subsequently, in the aftermath of the armed conflict of 1948, the 1949 General Armistice Agreement between Jordan and Israel provided in Article VIII for the establishment of a special committee for "the formulation of agreed plans and arrangements for such matters as either Party may submit to it" for the purpose of enlarging the scope of the Agreement and of effecting improvement in its application. Such matters, on which an agreement of principle had already been concluded, included "free access to the Holy Places".

This commitment concerned mainly the Holy Places located to the east of the Green Line. However, some Holy Places were located west of that Line. This was the case of the Room of the Last Supper and the Tomb of David, on Mount Zion. In signing the General Armistice Agreement, Israel thus undertook, as did Jordan, to guarantee freedom of access to the Holy Places. The Court considers that this undertaking by Israel has remained valid for the Holy Places which came under its control in 1967. This undertaking has further been confirmed by Article 9, paragraph 1, of the 1994 Peace Treaty between Israel and Jordan, by virtue of which, in more general terms, "Each party will provide freedom of access to places of religious and historical significance."

130. As regards the International Covenant on Economic, Social and Cultural Rights, that instrument includes a number of relevant provisions, namely: the right to work (Arts. 6 and 7); protection and assistance accorded to the family and to children and young persons (Art. 10); the right to an adequate standard of living, including adequate food, clothing and housing, and the right "to be free from hunger" (Art. 11); the right to health (Art. 12); the right to education (Arts. 13 and 14).

131. Lastly, the United Nations Convention on the Rights of the Child of 20 November 1989 includes similar provisions in Articles 16, 24, 27 and 28.

*

132. From the information submitted to the Court, particularly the report of the Secretary-General, it appears that the construction of the wall has led to the destruction or requisition of properties under conditions which contravene the requirements of Articles 46 and 52 of the Hague Regulations of 1907 and of Article 53 of the Fourth Geneva Convention.

133. That construction, the establishment of a closed area between the Green Line and the wall itself and the creation of enclaves have moreover imposed substantial restrictions on the freedom of movement of the inhabitants of the Occupied Palestinian Territory (with the exception of

Israeli citizens and those assimilated thereto). Such restrictions are most marked in urban areas, such as the Qalqiliya enclave or the City of Jerusalem and its suburbs. They are aggravated by the fact that the access gates are few in number in certain sectors and opening hours appear to be restricted and unpredictably applied. For example, according to the Special Rapporteur of the Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967, "Qalqiliya, a city with a population of 40,000, is completely surrounded by the Wall and residents can only enter and leave through a single military checkpoint open from 7 a.m. to 7 p.m." (Report of the Special Rapporteur of the Commission on Human Rights, John Dugard, on the situation of human rights in the Palestinian territories occupied by Israel since 1967, submitted in accordance with Commission resolution 1993/2 A and entitled "Question of the Violation of Human Rights in the Occupied Arab Territories, including Palestine", E/CN.4/2004/6, 8 September 2003, para. 9.)

There have also been serious repercussions for agricultural production, as is attested by a number of sources. According to the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories

> "an estimated 100,000 dunums [approximately 10,000 hectares] of the West Bank's most fertile agricultural land, confiscated by the Israeli Occupation Forces, have been destroyed during the first phase of the wall construction, which involves the disappearance of vast amounts of property, notably private agricultural land and olive trees, wells, citrus grows and hothouses upon which tens of thousands of Palestinians rely for their survival" (Report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories, A/58/311, 22 August 2003, para. 26).

Further, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied by Israel since 1967 states that "Much of the Palestinian land on the Israeli side of the Wall consists of fertile agricultural land and some of the most important water wells in the region" and adds that "Many fruit and olive trees had been destroyed in the course of building the barrier" (E/CN.4/2004/6, 8 September 2003, para. 9). The Special Rapporteur on the Right to Food of the United Nations Commission on Human Rights states that construction of the wall "cuts off Palestinians from their agricultural lands, wells and means of subsistence" (Report by the Special Rapporteur of the United Nations Commission on Human Rights, Jean Ziegler, "The Right to Food", Addendum, Mission to the Occupied Palestinian Territories, E/CN.4/2004/10/Add.2, 31 October 2003, para. 49). In a recent survey conducted by the World Food Programme, it is stated that the situation has aggra-

vated food insecurity in the region, which reportedly numbers 25,000 new beneficiaries of food aid (report of the Secretary-General, para. 25).

It has further led to increasing difficulties for the population concerned regarding access to health services, educational establishments and primary sources of water. This is also attested by a number of different information sources. Thus the report of the Secretary-General states generally that "According to the Palestinian Central Bureau of Statistics, so far the Barrier has separated 30 localities from health services, 22 from schools, 8 from primary water sources and 3 from electricity networks." (Report of the Secretary-General, para. 23.) The Special Rapporteur of the United Nations Commission on Human Rights on the situation of human rights in the Palestinian territories occupied by Israel since 1967 states that "Palestinians between the Wall and Green Line will effectively be cut off from their land and workplaces, schools, health clinics and other social services." (E/CN.4/2004/6, 8 September 2003, para. 9.) In relation specifically to water resources, the Special Rapporteur on the Right to Food of the United Nations Commission on Human Rights observes that "By constructing the fence Israel will also effectively annex most of the western aquifer system (which provides 51 per cent of the West Bank's water resources)." (E/CN.4/2004/10/Add.2, 31 October 2003, para. 51.) Similarly. in regard to access to health services, it has been stated that, as a result of the enclosure of Qalqiliya, a United Nations hospital in that town has recorded a 40 per cent decrease in its caseload (report of the Secretary-General, para. 24).

At Qalqiliya, according to reports furnished to the United Nations, some 600 shops or businesses have shut down, and 6,000 to 8,000 people have already left the region (E/CN.4/2004/6, 8 September 2003, para. 10; E/CN.4/2004/10/Add.2, 31 October 2003, para. 51). The Special Rapporteur on the Right to Food of the United Nations Commission on Human Rights has also observed that "With the fence/wall cutting communities off from their land and water without other means of subsistence, many of the Palestinians living in these areas will be forced to leave." (E/CN.4/2004/10/Add.2, 31 October 2003, para. 51.) In this respect also the construction of the wall would effectively deprive a significant number of Palestinians of the "freedom to choose [their] residence". In addition, however, in the view of the Court, since a significant number of Palestinians have already been compelled by the construction of the wall and its associated régime to depart from certain areas, a process that will continue as more of the wall is built, that construction, coupled with the establishment of the Israeli settlements mentioned in paragraph 120 above, is tending to alter the demographic composition of the Occupied Palestinian Territory.

134. To sum up, the Court is of the opinion that the construction of the wall and its associated régime impede the liberty of movement of the inhabitants of the Occupied Palestinian Territory (with the exception

59

of Israeli citizens and those assimilated thereto) as guaranteed under Article 12, paragraph 1, of the International Covenant on Civil and Political Rights. They also impede the exercise by the persons concerned of the right to work, to health, to education and to an adequate standard of living as proclaimed in the International Covenant on Economic, Social and Cultural Rights and in the United Nations Convention on the Rights of the Child. Lastly, the construction of the wall and its associated régime, by contributing to the demographic changes referred to in paragraphs 122 and 133 above, contravene Article 49, paragraph 6, of the Fourth Geneva Convention and the Security Council resolutions cited in paragraph 120 above.

135. The Court would observe, however, that the applicable international humanitarian law contains provisions enabling account to be taken of military exigencies in certain circumstances.

Neither Article 46 of the Hague Regulations of 1907 nor Article 47 of the Fourth Geneva Convention contain any qualifying provision of this type. With regard to forcible transfers of population and deportations, which are prohibited under Article 49, paragraph 1, of the Convention, paragraph 2 of that Article provides for an exception in those cases in which "the security of the population or imperative military reasons so demand". This exception however does not apply to paragraph 6 of that Article, which prohibits the occupying Power from deporting or transferring parts of its own civilian population into the territories it occupies. As to Article 53 concerning the destruction of personal property, it provides for an exception "where such destruction is rendered absolutely necessary by military operations".

The Court considers that the military exigencies contemplated by these texts may be invoked in occupied territories even after the general close of the military operations that led to their occupation. However, on the material before it, the Court is not convinced that the destructions carried out contrary to the prohibition in Article 53 of the Fourth Geneva Convention were rendered absolutely necessary by military operations.

136. The Court would further observe that some human rights conventions, and in particular the International Covenant on Civil and Political Rights, contain provisions which States parties may invoke in order to derogate, under various conditions, from certain of their conventional obligations. In this respect, the Court would however recall that the communication notified by Israel to the Secretary-General of the United Nations under Article 4 of the International Covenant on Civil and Political Rights concerns only Article 9 of the Covenant, relating to the right to freedom and security of person (see paragraph 127 above); Israel is accordingly bound to respect all the other provisions of that instrument.

The Court would note, moreover, that certain provisions of human rights conventions contain clauses qualifying the rights covered by those provisions. There is no clause of this kind in Article 17 of the Interna-

tional Covenant on Civil and Political Rights. On the other hand,
Article 12, paragraph 3, of that instrument provides that restrictions
on liberty of movement as guaranteed under that Article

> "shall not be subject to any restrictions except those which are pro-
> vided by law, are necessary to protect national security, public order
> *(ordre public)*, public health or morals or the rights and freedoms of
> others, and are consistent with the other rights recognized in the
> present Covenant".

As for the International Covenant on Economic, Social and Cultural
Rights, Article 4 thereof contains a general provision as follows:

> "The States Parties to the present Covenant recognize that, in the
> enjoyment of those rights provided by the State in conformity with
> the present Covenant, the State may subject such rights only to such
> limitations as are determined by law only in so far as this may be
> compatible with the nature of these rights and solely for the purpose
> of promoting the general welfare in a democratic society."

The Court would observe that the restrictions provided for under
Article 12, paragraph 3, of the International Covenant on Civil and
Political Rights are, by the very terms of that provision, exceptions to
the right of freedom of movement contained in paragraph 1. In addition, it
is not sufficient that such restrictions be directed to the ends authorized;
they must also be necessary for the attainment of those ends. As the
Human Rights Committee put it, they "must conform to the principle
of proportionality" and "must be the least intrusive instrument amongst
those which might achieve the desired result" (CCPR/C/21/Rev.1/Add.9,
General Comment No. 27, para. 14). On the basis of the information
available to it, the Court finds that these conditions are not met in
the present instance.

The Court would further observe that the restrictions on the enjoyment
by the Palestinians living in the territory occupied by Israel of their eco-
nomic, social and cultural rights, resulting from Israel's construction of
the wall, fail to meet a condition laid down by Article 4 of the Interna-
tional Covenant on Economic, Social and Cultural Rights, that is to say
that their implementation must be "solely for the purpose of promoting
the general welfare in a democratic society".

137. To sum up, the Court, from the material available to it, is not
convinced that the specific course Israel has chosen for the wall was
necessary to attain its security objectives. The wall, along the route
chosen, and its associated régime gravely infringe a number of rights of
Palestinians residing in the territory occupied by Israel, and the infringe-
ments resulting from that route cannot be justified by military exigencies
or by the requirements of national security or public order. The construc-
tion of such a wall accordingly constitutes breaches by Israel of various

of its obligations under the applicable international humanitarian law and human rights instruments.

<div align="center">*</div>

138. The Court has thus concluded that the construction of the wall constitutes action not in conformity with various international legal obligations incumbent upon Israel. However, Annex I to the report of the Secretary-General states that, according to Israel: "the construction of the Barrier is consistent with Article 51 of the Charter of the United Nations, its inherent right to self-defence and Security Council resolutions 1368 (2001) and 1373 (2001)". More specifically, Israel's Permanent Representative to the United Nations asserted in the General Assembly on 20 October 2003 that "the fence is a measure wholly consistent with the right of States to self-defence enshrined in Article 51 of the Charter"; the Security Council resolutions referred to, he continued, "have clearly recognized the right of States to use force in self-defence against terrorist attacks", and therefore surely recognize the right to use non-forcible measures to that end (A/ES-10/PV.21, p. 6).

139. Under the terms of Article 51 of the Charter of the United Nations:

> "Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security."

Article 51 of the Charter thus recognizes the existence of an inherent right of self-defence in the case of armed attack by one State against another State. However, Israel does not claim that the attacks against it are imputable to a foreign State.

The Court also notes that Israel exercises control in the Occupied Palestinian Territory and that, as Israel itself states, the threat which it regards as justifying the construction of the wall originates within, and not outside, that territory. The situation is thus different from that contemplated by Security Council resolutions 1368 (2001) and 1373 (2001), and therefore Israel could not in any event invoke those resolutions in support of its claim to be exercising a right of self-defence.

Consequently, the Court concludes that Article 51 of the Charter has no relevance in this case.

140. The Court has, however, considered whether Israel could rely on a state of necessity which would preclude the wrongfulness of the construction of the wall. In this regard the Court is bound to note that some of the conventions at issue in the present instance include qualifying clauses of the rights guaranteed or provisions for derogation (see para-

graphs 135 and 136 above). Since those treaties already address considerations of this kind within their own provisions, it might be asked whether a state of necessity as recognized in customary international law could be invoked with regard to those treaties as a ground for precluding the wrongfulness of the measures or decisions being challenged. However, the Court will not need to consider that question. As the Court observed in the case concerning the *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, "the state of necessity is a ground recognized by customary international law" that "can only be accepted on an exceptional basis"; it "can only be invoked under certain strictly defined conditions which must be cumulatively satisfied; and the State concerned is not the sole judge of whether those conditions have been met" (*I.C.J. Reports 1997*, p. 40, para. 51). One of those conditions was stated by the Court in terms used by the International Law Commission, in a text which in its present form requires that the act being challenged be "the only way for the State to safeguard an essential interest against a grave and imminent peril" (Article 25 of the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts; see also former Article 33 of the Draft Articles on the International Responsibility of States, with slightly different wording in the English text). In the light of the material before it, the Court is not convinced that the construction of the wall along the route chosen was the only means to safeguard the interests of Israel against the peril which it has invoked as justification for that construction.

141. The fact remains that Israel has to face numerous indiscriminate and deadly acts of violence against its civilian population. It has the right, and indeed the duty, to respond in order to protect the life of its citizens. The measures taken are bound nonetheless to remain in conformity with applicable international law.

142. In conclusion, the Court considers that Israel cannot rely on a right of self-defence or on a state of necessity in order to preclude the wrongfulness of the construction of the wall resulting from the considerations mentioned in paragraphs 122 and 137 above. The Court accordingly finds that the construction of the wall, and its associated régime, are contrary to international law.

\* \* \*

143. The Court having concluded that, by the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, and by adopting its associated régime, Israel has violated various international obligations incumbent upon it (see paragraphs 114-137 above), it must now, in order to reply to the question posed by the General Assembly, examine the consequences of those violations.

\* \*

144. In their written and oral observations, many participants in the proceedings before the Court contended that Israel's action in illegally constructing this wall has legal consequences not only for Israel itself, but also for other States and for the United Nations; in its Written Statement, Israel, for its part, presented no arguments regarding the possible legal consequences of the construction of the wall.

145. As regards the legal consequences for Israel, it was contended that Israel has, first, a legal obligation to bring the illegal situation to an end by ceasing forthwith the construction of the wall in the Occupied Palestinian Territory, and to give appropriate assurances and guarantees of non-repetition.

It was argued that, secondly, Israel is under a legal obligation to make reparation for the damage arising from its unlawful conduct. It was submitted that such reparation should first of all take the form of restitution, namely demolition of those portions of the wall constructed in the Occupied Palestinian Territory and annulment of the legal acts associated with its construction and the restoration of property requisitioned or expropriated for that purpose; reparation should also include appropriate compensation for individuals whose homes or agricultural holdings have been destroyed.

It was further contended that Israel is under a continuing duty to comply with all of the international obligations violated by it as a result of the construction of the wall in the Occupied Palestinian Territory and of the associated régime. It was also argued that, under the terms of the Fourth Geneva Convention, Israel is under an obligation to search for and bring before its courts persons alleged to have committed, or to have ordered to be committed, grave breaches of international humanitarian law flowing from the planning, construction and use of the wall.

146. As regards the legal consequences for States other than Israel, it was contended before the Court that all States are under an obligation not to recognize the illegal situation arising from the construction of the wall, not to render aid or assistance in maintaining that situation and to co-operate with a view to putting an end to the alleged violations and to ensuring that reparation will be made therefor.

Certain participants in the proceedings further contended that the States parties to the Fourth Geneva Convention are obliged to take measures to ensure compliance with the Convention and that, inasmuch as the construction and maintenance of the wall in the Occupied Palestinian Territory constitutes grave breaches of that Convention, the States parties to that Convention are under an obligation to prosecute or extradite the authors of such breaches. It was further observed that

"the United Nations Security Council should consider flagrant and systematic violation of international law norm[s] and principles by

Israel, particularly . . . international humanitarian law, and take all necessary measures to put an end [to] these violations",

and that the Security Council and the General Assembly must take due account of the advisory opinion to be given by the Court.

\* \*

147. Since the Court has concluded that the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem, and its associated régime, are contrary to various of Israel's international obligations, it follows that the responsibility of that State is engaged under international law.

148. The Court will now examine the legal consequences resulting from the violations of international law by Israel by distinguishing between, on the one hand, those arising for Israel and, on the other, those arising for other States and, where appropriate, for the United Nations. The Court will begin by examining the legal consequences of those violations for Israel.

\*

149. The Court notes that Israel is first obliged to comply with the international obligations it has breached by the construction of the wall in the Occupied Palestinian Territory (see paragraphs 114-137 above). Consequently, Israel is bound to comply with its obligation to respect the right of the Palestinian people to self-determination and its obligations under international humanitarian law and international human rights law. Furthermore, it must ensure freedom of access to the Holy Places that came under its control following the 1967 War (see paragraph 129 above).

150. The Court observes that Israel also has an obligation to put an end to the violation of its international obligations flowing from the construction of the wall in the Occupied Palestinian Territory. The obligation of a State responsible for an internationally wrongful act to put an end to that act is well established in general international law, and the Court has on a number of occasions confirmed the existence of that obligation (*Military and Paramilitary Activities in and against Nicaragua (Nicaragua* v. *United States of America), Merits, Judgment, I.C.J. Reports 1986*, p. 149; *United States Diplomatic and Consular Staff in Tehran, Judgment, I.C.J. Reports 1980*, p. 44, para. 95; *Haya de la Torre, Judgment, I.C.J. Reports 1951*, p. 82).

151. Israel accordingly has the obligation to cease forthwith the works of construction of the wall being built by it in the Occupied Palestinian Territory, including in and around East Jerusalem. Moreover, in view of the Court's finding (see paragraph 143 above) that Israel's violations of

its international obligations stem from the construction of the wall and from its associated régime, cessation of those violations entails the dismantling forthwith of those parts of that structure situated within the Occupied Palestinian Territory, including in and around East Jerusalem. All legislative and regulatory acts adopted with a view to its construction, and to the establishment of its associated régime, must forthwith be repealed or rendered ineffective, except in so far as such acts, by providing for compensation or other forms of reparation for the Palestinian population, may continue to be relevant for compliance by Israel with the obligations referred to in paragraph 153 below.

152.  Moreover, given that the construction of the wall in the Occupied Palestinian Territory has, *inter alia*, entailed the requisition and destruction of homes, businesses and agricultural holdings, the Court finds further that Israel has the obligation to make reparation for the damage caused to all the natural or legal persons concerned. The Court would recall that the essential forms of reparation in customary law were laid down by the Permanent Court of International Justice in the following terms:

> "The essential principle contained in the actual notion of an illegal act — a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals — is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it — such are the principles which should serve to determine the amount of compensation due for an act contrary to international law." (*Factory at Chorzów, Merits, Judgment No. 13, 1928, P.C.I.J., Series A, No. 17*, p. 47.)

153.  Israel is accordingly under an obligation to return the land, orchards, olive groves and other immovable property seized from any natural or legal person for purposes of construction of the wall in the Occupied Palestinian Territory. In the event that such restitution should prove to be materially impossible, Israel has an obligation to compensate the persons in question for the damage suffered. The Court considers that Israel also has an obligation to compensate, in accordance with the applicable rules of international law, all natural or legal persons having suffered any form of material damage as a result of the wall's construction.

\*

154. The Court will now consider the legal consequences of the internationally wrongful acts flowing from Israel's construction of the wall as regards other States.

155. The Court would observe that the obligations violated by Israel include certain obligations *erga omnes*. As the Court indicated in the *Barcelona Traction* case, such obligations are by their very nature "the concern of all States" and, "In view of the importance of the rights involved, all States can be held to have a legal interest in their protection" (*Barcelona Traction, Light and Power Company, Limited, Second Phase, Judgment, I.C.J. Reports 1970*, p. 32, para. 33). The obligations *erga omnes* violated by Israel are the obligation to respect the right of the Palestinian people to self-determination, and certain of its obligations under international humanitarian law.

156. As regards the first of these, the Court has already observed (paragraph 88 above) that in the *East Timor* case, it described as "irreproachable" the assertion that "the right of peoples to self-determination, as it evolved from the Charter and from United Nations practice, has an *erga omnes* character" (*I.C.J. Reports 1995*, p. 102, para. 29). The Court would also recall that under the terms of General Assembly resolution 2625 (XXV), already mentioned above (see paragraph 88),

"Every State has the duty to promote, through joint and separate action, realization of the principle of equal rights and self-determination of peoples, in accordance with the provisions of the Charter, and to render assistance to the United Nations in carrying out the responsibilities entrusted to it by the Charter regarding the implementation of the principle . . ."

157. With regard to international humanitarian law, the Court recalls that in its Advisory Opinion on the *Legality of the Threat or Use of Nuclear Weapons* it stated that "a great many rules of humanitarian law applicable in armed conflict are so fundamental to the respect of the human person and 'elementary considerations of humanity' . . .", that they are "to be observed by all States whether or not they have ratified the conventions that contain them, because they constitute intransgressible principles of international customary law" (*I.C.J. Reports 1996 (I)*, p. 257, para. 79). In the Court's view, these rules incorporate obligations which are essentially of an *erga omnes* character.

158. The Court would also emphasize that Article 1 of the Fourth Geneva Convention, a provision common to the four Geneva Conventions, provides that "The High Contracting Parties undertake to respect and to ensure respect for the present Convention in all circumstances." It follows from that provision that every State party to that Convention, whether or

not it is a party to a specific conflict, is under an obligation to ensure that the requirements of the instruments in question are complied with.

159. Given the character and the importance of the rights and obligations involved, the Court is of the view that all States are under an obligation not to recognize the illegal situation resulting from the construction of the wall in the Occupied Palestinian Territory, including in and around East Jerusalem. They are also under an obligation not to render aid or assistance in maintaining the situation created by such construction. It is also for all States, while respecting the United Nations Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end. In addition, all the States parties to the Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 are under an obligation, while respecting the United Nations Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention.

160. Finally, the Court is of the view that the United Nations, and especially the General Assembly and the Security Council, should consider what further action is required to bring to an end the illegal situation resulting from the construction of the wall and the associated régime, taking due account of the present Advisory Opinion.

*   *   *

161. The Court, being concerned to lend its support to the purposes and principles laid down in the United Nations Charter, in particular the maintenance of international peace and security and the peaceful settlement of disputes, would emphasize the urgent necessity for the United Nations as a whole to redouble its efforts to bring the Israeli-Palestinian conflict, which continues to pose a threat to international peace and security, to a speedy conclusion, thereby establishing a just and lasting peace in the region.

162. The Court has reached the conclusion that the construction of the wall by Israel in the Occupied Palestinian Territory is contrary to international law and has stated the legal consequences that are to be drawn from that illegality. The Court considers itself bound to add that this construction must be placed in a more general context. Since 1947, the year when General Assembly resolution 181 (II) was adopted and the Mandate for Palestine was terminated, there has been a succession of armed conflicts, acts of indiscriminate violence and repressive measures on the former mandated territory. The Court would emphasize that both Israel and Palestine are under an obligation scrupulously to observe the rules of international humanitarian law, one of the paramount purposes of which is to protect civilian life. Illegal actions and unilateral decisions have been taken on all sides, whereas, in the Court's view, this tragic

situation can be brought to an end only through implementation in good faith of all relevant Security Council resolutions, in particular resolutions 242 (1967) and 338 (1973). The "Roadmap" approved by Security Council resolution 1515 (2003) represents the most recent of efforts to initiate negotiations to this end. The Court considers that it has a duty to draw the attention of the General Assembly, to which the present Opinion is addressed, to the need for these efforts to be encouraged with a view to achieving as soon as possible, on the basis of international law, a negotiated solution to the outstanding problems and the establishment of a Palestinian State, existing side by side with Israel and its other neighbours, with peace and security for all in the region.

* * *

163. For these reasons,

THE COURT,

(1) Unanimously,

*Finds* that it has jurisdiction to give the advisory opinion requested;

(2) By fourteen votes to one,

*Decides* to comply with the request for an advisory opinion;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;
AGAINST: *Judge* Buergenthal;

(3) *Replies* in the following manner to the question put by the General Assembly:

A. By fourteen votes to one,

The construction of the wall being built by Israel, the occupying Power, in the Occupied Palestinian Territory, including in and around East Jerusalem, and its associated régime, are contrary to international law;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek, Al-Khasawneh, Elaraby, Owada, Simma, Tomka;
AGAINST: *Judge* Buergenthal;

B. By fourteen votes to one,

Israel is under an obligation to terminate its breaches of international law; it is under an obligation to cease forthwith the works of construction of the wall being built in the Occupied Palestinian Territory, including in and around East Jerusalem, to dismantle forthwith the structure therein situated, and to repeal or render ineffective forthwith

CONSTRUCTION OF A WALL (ADVISORY OPINION)          202

all legislative and regulatory acts relating thereto, in accordance with
paragraph 151 of this Opinion;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume,
Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek,
Al-Khasawneh, Elaraby, Owada, Simma, Tomka;
AGAINST: *Judge* Buergenthal;

C. By fourteen votes to one,

Israel is under an obligation to make reparation for all damage caused
by the construction of the wall in the Occupied Palestinian Territory,
including in and around East Jerusalem;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume,
Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek,
Al-Khasawneh, Elaraby, Owada, Simma, Tomka;
AGAINST: *Judge* Buergenthal;

D. By thirteen votes to two,

All States are under an obligation not to recognize the illegal situation
resulting from the construction of the wall and not to render aid or assis-
tance in maintaining the situation created by such construction; all States
parties to the Fourth Geneva Convention relative to the Protection of
Civilian Persons in Time of War of 12 August 1949 have in addition the
obligation, while respecting the United Nations Charter and inter-
national law, to ensure compliance by Israel with international humani-
tarian law as embodied in that Convention;

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume,
Koroma, Vereshchetin, Higgins, Parra-Aranguren, Rezek, Al-Khasawneh,
Elaraby, Owada, Simma, Tomka;
AGAINST: *Judges* Kooijmans, Buergenthal;

E. By fourteen votes to one,

The United Nations, and especially the General Assembly and the
Security Council, should consider what further action is required to bring
to an end the illegal situation resulting from the construction of the wall
and the associated régime, taking due account of the present Advisory
Opinion.

IN FAVOUR: *President* Shi; *Vice-President* Ranjeva; *Judges* Guillaume,
Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek,
Al-Khasawneh, Elaraby, Owada, Simma, Tomka;
AGAINST: *Judge* Buergenthal.

Done in French and in English, the French text being authoritative, at
the Peace Palace, The Hague, this ninth day of July, two thousand and

four, in two copies, one of which will be placed in the archives of the Court and the other transmitted to the Secretary-General of the United Nations.

*(Signed)* SHI Jiuyong,
President.

*(Signed)* Philippe COUVREUR,
Registrar.

  Judges KOROMA, HIGGINS, KOOIJMANS and AL-KHASAWNEH append separate opinions to the Advisory Opinion of the Court; Judge BUER-GENTHAL appends a declaration to the Advisory Opinion of the Court; Judges ELARABY and OWADA append separate opinions to the Advisory Opinion of the Court.

*(Initialled)* J.Y.S.
*(Initialled)* Ph.C.

71

# EXHIBIT B

UNITED STATES:   LETTER OF THE STATE DEPARTMENT LEGAL ADVISER
CONCERNING THE LEGALITY OF ISRAELI
SETTLEMENTS IN THE OCCUPIED TERRITORIES*

# APPENDIX

LETTER FROM STATE DEPARTMENT LEGAL ADVISER CONCERNING LEGAL-
ITY OF ISRAELI SETTLEMENTS IN THE OCCUPIED TERRITORIES

THE LEGAL ADVISER
DEPARTMENT OF STATE
WASHINGTON

April 21, 1978

Dear Chairmen Fraser and Hamilton:

Secretary Vance has asked me to reply to your re-
quest for a statement of legal considerations underly-
ing the United States view that the establishment of
the Israeli civilian settlements in the territories
occupied by Israel is inconsistent with international
law.   Accordingly, I am providing the following in re-
sponse to that request:

The Territories Involved

The Sinai Peninsula, Gaza, the West Bank and the
Golan Heights were ruled by the Ottoman Empire before
World War I.   Following World War I, Sinai was part
of Egypt; the Gaza Strip and the West Bank (as well as
the area east of the Jordan) were part of the British
Mandate for Palestine; and the Golan Heights were part
of the French Mandate for Syria.   Syria and Jordan
later became independent.   The West Bank and Gaza con-
tinued under British Mandate until May, 1948.

The Honorable
   Donald M. Fraser, Chairman
      Subcommittee on International
         Organizations,
            Committee on International Relations
               House of Representatives.

The Honorable
   Lee H. Hamilton, Chairman
      Subcommittee on Europe and the
         Middle East,
            Committee on International Relations,
               House of Representatives.

---

*[Reproduced from U.S. Congress, House of Representatives (95th
Congress, 1st Session), Committee on International Relations, Commit-
tee Print, Israeli Settlements in the Occupied Territories, Hearings
before the Subcommittees on International Organizations and on Europe
and the Middle East (Washington:   GPO, 1978), appendix, pp. 167-72.
   [The U.S. Department of State memorandum on Israel's right to
develop new oil fields in Sinai and the Gulf of Suez, dated October 1,
1976, appears at 16 I.L.M. 733 (1977).   The response of the Ministry
of Foreign Affairs of Israel, dated August 1, 1977, appears at 17
I.L.M. 432 (1978).]

In 1947, the United Nations recommended a plan of partition, never effectuated, that allocated some territory to a Jewish state and other territory (including the West Bank and Gaza) to an Arab state.  On May 14, 1948, immediately prior to British termination of the Mandate, a provisional government of Israel proclaimed the establishment of a Jewish state in the areas allocated to it under the partition plan.  The Arab League rejected partition and commenced hostilities.  When the hostilities ceased, Egypt occupied Gaza, and Jordan occupied the West Bank.  These territorial lines of demarcation were incorporated, with minor changes, in the armistice agreements concluded in 1949.  The armistice agreements expressly denied political significance to the new lines, but they were de facto boundaries until June, 1967.

During the June, 1967 war, Israeli forces occupied Gaza, the Sinai Peninsula, the West Bank and the Golan Heights.  Egypt regained some territory in Sinai during the October, 1973 war and in subsequent disengagement agreements, but Israeli control of the other occupied territories was not affected, except for minor changes on the Golan Heights through a disengagement agreement with Syria.

## The Settlements

Some seventy-five Israeli settlements have been established in the above territories (excluding military camps on the West Bank into which small groups of civilians have recently moved).  Israel established its first settlements in the occupied territories in 1967 as para-military "nahals".  A number of "nahals" have become civilian settlements as they have become economically viable.

Israel began establishing civilian settlements in 1968.  Civilian settlements are supported by the government, and also by non-governmental settlement movements affiliated in most cases with political parties. Most are reportedly built on public lands outside the boundaries of any municipality, but some are built on private or municipal lands expropriated for the purpose.

## Legal Considerations

1.  As noted above, Israeli armed forces entered Gaza, the West Bank, Sinai and the Golan Heights in June, 1967, in the course of an armed conflict.  Those areas had not previously been part of Israel's sovereign territory nor otherwise under its administration.  By reason of such entry of its armed forces, Israel established control and began to exercise authority over these territories; and under international law, Israel thus became a belligerent occupant of these territories.

Territory coming under the control of a belligerent occupant does not thereby become its sovereign territory. International law confers upon the occupying state authority to undertake interim military administration over the territory and its inhabitants; that authority is not unlimited.  The governing rules are designed to permit pursuit of its military needs by the occupying power, to protect the security of the occupying forces, to provide for orderly government, to protect the rights and interests of the inhabitants and to reserve questions of territorial change and sovereignty to a later stage when the war is ended.  See L. Oppenheim, 2 International Law 432-438 (7th ed., H. Lauterpacht ed., 1952); E. Feilchenfeld, The International Economic Law of Belligerent Occupation 4-5, 11-12, 15-17, 87 (1942); M. McDougal & F. Feliciano, Law and Minimum World Public Order 734-46, 751-7 (1961); Regulations annexed to the 1907 Hague Convention on the Laws and Customs of War on Land, Articles 42-56, 1 Bevans 643; Department of the Army, The Law of Land Warfare, Chapter 6 (1956) (FM-27-10).

In positive terms, and broadly stated, the Occupant's powers are (1) to continue orderly government, (2) to exercise control over and utilize the resources of the country so far as necessary for that purpose and to meet his own military needs.  He may thus, under the latter head, apply its resources to his own military objects, claim services from the inhabitants, use, requisition, seize or destroy their property, within the limits of what is required for the army of occupation and the needs of the local population. But beyond the limits of quality, quantum and duration thus implied, the Occupant's acts will not have legal effect, although they may in fact be unchallengeable until the territory is liberated.  He is not entitled to treat the country as his own territory or its inhabitants as his own subjects,...and over a wide range of public property, he can confer rights only as against himself, and within his own limited period of de facto rule.  J. Stone, Legal Controls of International Conflict, 697 (1959).

On the basis of the available information, the civilian settlements in the territories occupied by Israel do not appear to be consistent with these limits on Israel's authority as belligerent occupant in that they do not seem intended to be of limited duration or established to provide orderly government of the territories and, though some may serve incidental security purposes, they do not appear to be required to meet military needs during the occupation.

2.  Article 49 of the Fourth Geneva Convention relative to the Protection of Civilian Persons in Time of War, August 12, 1949, 6 UST 3516, provides, in paragraph 6:

> The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies.

Paragraph 6 appears to apply by its terms to any transfer by an occupying power of parts of its civilian population, whatever the objective and whether involuntary or voluntary.* It seems clearly to reach such involvements of the occupying power as determining the location of settlements, making land available and financing of settlements, as well as other kinds of assistance and participation in their creation. And the paragraph appears applicable whether or not harm is done by a particular transfer. The language and history of the provision lead to the conclusion that transfers of a belligerent occupant's civilian population into occupied territory are broadly proscribed as beyond the scope of interim military administration.

The view has been advanced that a transfer is prohibited under paragraph 6 only to the extent that it involves the displacement of the local population. Although one respected authority, Lauterpacht, evidently took this view, it is otherwise unsupported in the literature, in the rules of international law or in the language and negotiating history of the Convention, and it clearly seems not correct. Displacement of protected persons is dealt with separately in the Convention and paragraph 6 would be redundant if limited to cases of displacement. Another view of paragraph 6 is that it is directed against mass population transfers such as occurred in World War II for political, racial or colonization ends; but there is no apparent support or reason for limiting its application to such cases.

The Israeli civilian settlements thus appear to constitute a "transfer of parts of its own civilian population into the territory it occupies" within the scope of paragraph 6.

3.  Under Article 6 of the Fourth Geneva Convention, paragraph 6 of Article 49 would cease to be applicable to Israel in the territories occupied by it if and when it discontinues the exercise of governmental functions in those territories. The laws of belligerent occupation generally would continue to apply with respect to

particular occupied territory until Israel leaves it or the war ends between Israel and its neighbors concerned with the particular territory. The war can end in many ways, including by express agreement or by de facto acceptance of the status quo by the belligerents.

4.  It has been suggested that the principles of belligerent occupation, including Article 49, paragraph 6, of the Fourth Geneva Convention, may not apply in the West Bank and Gaza because Jordan and Egypt were not the respective legitimate sovereigns of these territories. However, those principles appear applicable whether or not Jordan and Egypt possessed legitimate sovereign rights in respect of those territories. Protecting the reversionary interest of an ousted sovereign is not their sole or essential purpose; the paramount purposes are protecting the civilian population of an occupied territory and reserving permanent territorial changes, if any, until settlement of the conflict. The Fourth Geneva Convention, to which Israel, Egypt and Jordan are parties, binds signatories with respect to their territories and the territory of other contracting parties, and "in all circumstances" (Article 1), in "all cases" of armed conflict among them (Article 2) and with respect to all persons who "in any manner whatsoever" find themselves under the control of a party of which they are not nationals (Article 4).

Conclusion

While Israel may undertake, in the occupied territories, actions necessary to meet its military needs and to provide for orderly government during the occupation, for the reasons indicated above the establishment of the civilian settlements in those territories is inconsistent with international law.

Very truly yours,

*Herbert J. Hansell*

Herbert J. Hansell

---

*Paragraph 1 of Article 49, prohibits "forcible" transfers of protected persons out of occupied territory; paragraph 6 is not so limited.

# EXHIBIT C

# Israel Ministry of Foreign Affairs

## Summary of the Opinion Concerning Unauthorized Outposts-Talya Sason, Adv.

10 Mar 2005

At the request of the Prime Minister bureau, I have prepared a summary of the opinion. The summary does not include the entire opinion, which naturally deals with many more subjects, with further details.

The second chapter of the opinion is a brief of the findings, conclusions and recommendations. This summary is based upon this brief. However, considering that this summary is presented a part from the opinion, a few remarks must be added.

**Opening Remarks**

A. The Commission

The commission issued by the Prime Minister is enclosed.

B. A Procedural Remark:

These are the main subjects the opinion deals with:

The opinion first explores the background for the growth of the unauthorized outposts phenomenon. Then it analyzes the legal background for establishing a legal settlement in the area of Judea, Samaria and Gaza, according to the local law (lex locus). In this context, a brief view of the laws governing Israel in its actions in the areas is presented. Following are the requirements for establishing a legal settlement. This includes the political, land, municipal (bounds of jurisdiction) and planning aspects.

In light of this legal background, a review of the unauthorized outposts is presented. This includes: the definition of an unauthorized outpost; numerical figures as far as I know them, including evacuation figures up to date; categorization of the outposts; the major ways of their establishment, as far as I know them.

A main chapter in the opinion deals with the involvement of state authorities and public authorities in the establishment of unauthorized outposts.

This framework reviews the involvement of the Settlement Division in their establishing and financing, as far as I know it.

It reviews the involvement of the Ministry of Construction & Housing - in financing infrastructure and public buildings for the outposts, financing the planning of unauthorized outposts, and the purchase of caravans affair in 2003.

It reviews the involvement of the Ministry of Defense in the matter of the unauthorized outposts, meaning the involvement of both the Civil Administration and the Assistant to Defense Minister - Settlement Affairs.

Following the factual findings is the chapter dealing with law enforcement in the territories. There I stressed the reasons for the failure of law enforcement, and recommended a legislative reform, concerning the law governing the territories, with an emphasis on actions concerning the establishment of unauthorized outposts.

As for recommendations:

Each chapter in the opinion includes recommendations concerning the findings presented in it. In addition, the opinion concludes with a general chapter of recommendations, some of which already mentioned. I enclose here the full recommendations chapter, although some of the recommendations already appear within this summary.

I further enclose to this summary the concluding chapter of the opinion, as presented at the end of the recommendations chapter.

C. The Authorities Reviewed in the Opinion, and the Authorities Not Reviewed

It should be emphasized what is not to be found in the opinion, and why I chose the authorities I dealt with:

An initial inquiry already lead me to the conclusion that the main relevant authorities involved in the matter of unauthorized outposts are the Ministry of Defense and the IDF, including the Civil Administration; the Ministry of Construction & Housing; the Settlement Division of the World Zionist Organization; the Ministry of Interior Affairs.

Hence this opinion focuses on the information I gathered mostly in these offices.

Nevertheless, other bodies are involved in establishing the unauthorized outposts, including the aerial councils in Judea, Samaria and Gaza, and other governmental ministries. Due to the shortage of time allotted to me (which I even exceeded), my limited means, the many bodies involved, and the limited accessibility to information - I have not succeeded in the given time to examine all that requires examination. Therefore I have submitted an interim report.

D. Difficulties in Accessibility to Information Regarding the Establishment of the Unauthorized Outposts:

The relevant information regarding the unauthorized outposts is not to be found in a single office. On the contrary. Every office that supplied information to me holds partial information regarding the outposts. There is no office or body which gathers all of the relevant information concerning the matter of outposts, nor coordinates government activity regarding them.

Part of the information is accessible, but a major part of it is concealed. Even after inquiring and exploring, I cannot say that I have reached all the necessary information. This is sometimes due to bureaucratic complexity, the scope of the information, the number of authorities and offices involved in the matter, and the time passed. But in more than a number of occasions I was under the impression that the office or official in charge of the relevant information was not open to deliver it. I received parts of such information from other sources. The result is I could not reach all the required information.

Furthermore, some of the people I approached refused to converse with me. Some claimed to be too busy, some met with me but refused to give answers to the point of most of my questions.

As for Material Received from the Relevant Ministries:

Compared to the material I have asked for, the material handed to me by some of these ministries was partial. It was only by the end of January 2005 that the Ministry of Construction & Housing responded to my request for data  concerning investments by the Ministry in unauthorized outposts over the last four years. This was only after correspondence starting September 2004, oral and written requests, reminders, an appeal to Minister Ms. Livni, her personal interference and demand to release the material - all of which was in vain (soon afterwards Ms. Livni left office to serve in the Ministry of Justice). Only after Mr. Herzog became Minister of Construction & Housing I received a response to my request, which I am not yet satisfied with, and which needs to be thoroughly examined (see detailed reference in section 8.3.1.1-d).

I might add, that in response to my last letter to the Ministry of Housing, in which I stressed that at least some of the data given to me was incorrect, the Ministry of Construction & Housing informed me, just less than a week ago, that it admits now the falseness of some of the data, and asked for further time to check it out. Needless to say, the false data is amounts, which are lower than the amounts actually allotted to unauthorized outposts.

Although requested, the Settlement Division of the World Zionist Organization has not yet delivered data concerning the amounts it invested in unauthorized outposts, which it took part in establishing. The Infrastructure Dept. of the Civil Administration has not yet delivered full data concerning unauthorized outposts, claiming this takes more time and requires much work.

E. Accuracy of Information Regarding Unauthorized Outposts

The data I hold was received from the Infrastructure Dept. of the Civil Administration. Possible errors may exist in this data, but I have no other source for certified information regarding the unauthorized outposts, including aerial photographs, valid and invalid programs, land privileges, etc.

F. Examination of the Outposts According Local Law

The opinion examines the legality of the unauthorized outposts only in the aspect of local law (lex locus), and not other possible aspects of international law.

G. Examination of Unauthorized Outposts and Not of Other Settlements

The opinion examines the unauthorized outposts, and not other settlements in Judea, Samaria and Gaza, nor unauthorized neighborhoods in existing settlements.

H. Collecting the Information

The opinion followed research. Interviews were made with some 100 officials in different offices. The interviews were documented. In addition, numerous meetings were held in different ministries, in which I took part, and many documents were gathered.

I received great assistance from Brigadier General (Res.) Baruch Shpigel, Assistant to the Defense Minister, who supplied me with material regarding the unauthorized outposts, always with good spirit and full cooperation. Further assistance was given by the staff of the Legal Advisor to Judea and Samaria, the International Law Branch of the IDF, the State Attorney, the General Attorney and the Ministry of Justice.

A summary of the opinion, the findings, the conclusions and the recommendations follows.

**The Background for the Establishment of the Unauthorized Outposts**

The expansion of the unauthorized outposts phenomenon began in the mid nineties, after the building in Judea, Samaria and Gaza was frozen by the Rabin Administration in 1993. Building in settlements was still approved, but the approval rate went decreasing as the negotiations with the Palestinian representatives accelerated.

The unauthorized outposts phenomenon began expanding, in light of the government's position opposing the authorizing of the building of settlements in the territories.

In fact, the unauthorized outposts phenomenon is a continuation of the settlement enterprise in the territories. But while in the distant past the Israeli governments officially acknowledged and encouraged the settlement enterprise, in some of the years, a major change took place in the beginning of the nineties. The Israeli governments were no longer officially involved in the establishment of settlements, apparently due to Israel's international situation, and the negative position of most nations towards the settlement enterprise. That was not the case for public authorities and other Israeli government bodies, who took, along with others, a major role in establishing the unauthorized outposts. Some of which were inspired by the political echelon, sometimes by overlooking, sometimes by actual encouragement and support, but never as a result of an authorized resolution by the qualified political echelon of the State.

The Necessary Conditions for Establishing a Settlement in the Judea, Samaria and Gaza Territories

The local law requires the fulfillment of a number of basic conditions before establishing a settlement in the Judea, Samaria and Gaza territories.

First, the decision to establish a settlement must be made by the authoritative political echelon. Government resolutions have always declared that the establishment of a new settlement, either inside Israel or in the territories, requires a government resolution. Such an establishment requires various considerations - economic, social, geographical, political, public and others.

The establishment of an Israeli settlement in the Judea, Samaria and Gaza territories requires additional considerations, including international and national policy and security considerations. The authoritative political echelon is the only one qualified to consider such considerations, and the only one who bares responsibility for such a decision.

The Second Condition concerns the interests (title) in the land to be settled.. After the High Court of Justice ruling in the case of Elon More, a 1979 Israeli government resolution states that Israeli settlements shall be established only on State land.

The Third Condition is that a settlement shall be established only according to a lawful designed building scheme. This means that a settlement in the Judea, Samaria and Gaza territories may be established only according to a detailed scheme, which has the power to produce a building permit. It must be clarified that according to the law in force in the territories, the approval of the political echelon is needed not only for establishing a settlement, but also in some of the steps in the plan approval. Meaning - as long as there is no approval for the plan for the settlement, or a part thereof - there is no political echelon approval for its establishment.

The Fourth Condition is that the bounds of jurisdiction of such a settlement was determined in an order by the Commander of the area. The Commander of the area may determine the bounds of jurisdiction only after receiving the approval of the political echelon.

These four conditions are accumulative. The lack of fulfillment of one of them makes the settlement illegitimate.

Unauthorized Outposts

An unauthorized outpost is a settlement which does not fulfill at least one of the abovementioned conditions. And I must emphasize: an unauthorized outpost is not a "semi legal" outpost. Unauthorized is illegal. I mean that if the outpost were authorized, according to the conditions mentioned above, it was legal. Missing an authorization of the kinds mentioned above makes it illegal.

After studying all Government resolutions, Minister Security Committee meetings, Settlement Minister Committee meetings, whether named as so, or operating as sub-committees for settlements of Minister Security Committee - I have not found a single government or committee resolution, since the beginning of the nineties, to establish a new settlement in the territories, or to expand a neighborhood of an existing settlement.

Since many outposts were established in the Judea, Samaria and Gaza territories, it seems that it was not the result of government decision.

The Characteristics of an Unauthorized Outpost:

A. There was no government decision to establish it, and in any case no authorized political echelon approved its establishment.

B. The outpost was established with no legal planning status. Meaning, with no valid detailed plan governing the area it was established upon, which can support a building permit.

C.  An unauthorized outpost is not attached to an existing settlement, but rather at least a few hundred meters distant from it as the crow flies.

D. The outpost was established in the nineties, mostly from the mid nineties and on.

The Number of the Unauthorized Outposts and Other Data Regarding them

I failed in finding out how many unauthorized outposts exist in Judea, Samaria and Gaza, since the source for the data is the Infrastructure Dept. of the Civil Administration, which has not delivered all the necessary information. I was informed that gathering the information requires much work and takes time.

The information I have so far shows that there are 105 unauthorized outposts (that I know of today). But this probably does not reflect the true number of outposts in the area. (As for the gap between this figure and data presented by the Ministry of Defense in the past - see sec. 5.4 of the opinion.)

Out of the number I know of: 26 outposts are located on State land; 7 are located on survey lands; 15 are located on Palestinian private property; 39 are located on "mixed" lands – part State, part survey, part owned by Palestinians.

In addition, a few outposts are located on lands which I failed yet to resolve its nature.

The Implication of Establishing an Unauthorized Outpost Not on State Land

After the High Court of Justice ruling in the case of Elon More, a 1979 Israeli government resolution states that Israeli settlements in Judea, Samaria and Gaza shall be established only on State land. Hence, no settlement is to be established on other than State land (the definition for State land appears in the first chapter of the opinion). No Israeli settlement is to be established on survey land (to which the title is unclear). Surely no Israeli settlement is to be established on private Palestinian property.

It is absolutely prohibited to establish outposts on private Palestinian property. Such an action may in certain circumstances become a felony.

But first and foremost this is a serious prejudice of the right of possession. This right is a basic right in Israel - included in Basic Law: Human Dignity and Freedom, and was defined by the Israeli Supreme Court as a constitutional right. Israel High Court of Justice ruled that the Commander of the area must protect the fundamental rights of the Palestinians in Judea, Samaria and Gaza. This means he must also protect their right of possession. It is the Commander's duty to prevent the intolerable prejudice of Palestinians' right of possession, which an establishment of outposts on their property causes.

There is no way to validate the establishment of an outpost on private Palestinian property, not even post factum. Such outposts must be evacuated, the sooner the better.

List of the Outposts by Date of Establishment

The list of the outposts may be divided into two lists: those established before March 2001, and those established afterwards, and were not evacuated, or were evacuated but returned. This division is based on political reasons, but has no legal implication. Accordingly, 71 outposts were established prior to March 2001, and 24 outposts were established afterwards. As for 10 more outposts - I have yet to find out when they were established. As mentioned above, this is probably not the full list of outposts in Judea, Samaria and Gaza (in lack of data).

Information Concerning Evacuation of Outposts

This information, concerning the evacuation of outposts established only after March 2001 was, delivered to me by the Ministry of Defense:

81 outposts were evacuated so far, only a few of them were manned. Some of them were re-occupied by the settlers, sometimes returning nearby the outpost. Some were evacuated again. Some were occupied again and not yet evacuated.

13 delimitation orders were issued so far, deriving from the Order Concerning Unauthorized Outposts (the main legal tool for evacuating outposts). Appeals were submitted against the delimitation orders. 12 appeals were granted. One is yet to be answered by the Ministry of Defense. Some of these outposts were evacuated (either willingly of by the IDF). A total of 7 outposts, 2 of which returned.

The legal proceedings before the High Court of Justice concerning 4 outposts have ended, and the petitions were denied. These outposts, plus two more that have returned, can be evacuated immediately. A total of 6 outposts can be evacuated effective today.

Requests for license according to a mandatory plan were submitted for a number of outposts. Most of them were denied.

Delimitation orders may be issued against them, unless appeals are submitted. As for other outposts, delimitation orders

may be issued (see details in sec. 5.5.1).

Neighborhoods Which are Not Outposts

It needs to be clarified that I have defined an outpost as a settlement not attached to an existing settlement. Civil

Administration information shows that new neighborhoods attached to existing settlements were established and

expanded. From the legal aspect this situation is sometimes similar to the establishment of unauthorized outposts.

I have not examined such unauthorized neighborhoods, in accordance with my jurisdiction.

The Momentum of Thickening Outposts Still Goes On

I am not aware of new outposts established over the last months. But I know of unauthorized building taking place in

existing outposts. The building momentum includes conveying caravans to the outposts (64 caravans were conveyed to

unauthorized outposts between August and December 2004). But it also features other ways, such as making new

infrastructure for future connection of caravans; land preparation, stiff construction in some outposts including permanent

buildings (for example, 23 structures, 160 square meters each, were placed in the Bruchin outpost on 28 September,

2004); 9 habitats were built in the Ahuzat Shalhevet outpost near Yitzhar on October 2004; primary structures of 60

square meters were placed in Migron and in other outposts. Sheds and agriculture structures were built, lands were over

taken, roads were paved. This is day to day activity. Illegal sites and new invasions report between 8 August 2004 and 5

December 2004 enclosed (annexes 1 & 2 of booklet C). I must add that the expansion continues to take place in outposts

which delimitation orders were issued against them, even after approved by the High Court of Justice. For instance, 3

caravans were placed in Giv'at Haro'eh on January 2005, and preparations are made for two more caravans; iron

elements are starting to be placed in Giv'at Hadegel, a playground was built on December 2005 and two caravans were

coated with stone; 5 caravans were placed outside the delimited area in Mitspe Asaf; two caravans and two containers

were placed in Mitspe Yitzhar.. All delimited outposts, which the High Court of Justice allowed their evacuation, and were

still thickened were listed in the report enclosed (see the abovementioned annexes 1 & 2).

The Ways the Outposts were Established

The outposts are mostly established by bypassing procedure and violating the law, displaying false pretense towards

some of the State authorities, and enjoying the cooperation of other authorities in harsh violation of the law.

One way to establish an outpost is first to falsely ask for an antenna to be placed up on a hill. Afterwards comes a request

to supply electricity - only for the antenna. Then a cabin is placed, for the guard, and the cabin is also connected to the

electricity. Then a road is paved to the place, and infrastructure for caravans is prepared. Then, one day a number of

caravans arrive at the place - and an outpost is established.

Another way is falsely requesting to built an agricultural farm (either an acclimatization or a biosphere farm). The farm is

supposedly built for agricultural needs. After a while, caravans arrive to the place and an outpost is established.

Another way is founding an educational institution. "Staff" families settle in the place and an outpost is established.

Another way is establishing outposts by "expansions" and "neighborhoods" in disguise, within an existing outpost. The new outpost is named as the old one, as though it were just a neighborhood, even when it is sometimes kilometers away as the crow flies; on the ground the distance is much greater). (In some cases this explains the variety of names given to a single outpost, for example Esh Kodesh N.G. 827 - Migdalim Southl; Nof Harim - Aley T., etc.) This enables financing the new outpost by the different authorities: the money supposedly goes to the old settlement, as known to the authorities. In fact, it goes to the new outpost.

After a while, when the outpost stands still, it is no longer convenient for its inhabitants to be considered just as a neighborhood of an existing settlement. They wish for direct connection to different sources; they are interested in an independent emblem given by the Ministry of Interior Affairs (which allows budget from the Ministry of Interior Affairs as a local authority). Therefore the Assistant to Defense Minister - Settlement Affairs requested the Settlement Division of the World Zionist Organization to acknowledge some of the outposts as independent settlements, eligible for an emblem and a budget. The former Director General of the Prime Minister Office (Mr. Lieberman) has also requested such acknowledgement regarding some of these outposts (these letters are included in annexes booklet C, enclosed to the opinion).

### Involvement of Government Authorities in Establishing Outposts

A substantial number of outposts were built with the involvement of public authorities and State bodies, but with no authoritative decision by the Government of Israel.

These are the State authorities I succeeded to examine:

The Ministry of Construction & Housing;

The Ministry of Defense and the IDF: the Civil Administration, and several aspects of the Assistant to Defense Minister - Settlement Affairs;

In addition: the Settlement Division of the World Zionist Organization, which is a public authority.

These authorities have legitimate powers regarding the Israeli settlement in Judea, Samaria and Gaza, but they apparently use their powers unlawfully in connection with unauthorized outposts, as to be described.

As I have already mentioned, other authorities and government ministries are involved in establishing unauthorized outposts. I also know that the regional councils in Judea, Samaria and Gaza take a major part in this activity. But due to the short time I was given and the scope of the research needed, I could not examine them as well.

Authorities and Their Relevant Roles

The World Zionist Organization - The Settlement Division

The role of the World Zionist Organization is to settle. It receives lands from the official in the Civil Administration (the Commissioner of Government and Deserted Property), for the purpose of planning or planning and development. It is supposed to allot the lands for building settlements, after receiving the approval of the qualified political echelon – to establish a new settlement or to expand an existing one. It is supposed to take care of planning for the land, establishing the primary camp and creating means for production.

The Ministry of Construction & Housing

Involved in establishing settlements or expanding existing ones in Judea, Samaria and Gaza, through the Rural Building Administration of the Ministry of Construction & Housing. Finances the establishment of infrastructure and public buildings in Judea, Samaria and Gaza settlements. Plans new settlements and employs independent architects for planning and expanding settlements in Judea, Samaria and Gaza. Owns caravans for residence, which it transfers to others, especially to Judea, Samaria and Gaza.

The Civil Administration

Responsible for locating lands for new Israeli settlements, and examining rights and privileges concerning them; registering titles to land. Responsible for allotting land to settling bodies, including the Settlement Division. Responsible for the planning and building registration process. Responsible for receiving the political echelon's approval for planning. Responsible for supervising illegal construction in the territories. Responsible for permitting connections of buildings to water or electricity. Responsible for permitting caravan conveyance in the territories, subject to the approval of the Ministry of Defence.

The Ministry of Defense

Responsible for granting various permits, including: permit for initiating land survey; license for land planning prior to its allotment by the Commissioner to a settling body; permit to convey a caravan to the territories; approval of the political echelon (the Minister of Defense) for different stages of a plan.

Regarding law enforcement in the territories - the Ministry of Defense grants the political approval for security legislation in the area, including legislation concerning the establishment of unauthorized outposts and unlawful confiscation of lands. Approves the carrying out of destruction orders issued as a result of illegal construction. Issues delimiting orders in order to evacuate outposts. Instructs the IDF directly to evacuate unauthorized outposts.

I shall specify my findings regarding each of these authorities. Following the findings, I shall describe my main recommendations for each authority. It should be noted that the recommendations chapter includes additional and more general recommendations.

Types of Recommendations According to My Commission

A. Organizational recommendations

B. Amendments to government resolutions and new resolutions to be taken

C. Instructions to authorities in connection with all matters of establishing unauthorized outposts

D. New legislation

E. Reform in security legislation in the territories

F. Recommendations for the Attorney General

**The Settlement Division of the World Zionist Organization**

The Settlement Division is a part of the World Zionist Organization, which is a settling body, according to a government resolution. The Division's role is to assist the government in establishing Israeli settlements in Judea, Samaria and Gaza.

Its full budget comes from State treasury.

The Settlement Division took major part in establishing Israeli settlements in Judea, Samaria and Gaza. According to the findings in the repost, it built mostly many unauthorized outposts, without the approval of the qualified political echelon.

This reality shows that there is no more a political mechanism for establishing new settlements in the territories. The decision to establish settlements has "dropped one scale", and became a decision made by officials who were not authorized to do so. It is no longer the decision of the elected echelon, who is accountable towards their voters.

The "engine" behind a decision to establish outposts are probably regional councils in Judea, Samaria and Gaza, settlers and activists, imbued with ideology and motivation to increase Israeli settlement in the Judea, Samaria and Gaza territories. Some of the officials working in the Settlement Division of the World Zionist Organization, and in the Ministry of Construction & Housing, cooperated with them to promote the unauthorized outposts phenomenon. After the mid nineties, these actions were apparently inspired by different Ministers of Housing, either by overlooking or by actual encouragement and support, with additional support from other Ministries, initiated either by officials or by the political echelon of each Ministry.

The Settlement Division is supposed to be an executive echelon, implementing decisions made by the political echelon. In this case it was the other way around, and the executive echelon became partners with the political one, contrary to its role.

The lands were allotted to the Division by the Commissioner of Government and Deserted Property of the Civil Administration, on the assumption that the Division act with good faith and according to allotment regulations. Apparently, the Division violated the agreement with the Commissioner in more than one aspects: it allotted lands a secondary allotment without the Commissioner's approval; it sometimes allotted lands which it received for planning purposes only. The Commissioner wasn't even informed of the allotment. It failed to regulate the settlers' status in the land against the Commissioner.

The Settlement Division established unauthorized outposts, disregarding the need for a valid detailed plan, and this not by accident, but rather as a system. This is a violation of the Jordanian Planning and Construction Law in force in the territories. The Division never even attempted to authorize a plan before starting building.

Some of the settlements established by the Division exceed the area allotted, and are partly located not on State land (part of the settlement is located within the area, and another part is outside of it, sometimes on survey land, sometimes on private property).

Response of the Settlement Division

A. No political approval is required for the establishment of outposts.
B. If it is indeed required, thus it was granted.
C. The outposts were established without a valid detailed plan, since this is the way settlements are established regularly by the Division inside Israel.

This response does not settle with my findings. An establishment of an outpost requires the approval of the political echelon, according both government resolutions and the law in force in the territories. The claim that the political approval

for establishing outposts was granted is false.

The attempt to justify the Division's actions, in contrary to the Planning and Construction Law, by claiming it to be its standard procedure inside Israel - is unacceptable. Actions violating the law cannot be justified. Surely continuous violation in one place cannot justify continuous violation in another.

It is my conclusion that a fundamental change in the operation of the Settlement Division must take place.

My Main Recommendations for the Settlement Division

A government resolution must be made as follows:

To cancel all land allotments made to the Settlement Division, if and to the extent they were not yet allotted to others, and to return them to the Commissioner; to cancel all land allotments made to the Settlement Division, which it further allotted to others in contrary to its license; to cancel all allotments made by the Division to others, and were not yet used, and to return them to the Commissioner; to cancel all allotments upon which unauthorized outposts were established, and to return them to the Commissioner; to cease all activity of the Settlement Division in establishing settlements, unless the Government authorizes ad-hoc the Division as a settling body for the purpose of establishing or expanding a specific settlement in Judea, Samaria and Gaza, that the Government has decided to establish or expand; the Ministry of Finance shall modify the Settlement Division budget in light of the necessary changes resulting this resolution.

**The Ministry of Construction & Housing**

The Ministry of Construction & Housing is involved with establishing unauthorized outposts.

The main (but not the only) branch of this Ministry involved with unauthorized outposts is the Rural Building Administration. This administration is engaged for years in establishing new settlements in Judea, Samaria and Gaza and in expanding old ones. The Rural Building Administration executed the policy of Housing Ministers and Director Generals of this Ministry in the relevant years in which the outposts phenomenon flourished, meaning the mid nineties and on.

It seems that at least between 2000 and 2004, a substantial part of the Rural Building Administration budget was dedicated to building in the territories, including unauthorized outposts.

These are the activities of the Ministry of Construction & Housing in establishing unauthorized outposts known to me:

Financial Aid for Infrastructure and Public Buildings in Unauthorized Outposts

The Ministry of Construction & Housing assisted regional councils in Judea, Samaria and Gaza, by financing foundations and infrastructure (such as land preparation, development, road break through and paving, connecting water, electricity and other facilities, preparing infrastructure for caravans, etc.), and establishing public buildings in unauthorized outposts. The aid was disguised as building new neighborhoods within existing settlements, in order to bypass the absence of a Government resolution to establish outposts. The Ministry of Construction & Housing was aware of the absence of a qualified political echelon approval for establishing the outposts.

The aid by the Ministry of Construction & Housing was indirect - through the regional councils. The Ministry of Construction & Housing did not engage directly with contractors. The regional councils did so, and the Ministry of

Construction & Housing financed it. It seems that this way was chosen in order to conceal the fact that the Ministry of Construction & Housing is financing building in unauthorized outposts.

In 2001 the Ministry of Construction & Housing created a special budgetary clause, named "general development misc.", and used it for financing unauthorized outposts. In 2001 the amount in this section was 17 million shekels. In 2002 it was 34 million shekels. No criteria were set for the usage of this money. There is no public transparency concerning the goals and the exploitation of this budget.

According to the information the Ministry of Construction & Housing supplied (referring to a partial list it was given), between 2000 and 2004 the Ministry has spent an amount of NIS 71,870,000 on unauthorized outposts.

This is figure stated by the Ministry of Construction & Housing - the Rural Building Administration. It does not settle with information appearing in the Ministry's working schemes for these years. In light of these working schemes it allegedly seems that the Ministry financed unauthorized outposts in much greater sums. Questions directed towards the Ministry of Housing were not yet answered to the point (see details in sections 8.3.1.1). The Ministry of Construction & Housing has informed me, only a few days before submitting the opinion to the Prime Minister, that after examining my last address it found the information earlier given to me to be partially wrong. They claim to be further examining the matter these days.

Be that as it may, it seems that the actual sum considerably exceeds the one mentioned above. I might add that the abovementioned sums are nominal.

The sum also does not include money the Ministry of Construction & Housing paid for infrastructure, public buildings and planning in unauthorized neighborhoods in Judea, Samaria and Gaza.

The Ministry of Construction & Housing was well aware of the fact that the construction work it financed was done without legal planning status. In other words, it was done in violation of the Planning and Construction Law.

The Ministry of Construction & Housing financed the establishment of unauthorized outposts, but never examined the interests (title) in the lands upon which the outposts were built. Some of the outposts built with the Ministry's aid were located on private Palestinian property and on survey land. The Housing Ministry claims it was not aware of this fact. There is no dispute it never bothered to check it out.

Planning Unauthorized Outposts, Some of which on Private Palestinian Property

Architects of the Housing Ministry, as well as free lance architects, were employed in planning unauthorized outposts, after their establishment. The Ministry was aware of the absence of a government resolution or a qualified political echelon decision to establish them. Part of the unauthorized outposts planned were built on private Palestinian property.

Acquisition of Caravans and Placing Them in Unauthorized Outposts in 2003

The acquisition of caravans by the Ministry of Construction & Housing in 2003 is a bold example of bad government, and it is also connected with unauthorized outposts.

In 2003 the Ministry of Construction & Housing has decided to finance the acquisition of caravans by the regional councils in Judea, Samaria and Gaza. The budget needed for this purchase: NIS 33,749,180.

The Ministry of Construction & Housing tried to exempt this sum from tender, so that the money could go to the regional councils for purchasing the caravans. The Ministry of Finance objected granting an exemption. The subject was brought to the Attorney General. His deputy determined that the Ministry of Construction & Housing must set criteria, as a pre-condition for supporting the regional council. But the Ministry of Construction & Housing did not wish to set such criteria, so it chose a bypass, to avoid confronting the legal barrier.

The Ministry of Construction & Housing has decided to purchase the caravans itself, to divide them only between the regional councils in Judea, Samaria and Gaza, with no explanation, with no criteria, and with nothing in return.

The Ministry of Construction & Housing published a frame tender for purchasing caravans. Two companies won the tender. The Ministry ordered 400 caravans from one company, and 120 from the other. I found that some of the caravans were ordered and produced much earlier - for the regional councils in Judea, Samaria and Gaza. These caravans were already placed in the area at the time the tender for their production was published. At the time a total of 140 caravans were placed in the territories, 90 of which in unauthorized outposts.

Apparently, the same company that won the Ministry of Construction & Housing's tender, and was requested to produce 400 caravans, was the one who produced the caravans for the regional councils, for which the Ministry of Construction & Housing paid.

The Ministry of Construction & Housing delivered all of the 400 caravans to Judea, Samaria and Gaza without any agreement to receive any consideration in exchange - either from the regional councils or from whoever received the caravans. A year and a half has passed by, and the Ministry of Construction & Housing has received nothing in return for the caravans.

Main Recommendations Regarding The Ministry of Construction & Housing

1. A government resolution shall be made, as follows:

a. Regarding planning, budgeting and establishing unauthorized outposts and/or unauthorized constructions

The Ministry of Construction & Housing shall not plan a settlement, a neighborhood or any building in Judea, Samaria and Gaza, before running a thorough examination concerning the interests in the lands designated for planning. The Ministry of Construction & Housing shall not plan the establishment of a settlement or a neighborhood without a decision of the political echelon. The Ministry of Construction & Housing shall not plan post factum an unauthorized outpost. The Ministry of Construction & Housing shall not plan, budget or build in lands that are not State lands. For the avoidance of doubt, the Ministry of Construction & Housing shall never take any action mentioned above in survey lands or in private Palestinian property. The Ministry of Construction & Housing shall establish a data base with all the information concerning titles to land in Judea, Samaria and Gaza. This data base shall be accessible to all of the Ministry's departments, including the Rural Building Administration. The Ministry of Construction & Housing shall not finance nor built in Judea, Samaria and Gaza, either directly or through others, without first getting a building permit.

b. Regarding the purchase of caravans

Any purchase of caravans designated for the territories is equal to an approval for building houses in the territories. Therefore, any future purchase, by the Ministry of Construction & Housing or by any other Ministry, of caravans

designated to the Judea, Samaria and Gaza territories, is subject to the approval of both the Prime Minister and the Minister of Defense, prior to the publication of a tender for their production or acquisition.

2. Administrative recommendations regarding the issue of caravans

A number of recommendations were given concerning the acquisition of caravans, including criteria for future purchase. The Ministry of Construction & Housing shall demand the caravans back from the regional councils. The Ministry of Construction & Housing shall demand restoration for their usage until their actual return to the Housing Ministry.

3. A recommendation to forward material in the report to the Attorney General

I have recommended to forward the report's findings in this chapter to the Attorney General, in order to consider whether to take legal action against State officials and others, who with regards to establishing unauthorized outposts knowingly acted while violating the law.

I further recommended to forward to the Attorney General all material in this report concerning publishing the tender for the manufacture of caravans, the winning thereof, their conveyance to unauthorized outposts, and all other matters concerning the caravan affair - in order to consider whether to take legal action against Ministry officials and others involved.

**The Civil Administration in Judea, Samaria and Gaza**

I have examined various aspects of its authorities and activities concerning the establishment of unauthorized outposts.

Main Findings

Locating Lands and Inquiring into Interests in Lands Designated for Israeli Settlements

I found that some of the lands allotted by the Civil Administration to the Settlement Division were survey lands, and some were private Palestinian property. Apparently this was a result of errors in marking State lands on maps. This is one of the reasons that some of the unauthorized outposts were established not on State lands.

I recommend that no lands shall further be allotted until a serious reexamination is made concerning interests in the land allotted, so that only State lands are allotted, according to the 1979 Government resolution. A systematic examination of titles to lands shall be made concerning old allotments. Planning committees shall be instructed not to approve any plan until the interests in the lands are reexamined, and the plan undoubtedly applies only State lands.

Survey land procedure regarding unauthorized outposts - It is my conclusion that survey land procedure shall not be taken regarding outposts for which delimiting orders were issued. These are outposts which the political echelon found illegal and has decided to evacuate. Survey land procedure for such lands is contradiction in terms. I therefore recommend that a Government resolution shall be made that no application for survey land procedure shall be submitted regarding outposts with delimiting orders, and if submitted - it shall not be examined. I further recommend that no application for survey land procedure shall be submitted nor examined, regarding an unauthorized outpost (even when there is no delimiting order), unless the Government decided it wishes it to be an acknowledged settlement, and this requires survey land procedure. I further recommended that from now on initiating survey land procedure shall be a decision made only by

the Minister of Defense or his Deputy (instructions in this matter were given until now by the Assistant to Defense Minister - Settlement Affairs).

Building Permits According to a Mandatory Plan

I have found that it is possible to be granted with a building permit according to a mandatory plan which is in force in the area. While a political approval is necessary for a plan submitted according to security legislation, a building permit according to a mandatory plan requires no political approval. This crack allowed some of the unauthorized outposts to be established.

I recommend:

To instruct the Minister of Defense to direct the Commissioner of Government and Deserted Property, that the Commissioner shall from now on sign any application for building permits according to a mandatory plan regarding State lands. Not the World Zionist Organization, which used to do it until now.

A license committee, authorized to grant building permits according to a mandatory plan, shall accept no application for such a building permit, unless signed by the Commissioner. The Commissioner shall sign only after getting the approval of the Minister of Defense. The result is that a building permit according to a mandatory plan can be received only after the approval of the Minister of Defense.

I further recommend that a license committee shall be instructed not to grant a building permit to an Israeli unless she has presented a certificate from the Commander of the Area indicating his consent to the permit.

In accordance with the Construction Supervision Order (Judea & Samaria) (No. 393), 1970, the Commander of the Area shall order that license committees may grant building permits according to a mandatory plan only to Israelis who hold an approval by the Area Commander for such permit. This is due to security implications of building one isolated Israeli house in the territories (which a mandatory plan allows).

As a result, no building permit according to a mandatory plan shall be granted, either in State lands or in Israeli purchased property, without the approval of the Minister of Defense and/or the Commander of the Area.

Application for Building Permits According to a Detailed Plan

The Commissioner of Government and Deserted Property in the Civil Administration represents the State as the owner of State lands, and allots lands to the World Zionist Organization. Since 1996, the World Zionist Organization is allotted with lands for planning purposes only. Apparently, the Organization allots the lands to others, for purposes of development and establishing of settlements, contrary to its permit.

It was also established that Civil Administration planning committees grant building permits on lands allotted to the World Zionist Organization, according to a valid detailed plan, without the signature of the Commissioner. The situation is different in Israel, where the Israel Lands Administration is required to approve any building permit as a pre condition for its issue.

As a matter of fact, as soon as the Commissioner allotted land to the World Zionist Organization, and signed an application for a detailed plan, the connection between him and the land was cut off, since his signature is not necessary

for the building permit request. This is one of the reasons why no contractual relations were made between the Commissioner and the settlers in Judea, Samaria and Gaza, and the Commissioner was not paid for the usage of the land.

I recommended the Prime Minister to instruct the Minister of Defense to direct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration not to allow a planning committee to discuss a building permit application and not to issue a building permit according to a detailed plan regarding State land, without a written approval of the Commissioner of Government and Deserted Property. The Commissioner shall sign a building permit only after contractual relations were made between the Commissioner and the Division, and between the Commissioner and the settlers, and only after all payments involved were settled. The Commissioner shall not sign a building permit where the land was allotted to the World Zionist Organization for planning purposes only.

Connection to Water and Electricity Network

Connections to the Mekorot water network and to the Electricity Company network are subject to a permit from the Water KMT  and the Electricity KMT  of the Civil Administration, respectively. I found that some of the unauthorized outposts were connected to these networks. I found the Electricity KMT  to approve such connections without considering all circumstances. I found that some outposts were granted of such approval, and some were not, with no clear criteria. It is my judicial opinion, that as a rule a permit for electricity connection is not to be granted to an unauthorized outpost, with the exception of a special security need, according to fixed criteria. I believe that water connection permits shall not be granted, and I find it difficult to imagine a case to justify such a permit.

The Minister of Defense shares this view, and he has informed me of his instruction not to connect an unauthorized outpost to infrastructure, including water and electricity networks.

I recommended that the Minister of Defense instruct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration to set criteria, which I suggest, when electricity will be connected. A connection would be the exception. The rule is no unauthorized outpost shall be connected to infrastructure, including electricity or water. These criteria, for connecting an outpost to electricity only when there is a special security need, shall be subject to the approval of the Attorney General. I further recommended legislative amendments, so as to be in accordance with the Israeli Planning and Construction Law and its regulations, which require "Form No. 4" as a precondition for water, electricity and telephone connections.

The Supervising Unit

The Supervising Unit is the Civil Administration's law enforcement branch, responsible of illegal construction in Judea, Samaria and Gaza. The unit is supposed to supervise Israeli and Palestinian illegal construction. In 1998 the Commander of the Area (the present Chief of the General Staff Ya'alon) has limited the unit's scope of supervision. The unit was allowed not to supervise settlements within areas in which a valid detailed plan is in force (see response of Chief of the General Staff in sec. 9.1.8). However, the Supervising Unit "stretched" the limitation much more beyond this release, and ceased to supervise at all Israeli settlements in Judea, Samaria and Gaza, regardless of the existence of a detailed plan. This is one of the reasons why the information the unit holds concerning what actually goes on is lacking. In many cases it has not reported of new neighborhoods, expanded neighborhoods and unauthorized outposts.

However, there are additional reasons for this informative deficiency, that are not the Supervising Unit's responsibility. Among others: the Supervising Unit is short of staff, and so is unable to fully report, real time, on what actually goes on; no aerial photography to trace illegal construction in the territories is taking place for the last 4 years. These are some of the reasons the Civil Administration lacks all the information it needs regarding illegal construction in the territories. Just lately these flights were resumed, but their pace is still unsatisfying.

On 24 January 2005, as a response to my letter, the Minister of Defense has informed me of his instruction to resume photography flights once a month (annex 3 of booklet C).

Destruction orders are not executed: the Supervising Unit issued thousands of destruction orders, according to Illegal Construction Procedure (see chapter 1, Opening Remarks, Definition of Terms - I.C. Procedure), but they were not executed. Apparently, these orders can be executed only at the instruction of the Minister of Defense. Ministers of Defense have avoided for years instructing the execution of destruction orders, except for single cases. I have presented this matter to the current Minister of Defense, Mr. Mofaz (see his response and my position, ibid - chapter 9, sec. 9.1.8).

Therefore, the unit works in vain.

To conclude, the Supervising Unit is insignificant and almost worthless as a law enforcing instrument over unauthorized construction. It fails to produce the benefit it is expected to produce, considering its role.

I recommended to increase the Supervising Unit's staff. The Minister of Defense has informed me of his instruction to resume aerial photography flights monthly, and I find it satisfying. However, a deciphering unit of aerial photography must be established; the Supervising Unit must expand its supervision over the Israeli settlement in Judea, Samaria and Gaza, and not settle with the supervision done so far. I further recommend the Prime Minister to instruct the Minister of Defense to order the execution of valid destruction orders.

Caravan Conveying Permit

The typical way of establishing unauthorized outposts is conveying caravans, placing them on the ground and connecting them to networks. A caravan is "a house on wheels". Its mobility enables establishing a settlement overnight.

Conveying a caravan into and within the territories requires a permit. Placing one on the ground requires a building permit. Therefore, a permit to convey a caravan may be granted only when there is a valid building scheme in force at the caravan's destination, which allows placing the caravan on the ground.

It appears that the Assistant to Defense Minister - Settlement Affairs has approved the conveyance of caravans into the territories, even after informed there is no planning status at its destination. According to the State Comptroller Report and other documents, the former Assistant to Defense Minister did the same.

It also appears that caravans permitted to reach specific places have not arrived at their destination. An inspection in 2004 discovered that 70 out of 111 caravans inspected never reached their destination. In the meanwhile, caravans arrived at unauthorized outposts.

On July 2004 the Minister of Defense Mr. Mofaz ordered to strict the instructions regarding permits to convey caravans. He ordered that IDF soldiers escort caravans with permits, until they arrive at their destination. In spite of this instruction,

caravans still arrive at unauthorized outposts.

I was informed that lately the Minister of Defense has stiffen further more the conditions for granting a caravan convey permit. The Minister demands proof of the necessity for a caravan, as a precondition for a conveyance permit.

In spite of the Minister of Defense's positive steps, caravans still arrive at unauthorized outposts.

To illustrate my point, according to "Report on Illegal Sites and Fresh Invasions in Judea, Samaria and Gaza", between 18 August and 5 December 2004 64 caravans were placed in unauthorized outposts, in spite of the criteria aggravation for conveyance.

I recommended that the terms already set, such as enclosing a valid building permit granted by a planning committee and a legal affidavit clarifying the need for the caravan, will be legislated in security legislation dealing with caravan conveyance permits. I recommend to issue an order requiring the applicant to enclose an aerial photograph of the caravan's destination, a valid detailed plan, and a written approval by the local council engineer assuring the caravan will be placed according to the plan. I further suggested that an applicant for a caravan conveyance permit will be required to deposit guarantees at an amount to be determined, to insure the caravan arrives at its destination and stays there. The guarantees will stand for 18 months after the arrival of the caravan to the Judea, Samaria and Gaza territories. If the caravan is found out of its place, the guarantee will be confiscated.

Setting Fixed Periods for Civil Administration Officials

Officials at the Civil Administration have a difficult duty, which exposes them to hard stress. On the one hand, they have a very broad authority, and on the other hand they have to deal with ideological passionate people. This puts them under pressure and lobbyism for permits and licenses. A lengthy service at these offices may wear them out and harm their functioning (see details and examples in sec. 9.1.11 of the report).

As opposed to the standard custom in IDF, Civil Administration officials remain at office for many years.

I recommend to set fixed periods for managing roles in the Civil Administration.

**Assistant to Defense Minister - Settlement Affairs**

The Assistant to Minister unit is subordinate directly to the Minister of Defense. The Assistant to Defense Minister - Settlement Affairs is the head of the unit. Office directives of the Ministry of Defense define his duties. His roles are mainly - assisting local authorities and settlements by allotting budgets for security purchases; initiating and assistance in security affairs inside settlements; supervising the execution of the Minister of Defense policy regarding settlements in Judea, Samaria and Gaza.

I found that the Assistant to Defense Minister - Settlement Affairs wrote letters to the Settlement Division confirming that specific outposts, that are unauthorized outposts, are independent settlements eligible for budgets and emblems. The Minister of Defense is not an addressee of these letters. Mr. Shechner, Assistant to Defense Minister – Settlement Affairs, has not informed the Minister of these letters. The Minister of Defense confirms he had no knowledge of the letters and of their content.

The Assistant to Defense Minister - Settlement Affairs claims these letters to engage only with security needs of the unauthorized outposts. I haven't found any security issues in these letters. However, other requests appear in them, concerning settlement emblems and budgets. It must be clarified, that a settlement is eligible for en emblem only if it has legal planning status. The emblem allows a settlement to receive budgets from the Ministry of Interior Affairs designated for local authorities.

These letters allegedly exceed the Minister Assistant's jurisdiction. It is not his duty to engage with settlement acknowledgement or budgeting by the Ministry of Interior Affairs.

These letters do not reflect the position of the Minister of Defense nor of the Ministry of Defense, since the Minister has declared at a Knesset committee session that some of the outposts mentioned in Mr. Shechner's letters are unauthorized outposts. It turns out that the Assistant to Minister of Defense acts contrary to the policy of the Minister of Defense, while his job is to implement the policy of the Minister and the Ministry, and not to create his independent policy, which is opposite to office policy.

These letters were sent as to instruct another authority (the Settlement Division of the World Zionist Organization). It seems the letters are misleading. The Settlement Division waves these letters, claiming them to be approval by the political echelon that the outposts mentioned are authorized, while in fact no authorized political echelon had decided to establish them. One of these letters found its way to Mekorot, but they refused to rely upon it, and did not connect an unauthorized outpost to the water network. A similar letter was presented in a Supreme Court proceeding. See sec. 9.2.2 of the report for the reference of the Supreme Court to this letter.

The Assistant to Defense Minister - Settlement Affairs also approved conveyance of caravans into the territories, although he was informed their destination has no legal planning status. This means the Assistant to Defense Minister - Settlement Affairs approved conveying caravans to illegal destination. In the meanwhile, the Civil Administration sent its Supervising Unit to issue termination orders, for the purpose of issuing destruction orders, for the same caravans.

The Assistant to Defense Minister - Settlement Affairs wrote the Settlement Division a letter concerning supplying electricity for circumferential lighting in unauthorized outposts. This is a general direction regarding a principal and problematic question. As I mentioned, in principal, connecting an unauthorized outpost to electricity is illegal. The Minister of Defense had no knowledge of this letter.

It concludes that The Assistant to Defense Minister - Settlement Affairs has allegedly acted in contrary to the policy of the Minister of Defense and of the Ministry of Defense, exceeding his jurisdiction; instructed other authorities in a manner which could be misleading; approved activities which were known in advance to result in violation of the law.

I have presented all of this information to Mr. Shechner and to the Minister of Defense (see their positions in sec. 9.2.2-4 & 9.1.6). The Minister of Defense has informed me that he was unaware of these letters, and stressed that they were inappropriate. He commented Mr. Shechner on his actions, and instructed him not to issue any more certificates concerning unauthorized outposts.

After considering the matter I have found it still unsatisfactory.

I therefore recommended to consider the necessity of an Assistant to Defense Minister dealing with Settlement Affairs. If there is a need, the office should be fulfilled by a person with no prior obligation to outposts and to the settlement enterprise, so that she can fulfill her roles objectively, following the Minister of Defense instructions.

I further recommended the Prime Minister to deliver the report findings concerning the Assistant to Defense Minister - Settlement Affairs to the Attorney General, in order to examine whether legal proceedings should be taken against him.

### Law Enforcement in Judea, Samaria and Gaza

A large part of the report was dedicated to the subject of law enforcement in the territories, with an emphasis on unauthorized outposts.

I find three main reasons for the failure of enforcing the law concerning unauthorized outposts:

A. State authorities, State officials and public authorities were unlawfully involved in establishing the unauthorized outposts.
B. Ineffective law enforcement.
C. Lacking of suitable legislation and legal tools to deal with building unauthorized outposts.

The Legal Treatment of Derivative Offences Accompanying the Establishment of Unauthorized Outposts

Establishing unauthorized outposts involves criminal offences.

The legal treatment may be of two kinds. One - criminal; the other - administrative, by the IDF and the Civil Administration, i.e. removing the invasive caravan or the illegal construction, or evacuating the outpost, etc.

The criminal procedure comes up against many problems. Some because of no suitable legislation. (For example: conveying a caravan without a permit into Judea, Samaria and Gaza is an offence of 5 year imprisonment, but no court has jurisdiction over this offence. The result is criminal cases and investigations running in vain. Illegal construction is not a criminal offence in the territories. As a result, no one is brought to justice because of illegal construction in the territories. Etc.) A different problem is the difficulty in obtaining evidence in Judea, Samaria and Gaza. Another difficulty is the involvement of State and public authorities in breaking the law by establishing the unauthorized outposts.

The administrative procedure requires instructions from the political echelon. No destruction order will be executed without instruction from the Minister of Defense; no unauthorized outpost will be evacuated without a direction from the Prime Minister and the Minister of Defense, etc.

It has been years since Defense Ministers have instructed to execute destruction orders. Thousands of destruction orders are lying still.

Furthermore, no general political instruction to issue delimiting orders against the unauthorized outposts is given (an outpost can be evacuated only after such order is issued). Even outposts which their delimiting orders were approved months ago by the High Court of Justice were not evacuated (six outposts, four of which were previously evacuated and returned).

This gives a clear signal of no law enforcement in the territories.

Security legislation in the territories is the authority of the Commander of the Area. But in fact such legislation requires the support of the political echelon. Especially legislation regulating unauthorized outposts. Security legislation requires extensive amendment. Without such support, this cannot be done.

Over the last few months some work was initiated to amend legislation.

Law Enforcement Regarding Outposts is Mainly in the Hands of the Political Echelon

The conclusion is that, as opposed to Israel, law enforcement in the territories is partially in the hands of the political echelon, especially in the matter of unauthorized outposts.

The Message Given by the Political Echelon Concerning Law Enforcement Regarding Unauthorized Outposts

As far as law enforcement is concerned, the political echelon sends a message of no enforcement, when it comes to the territories. Felons are not punished. The overall picture draws the conclusion that no one seriously wants to enforce the law:

Some of the land confiscation and illegal construction was done with the unauthorized aid of the Ministry of Housing and the Settlement Division, while violating the law publicly; the State of Israel finances at least part of the establishment of unauthorized outposts; the Civil Administration overlooks for years neighborhood expansions, either nearby or far away from settlements, done without a lawful detailed scheme, sometimes over private Palestinian property; does not supervise construction there; refuses to give information regarding outposts, with excuses such as the definition of an outpost, claiming not to have such information because of the limitation of its supervising powers - which it "stretched" as I mentioned way beyond its instructions; the Ministry of Defense sometimes permit caravans to enter Judea, Samaria and Gaza even when there is no legal planning for their destination; Assistant to Defense Minister - Settlement Affairs certifies other State authorities, that unauthorized outposts are settlements eligible for an emblem (which means eligibility for local authority budgets from Ministry of Interior Affairs), while the Minister of Defense publicly declares them as unauthorized; thousands of destruction orders remain unexecuted for years; the outposts keep increasing and getting thicker, while no delimiting orders are issued, not even regarding outposts mentioned in the March 2001 list, which Israel took upon itself an explicit political obligation to evacuate; delimiting orders issued and approved by the High Court of Justice remain unexecuted (four outposts, plus two more previously evacuated and returned); orders necessary for law enforcement are not legislated, as well as amendments to existing orders.

To this I should add the security concept that wherever an Israeli is placed in the territories - he should be protected. Thus, IDF soldiers will arrive at any place where someone decided to build an outpost, and protect him.

The result is that IDF is unwillingly dragged to give its "seal" to illegal settlements, by being present and protecting the settlers. In its presence, and by protecting law violators, IDF sets the situation, together with these violators. It gives them protection, instead of evacuating them.

Therefore it seems that law violation became institutionalized. We face not a felon, or a group of felons, violating the law. The big picture is a bold violation of laws done by certain State authorities, public authorities, regional councils in Judea, Samaria and Gaza and settlers, while false presenting an organized legal system.

This sends a message to IDF, its soldiers and commanders, the Israeli police and police officers, the settler community and the public.

And the message is that settling in unauthorized outposts, although illegal, is a Zionist deed. Therefore the overlook, the "wink", the double standard becomes it.

This message has a very bad influence - both on the IDF and on the Israeli police.

The Role of IDF in Enforcing Law and the Influence of the Message Coming from the Political Echelon

The IDF soldiers' main mission in the territories is taking care of security. The Israeli police's role is to enforce the law. But sometimes law enforcement becomes IDF's job, for several reasons.

Legally speaking, the Commander of the Area has sovereignty in the territories. This makes him responsible for the overall order and security in the territories. Judea and Samaria (JS) district of the Israeli police is his subordinate.

The overall responsibility is IDF's not only because of formalities. IDF soldiers are the ones who are in fact in the area, as opposed to the small police force of the JS district. IDF is first to witness Israelis breaking the law. The police arrive at the place mostly later on. Sometimes, because of security reasons, the police cannot even get to the scene of the crime. Furthermore, any security event, in which IDF soldiers are involved, can turn out to be a criminal one, and vice versa.

Law Enforcement Procedure in the Territories, which is a part of IDF Commands, gives IDF soldiers the same enforcement powers as policepersons.

But in practice IDF soldiers do not enforce the law, have no knowledge of the Law Enforcement Procedure, and have no interest to function as cops. "The commander spirit", as described to me, sees the settlers' acts building outposts as Zionist deeds, although illegal, and asks them not to inspect such acts through the eyes of the law. This "commander spirit" is nourished by the involvement of State authorities and public authorities in establishing unauthorized outposts (see sec. 10.3 of the opinion for details on IDF officers' statements in this matter).

The failure to execute delimiting orders gives a good example of the lack of enforcement coming from the political echelon. This is a matter of special severity, because it is not a case of neglect, but rather a process of enforcement that stopped after the Supreme Court approved the enforcement.

The attitude towards law breaking settlers is mostly forgiving. The result is a large increase in law violations (see details in sec. 10.5 of the opinion).

I might add that high ranked officers told me that the deterioration of the security in the territories over the last few years, plus the intensive occupation of IDF soldiers in defense missions, were sometimes abused by settlers to increase settling in unauthorized outposts.

Judea and Samaria (JS) District of the Israeli Police

The Israeli police find it difficult to handle the ongoing law violation, done also by State and public authorities. It might be added that the Israeli population in the JS district is partly hostile to the police and uncooperative. Sometimes harsh hostile actions are taken against police officers. For instance, young children throw eggs and even stones at police

officers. Above all this, the JS staff is very small, and some of them are sometimes sent to other districts, to handle enforcement difficulties over there (see in detail - sec. 10.6 of chapter 10).

When dealing with land disputes, which are relevant to the unauthorized outposts phenomenon, JS police officers find it hard to collect necessary evidence. In order to accuse of trespassing, it needs to prove who holds the land, and sometimes who owns it. Most of the lands in Judea, Samaria and Gaza were not regularized, and therefore it is difficult to show ownership. Proving possession is also problematic.

Another difficulty is land law in the territories. It is based on Ottoman, Jordanian, and sometimes Mandatory sources, and on security legislation in the territories. This complexity is very difficult for JS police. In fact, its ability to handle it is minimal. This is part of the reason why legal proceedings were almost never taken against trespassers who unlawfully took over Palestinian property.

Summary of the Law Enforcement in the Territories Chapter

Almost all senior officials who I talked with, in the Ministry of Defense, IDF and the Israeli police, believe that the major difficulty with enforcing law in the territories, regarding unauthorized outposts, is the mixed message sent by Israeli governments along the years to executive echelons, both security and civil. As soon as the government decides upon a clear policy, this reality will stop and a solution will be found.

I recommend a change of the political message, by giving immediate instructions to the relevant offices, as I proposed; by making the necessary government resolutions; by evacuating those unauthorized outposts which legally may be evacuated; by issuing delimiting orders against unauthorized outposts; by instructing the Commander of the Area to initiate execute a legislative reform in security legislation, as I proposed; by allotting the necessary budgets to increase enforcement.

**Reform Proposal in Security Legislation Concerning Law Enforcement in the Territories**

I propose a legislative reform in security legislation in the territories. In the past few months the Legal Adviser to Judea, Samaria and Gaza, IDF International Branch and the Deputy Attorney General (Consulting) Mr. Mike Blass are engaged in preparing proposals for changes in security legislation in the territories. My proposals are partly based, among other sources, upon their work. These are the main proposals:

A. AMENDING SECURITY LEGISLATION - ORDER CONCERNING UNAUTHORIZED BUILDINGS (TEMPORARY PROVISION) 1539.. THIS IS THE MAIN LEGAL TOOL USED TO EVACUATE UNAUTHORIZED OUTPOSTS. I PROPOSE CHANGING THE PUNISHMENT FOR VIOLATION, BY SETTING A SUBSTANTIAL IMPRISONMENT PUNISHMENT AND A BURDENSOME PENALTY. IN ADDITION, AN AUTHORIZED COURT MUST BE DETERMINED, TO WHICH ISRAELIS CAN BE BROUGHT (SEE THE FOLLOWING KNESSET LAW PROPOSAL).

B. As for evacuation of outposts - the existing legislations seems sufficient. If future evacuation encounters legal difficulties, an alternative way to solve it may be considered.

C. AMENDING SECURITY LEGISLATION BY ADDING PROVISIONS ENABLING CONFISCATION AND REMOVAL OF CARAVANS, PLACED ON THE GROUND OR CONNECTED TO INFRASTRUCTURE, THROUGH A QUICK ADMINISTRATIVE PROCEDURE, WITHIN A FIXED PERIOD OF TIME.

D. Amending security legislation - Adding to the following requirements for a caravan conveyance permit:

(1) A caravan conveyance permit shall be granted only after a valid building permit to place the caravan in its destination is presented; an aerial photograph of the caravan's destination is displayed; a valid detailed building scheme is presented; and a written approval by the local council engineer assuring the caravan will be placed according to the scheme.

(2) The petitioner for the permit must deposit an 18-month guarantee to insure the caravan arrives at its destination and stays there.

(3) The petitioner for the permit shall clarify, in a written legal affidavit, the necessity in conveying the caravan.

E. AMENDING SECURITY LEGISLATION IN ORDER TO EXTEND AUTHORITIES FOR TREATMENT OF ILLEGAL INVADERS TO PRIVATE PROPERTY. THE GOAL IS TO SUPPLY WITH EFFECTIVE PROTECTION AGAINST UNLAWFUL INVASION TO PALESTINIAN PRIVATE PROPERTY.

F. Amending the Jordanian Planning and Construction Act, by supplementing provisions, as similar as possible to Israeli legislation regarding "Form No. 4" as a precondition for connecting a building to water and electricity networks.

G. AMENDING THE JORDANIAN PLANNING AND CONSTRUCTION ACT, SO THAT BUILDING WITHOUT PERMIT IS A CRIMINAL OFFENCE. IT SHALL BE DETERMINED WHICH COURT IS AUTHORIZED TO JUDGE SUCH OFFENCES; AND PROSECUTORS SHALL BE AUTHORIZED.

H. Amending security legislation concerning limitations on construction in the territories, due to some incompatibility to government resolution 150.

**Knesset Legislation**

I propose to amend sec. 2(a) of the Law Concerning the Extension of Validity of Emergency Regulations (Judea, Samaria and Gaza - Judgment of Offences and Legal Aid), 1967, in order to allow the prosecution of an Israeli who violated a law in the territories that is not an offense inside Israel, such as entering caravans into the area and conveying it not according to a permit; violation of a prohibition to enter closed military area; violation of a delimiting order according an order regarding unauthorized buildings, etc.

This is a vital and immediate amendment, since there is almost no legal way to prosecute an Israeli who violated the abovementioned (and more) laws in the territories. Alternatively, amending security legislation in order to allow prosecuting Israelis in local courts.

As mentioned above, the following is the full recommendation chapter in the opinion. It is followed by the conclusion chapter.

**Chapter Twelve**

**Recommendations**

12.1  Organizational Recommendations

12.2  Amendments to Existing Government Resolutions and New Resolutions

12.3  Administrative Instructions to State Authorities Regarding Unauthorized Outposts

12.4  Knesset Legislation Proposals

12.5  Reform in Security Legislation

12.6  Recommendations for the Attorney General

**Preface**

While writing the opinion I decided to integrate relevant recommendations in every chapter. This does not make a recommendations chapter unnecessary. This recommendations chapter includes the same integrated recommendations, for convenience, and adds further recommendations. Aside the new recommendations, I explained why they are needed.

These are my recommendations.

**12.1 Organizational Recommendations**

12.1.1 Establishing a Coordinative and Instructive Directorate Regarding Outposts

One of the difficulties emerging from this report is the absence of one body which coordinates and instructs the different authorities regarding unauthorized outposts. One of the reasons for the systematic failure in the matter of unauthorized outposts is the fact that authority is given to many bodies. The bounds of jurisdiction are not clear; different bodies handle the same matters uncoordinated; relevant facts are inaccessible being only in the possession of the Civil Administration, in an unorganized and unsystematic manner. In fact, the qualified authorities, supposed to examine this information and decide upon it, do not have it; the connection between the executive and the political branches is inappropriate, and there is no clear guidance from one authoritative body.

This harsh situation demands actions. Some of which are:

A central body must be established. It will guide and instruct all other bodies, coordinate them, and certify some of their actions. This body shall hold all information concerning Israeli construction in Judea, Samaria and Gaza, including up-to-date aerial photographs, full data on authorized and unauthorized schemes, titles in land, information about obligations made regarding land allotted, and more.

This coordinative and instructive body will be subordinate to the Prime Minister, and coordinated with the Minister of Defense.

The jurisdiction and authority of all bodies involved in this matter must be clearly defined.

It must be clearly instructed: which actions are completely prohibited, and which are allowed on discretion. Such discretion must be evident, equal and general. Ad hoc decisions, with no clear criteria or reasons, will not be acceptable any more.

The instructive body will check the implementation of government resolutions and this opinion's recommendations, if accepted.

The instructive body will examine money transference to the territories and to Israeli settlements and make sure it doesn't end in unauthorized outposts;

The instructive body will check whether the bodies and authorities mentioned in this opinion have ceased their illegal or improper activity, as mentioned above.

As for this body's jurisdiction and operating mechanism, I recommend an inter-official team, to present to you a detailed proposal.

12.1.2 Distributing the List of Unauthorized Outposts to the Ministries

I recommend the distribution of the unauthorized outposts list to all government Ministries. They will be instructed not to take any illegal action, according to the Attorney General direction of April 2004.

12.1.3 Budgets for Law Enforcement in the Territories

A. The staff at the Supervising Unit of the Civil Administration must be reinforced, in order to actually supervise the illegal Israeli construction in the territories. The Head of the Civil Administration, together with the Coordinator of Government Activities in the Territories and the Legal Adviser to Judea & Samaria will prepare a proposal for the additional staff needed.

B. The proposed changes in security legislation requires new prosecutors to handle illegal construction offences in the territories (I believe three prosecutors are needed).

C. Additional staff is needed at the Legal Adviser to Judea & Samaria Bureau – in order to increase the involvement of the Legal Adviser staff in planning and licensing committees and other Civil Administration committees, to support the amendments to security legislation with the necessary legal advice, and to prepare the State's and the other authorities' responses in High Court proceedings. I believe 3 solicitors must be added for this.

D. Additional staff is needed for the Judea & Samaria Police District, to enable more effective law enforcement. Alternatively, as the Chief Inspector of the Police suggested, Magav police officers posted in Judea, Samaria and Gaza for special operations can be added to the JS District police force.

These changes require budgeting, and I recommend so.

**12.2 Amendments to Existing Government Resolutions and New Resolutions**

12.2.1 I recommend the abolishment of resolution 175, to be replaced by the following one:
This resolution concerns establishing and expanding settlements in Judea, Samaria and Gaza

A. The establishment of a new settlement or the building expansion of a settlement in the Judea, Samaria and Gaza territories (hereinafter: "expansion"), which was established by a government or a Settlement Minister Committee resolution - requires a government resolution.

B. An expansion of the jurisdiction of a regional, aerial or city council or of a settlement in Judea, Samaria and Gaza - requires a government resolution.

C. A settlement established according to a government or a Settlement Minister Committee resolution, and neighborhoods or buildings were unlawfully built nearby, no expansion is to be executed nearby such buildings until it is decided what will become of them.

D. The Minister of Defense shall not grant a planning permit, and a planning committee shall not consider a scheme before presented the appropriate approvals of the political echelon, as required according to this resolution.

12.2.2 Amending Resolution 150 of 1996

I propose some amendments to this resolution.

The resolution is as follows:

"a. With respect to settlement within Judea, Samaria and Gaza… government Ministries shall act as follows, subject to the authorities of the security system and the Minister of Defense in this field, and in the framework of the approved State budget's sections, according to the instructions of the Prime Minister.

b. Any new licensing of planning and State land allotment for construction in the areas is subject to the approval of the Minister of Defense.

c. Planning committees in the areas shall not consider a contour scheme before the approval of the Minister of Defense. Such scheme shall be valid only at the Minister's approval.

d. The above provisions shall be implemented in security legislation in Judea, Samaria and Gaza.

e. This resolution replaces resolution 360 of 22 November 1992…

f. Following the above mentioned: all matters of overall policy regarding settlements, road paving and proposals for establishment of new settlements will be brought to the discussion and resolution of the government."

These amendments must be made:

A. Application of Resolution 150 to Allotments Prior to 1996

This resolution does not consider old land allotments, prior to 1996, made to the Zionist Organization and to other settling bodies and were not yet sub-allotted to others.

Indeed, I recommended the abolishment of all allotments made by the Commissioner to the Zionist Organization and not yet sub-allotted to others.

I do not know whether this recommendation is accepted. I also know there are other settling bodies. I do not know if they land were allotted to them and not yet sub-allotted to others.

Therefore, in addition to my recommendation regarding the Settlement Division, I recommend the amendment of resolution 150, in accordance with its purpose: land allotted prior to the 1996 resolution shall not be sub-allotted, unless it is so permitted by the Minister of Defense.

I therefore propose the following government resolution:

Any land allotment made by the Commissioner of Government and Deserted Property of the Civil Administration to a settling body before government resolution 150, where the land has not yet been allotted by the settling body to others - shall immediately be abolished, and the land shall return to the Commissioner.

Government resolution 150 (and other resolutions if to be made following this opinion) will apply to such land returned to the Commissioner.

B. Land Allotment for Purposes Other Than Construction

Government resolution 150 deals only with land allotments for construcion purposes:

b. Any new licensing of planning and State land allotment for construction in the areas is subject to the approval of the Minister of Defense.

Therefore it seems that the resolution does not apply to land allotment for agricultural purposes. This allows the Zionist Organization to allot lands for agricultural purposes without the approval of the Minister of Defense.

We have already witnessed how land allotted for agricultural purposes then becomes a place for building agricultural farms, and one day an unauthorized outpost appears on it.

One of the claims of such settlers is that they are not invaders, since the World Zionist Organization was the one who allotted their land.

I propose an amendment to government resolution 150, so that any allotment of any kind, either for construction, agricultural or any other purpose, is subject to the approval of the Minister of Defense.

I therefore suggest the following government decision:

Amending resolution 150:

Sub-section b shall be replaced as follows:

b. Any land allotment, either for construction, agricultural or other purposes, and any new licensing of planning, regarding State land in the areas, is subject to the approval of the Minister of Defense.

12.2.3 Government Resolution Regarding the Settlement Division of the World Zionist Organization

A government resolution shall be made ordering the Settlement Division:

a. To abolish all land allotments held by the Settlement Division and not yet allotted to others, if there are any, and return it to the Commissioner of Government and Deserted Property of the Civil Administration (hereinafter: the Commissioner). The Commissioner shall make a similar examination.

b. To abolish all land allotments made to the Settlement Division, and allotted by it to others violating its permit.

c. To abolish all land allotments made by the Settlement Division to others, and are still unused, and return it to the Commissioner.

d. To abolish all land allotments upon which unauthorized outposts were established, and return it to the Commissioner.

e. To cease any activity of the Settlement Division in the territories, unless the Government authorizes ad-hoc the Division as a settling body for the purpose of establishing or expanding a specific settlement in Judea, Samaria and Gaza, that the Government has decided to establish or expand.

f. The Ministry of Finance shall modify the Settlement Division budget in light of the necessary changes resulting this resolution.

g. The Ministry of Finance shall check whether budgets transferred so far to the Settlement Division are directed according to this resolution.

h. The Settlement Division must make every effort to settle the contractual relations between the Commissioner and the settlers in Judea, Samaria and Gaza, regarding land allotted to the World Zionist Organization.

In addition, even if these recommendations or parts thereof are not accepted, it shall be decided:

The Settlement Division shall not purchase generators nor supply them to unauthorized outposts.

12.2.4 Government Resolutions Regarding the Ministry of Construction & Housing

Regarding planning, budgeting and establishing unauthorized outposts and/or buildings

a. The Ministry of Construction & Housing shall not plan a settlement, a neighborhood or any building in Judea, Samaria and Gaza, before running a thorough examination concerning the interests in the lands designated for planning.

b. The Ministry of Construction & Housing shall not plan the establishment of a settlement or a neighborhood without a decision of the political echelon.

c. The Ministry of Construction & Housing shall not plan an unauthorized outpost post factum.

d. The Ministry of Construction & Housing shall not plan, budget or build in lands that are not State lands. For the avoidance of doubt, the Ministry of Construction & Housing shall never take any action mentioned above in survey lands or in private Palestinian property.

e. The Ministry of Construction & Housing shall establish a data base with all the information concerning titles to land in Judea, Samaria and Gaza. This data base shall be accessible to all of the Ministry's departments, including the Rural Building Administration.

f. The Ministry of Construction & Housing shall not finance nor built in Judea, Samaria and Gaza, either directly or through others, without first getting a building permit.

Regarding future purchase of caravans for Judea, Samaria and Gaza

Any purchase of caravans designated for the territories is equal to an approval for building houses in the territories. Therefore, any future purchase, by the Ministry of Construction & Housing or by any other Ministry, of caravans designated to the Judea, Samaria and Gaza territories, is subject to the approval of both the Prime Minister and the Minister of Defense, prior to the publication of a tender for their production or acquisition.

12.2.5 Government Resolutions Regarding the Jurisdiction of the Minister of Defense and the Civil Administration

Initiating land survey procedure in Judea, Samaria and Gaza

(1) No application to declare survey lands as State lands, according to land survey procedure, shall be submitted, and no such application submitted in the past shall be examined, regarding unauthorized outposts if a delimiting order concerning them were issued according to the Order Concerning Unauthorized Buildings (Temporary Instruction) 1539.

(2) No application to declare survey lands as State lands, according to land survey procedure, shall be submitted, and no such application submitted in the past shall be examined, regarding lands on which unauthorized outposts are located, unless Government has decided to examine the possibility of turning the unauthorized outpost into an acknowledged settlement.

(3) No application to declare survey lands as State lands, according to land survey procedure, shall be submitted, and no such application submitted in the past shall be examined, unless Government has previously decided to establish an Israeli settlement in the same area.

(4) No application to initiate land survey procedure shall be submitted without the approval of the Minister of Defense or his Deputy. They may not delegate their authority.

An application according to land survey procedure shall not be promoted if the land is already examined by the Civil Administration, unless the Minister of Defense approves such promotion, and further certifies that this government resolution is implemented regarding it.

Acquisition of Land by Israelis in Judea, Samaria and Gaza

Acquisition of Land by Israelis in Judea, Samaria and Gaza requires the written approval of the Minister of Defense. The Minister of Defense may delegate this authority only to his Deputy.

The Order Concerning Land Transactions (Judea & Samaria) (No. 25), 1967 shall be amended so that the government resolution is implemented in security legislation.

**12.3 Administrative Instructions to State Authorities Regarding Unauthorized Outposts**

12.3.1 Instructions for the Ministry of Construction & Housing

Regarding planning of unauthorized outposts

The Minister of Construction & Housing shall be instructed to immediately cease further planning of unauthorized outposts in Judea, Samaria and Gaza, which are still in planning procedures. Since some of the planning is done by free lance architects, the Legal Adviser to the Minister, with the guidance of the Ministry of Justice, shall check for legal possibilities to cancel the contracts at the minimum cost for the State.

The Ministry of Construction & Housing shall receive a qualified unauthorized outposts list, to be updated from time to time. The Director General of the Ministry shall deliver the list to all branches of the office, especially to Rural Building Administration.

Regarding caravans purchased by the Ministry of Construction & Housing in 2003

The caravans shall not be delivered to others before determining criteria for their disposal. Only after appropriate criteria are set, and contracts are signed with their recipients, and payment arrangements to the Ministry are determined, to the satisfaction of the Legal Adviser of the office, the caravans may be rented or sold to third parties.

The Ministry shall demand the return of the caravans delivered to aerial councils in Judea, Samaria and Gaza.
The Legal Adviser of the office, with the guidance of the Attorney General, shall determine the appropriate legal manner to restore the caravans to the Ministry of Construction & Housing. They shall also determine the appropriate legal manner to demand and receive appropriate payment from these aerial councils or third parties the caravans were delivered to, for the period of possession.

12.3.2 Instructions for the Minister of Defense

I recommend the following instructions to the Minister of Defense:

Regarding allotment of lands by the Commissioner to settling bodies

a.   I recommend the following instructions to the Minister of Defense:

Regarding new allotments:

(1) The Minister of Defense shall instruct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration to cease the allotment of lands at this point.

(2)  The Minister of Defense shall instruct the Coordinator of Government Activities in the Territories and the Head of the

Civil Administration to initiate a serious examination concerning interests in the land to be allotted. No land shall be allotted if it is not State land.

(3) A new allotment decision shall be made only at the written approval from the Head of the Civil Administration to the Commissioner, that the land was reexamined, and after a new up-to-date examination the land was found to be State land. Without such a written approval, the Commissioner shall not allot lands.

Regarding old allotments:

(4) The Head of the Civil Administration shall be instructed to systematically examine all lands previously allotted by the Commissioner to settling bodies, including the Settlement Division, to determine whether the land is State land.

If the land is found not to be State land, any usage or plan thereof is to be prohibited.

b.  Instructing Planning Committees

(5) The Head of the Civil Administration shall instruct planning committees not to approve any scheme for Israeli settlement unless a reexamination proved the relevant land to be State land. The Head of the Civil Administration shall certify that such a reexamination has taken place.

c.  Setting Criteria for Land Allotment

(6) The Head of the Civil Administration, together with the Legal Advisor to Judea and Samaria, the International Law Branch of the IDF, and the Military Attorney General shall set criteria for the allotment of lands for various purposes. These criteria are subject to the approval of the Minister of Defense. The Attorney General may also approve the criteria, if he wishes to do so.

Regarding the requirement for the Commissioner's signature on the building permit as the owner

I recommend an instruction the Minister of Defense, to direct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration as follows:

a.  A planning committee may not consider a building permit application and may not issue a building permit regarding State land, without a written approval of the Commissioner of Government and Deserted Property.

b. The Commissioner shall sign a building permit only after contractual relations were made between the Commissioner and the Division of the World Zionist Organization, and between the Commissioner and the settlers, and only after all payments involved were settled.

c. The Commissioner shall not sign a building permit where the land was allotted to the World Zionist Organization for planning purposes only.

Regarding the requirement for a written approval from the political echelon for considering a scheme

The Minister of Defense shall instruct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration to direct planning committees not to consider a scheme unless presented with a certified political echelon resolution to establish a new settlement or to expand an existing one.

The certificate is required both for the construction applied for, and the expansion of the bounds of jurisdiction.

Building permit for an Israeli according to a Mandatory plan

a. The Minister of Defense shall instruct the Commissioner, that the latter shall sign from now on any application of an Israeli for building permits according to a mandatory plan regarding State lands. The Commissioner must first receive the approval of the Minister of Defense.

b. The Minister of Defense shall instruct the Coordinator and the Head of the Civil Administration to direct license committees not to consider applications for building permits without the written approval of the Commissioner on the application.

c. The Commander of the Area shall be instructed to order that license committees may grant building permits according to a mandatory plan only to Israelis who submit an approval by the Area Commander for such permit.

Regarding the connection of unauthorized outposts to electricity and water networks

a. The Minister of Defense has instructed, as a general rule, that no unauthorized outpost may be connected with electricity. Nevertheless, the Minister of Defense shall instruct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration to propose criteria for exceptions, in which unauthorized outposts shall be connected to electricity, and only when there is a special security need, and subject to the approval of the Head of the Civil Administration.

The Attorney General may review and approve these criteria.

As for connecting an unauthorized outpost to water, the Minister of Defense is of the opinion that no such connection shall be done. This is his general instruction, and I find it satisfying.

b. The unauthorized outposts list, which will be updated from time to time, shall be delivered to the Coordinator of Government Activities in the Territories and to the Head of the Civil Administration. They shall instruct the Electricity and Water Staff Officer not to approve of electricity or water connections to an unauthorized outpost. Where the Water or Electricity Staff Officer is uncertain whether the outpost is unauthorized, he must receive in advance an approval from the Head of the Civil Administration himself, for the connection.

c. The Ministry of Defense shall inform the Director of the Electricity Company and its Jerusalem District Director, as well as the Director of Mekorot and its Center District Engineer, of these instructions, and send them the unauthorized outposts list.

d. In case of an unauthorized outpost connected illegally to the electricity network of an acknowledged settlement, the Minister of Defense shall instruct the Head of the Civil Administration to cut off such connection through the Supervising Unit and Electricity Staff Officer.

Regarding conveyance of caravans

I recommend instructing the Minister of Defense to regulate by the Order Concerning Transference of Goods (1252) and by the Caravan Conveyance Procedure the following provisions (if they are not yet regulated):

1. A precondition for receiving a caravan conveyance permit shall be: presenting a valid building permit issued by a planning committee, which will be attached to the application; presenting an aerial photograph of the caravan's destination, a valid detailed plan, and a written approval by the local council engineer assuring the caravan will be placed according to the plan.

2. In every application for caravan conveyance permit, the Civil Administration and the Coordinator shall examine whether the building permit was legally issued, and whether the caravan is to be located according to the plan. They shall submit their written opinion to the Minister of Defense.

3. A petitioner for a caravan conveyance permit shall clarify, in a written legal affidavit, the necessity in conveying the caravan into the territories.

4. A caravan conveyance permit shall be conditioned, as suggested in section 5 as follows.

5. An applicant shall deposit a guarantee to insure the caravan arrives at its destination and stays there. If one of the conveyance permit provisions is violated within 18 months after the arrival of the caravan to the Judea, Samaria and Gaza territories, the guarantee will be confiscated.

6. The Commander of the Area shall determine the amount of the guarantee by issuing an order.

Regarding the Supervising Unit of the Civil Administration

I recommend instructing the Minister of Defense to direct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration as follows:

1. To define the supervising jurisdiction of the Supervising Unit as including the Israeli settlement in Judea, Samaria and Gaza in these places: the Supervising Unit shall supervise any area of Israeli settlement that a building permit cannot be issued in by the power of a detailed scheme; the Supervising Unit shall supervise any area where construction is done in contrary to the destination of the land. The Head of the Civil Administration shall regulate, with the approval of the Minister of Defense, supervising rules according to these instructions, for the Supervising Unit.

2.  To considerably increase the Supervising Unit's staff, in light of its unit's deployment.

3. Since the Minister of Defense has agreed that aerial photography flights will take place once a month, a responsible body shall be determined to execute this instruction. The photographs will be delivered to a deciphering unit, and shall be used by the Supervising Unit as an important tool for receiving information from the ground. The information gathered shall be delivered regularly to the Coordinator of Government Activities in the Territories and to Mr. Shpigel, Assistant to Defense Minister.

Regarding the execution of destruction orders

The Minister of Defense shall be instructed to examine all destruction orders valid today. He shall be instructed to execute all valid destruction orders, and to coordinate the implementation of existing delimiting orders.

A permanent forum shall be established for discussion, follow-up and supervision of the execution of destruction orders, headed by the Head of the Civil Administration.

Regarding regularization of planning status according to section 34a of the Jordanian Planning and Construction Law and granting caravan conveyance permit based upon it

I recommend instructing the Minister of Defense to regulate the abovementioned rules he has set (sec. 9.1.10) concerning the use of section 34a of the Planning and Construction Law. I recommend regulating an additional requirement for a legal affidavit clarifying the need for a building permit and the urgency for it.

Regarding setting fixed periods for Civil Administration officials

The Minister of Defense shall be instructed to direct the Coordinator of Government Activities in the Territories and the Head of the Civil Administration to set fixed periods for managing roles in the Civil Administration, in coordination with the Civil Service Commission.

Regarding the Assistant to Defense Minister - Settlement Affairs

I recommend considering whether there is a need for the office of an Assistant to Defense Minister - Settlement Affairs. If you decide there is a need, please consider instructing the Minister of Defense to appoint in the future someone who is objective and uncommitted to a particular sector.

**12.4 Knesset Legislation Proposals**

Amending section 2(a) of the Law Extending the Validity of Emergency Regulations (Judea, Samaria and Gaza - Judgment of Offences and Legal Aid), 1977

I have proposed legislation regulating the prosecution of an Israeli who has committed the offence of conveying a caravan without a permit (or not according to a permit); and the prosecution of an Israeli who violated the Order Concerning Unauthorized Buildings (Temporary Instruction) 1539; and Israeli who violated a closed military area order; entering A zone without a permit; transferring dangerous materials without a permit.

Therefore I propose amending section 2(a) of the Law Extending the Validity of Emergency Regulations (Judea, Samaria and Gaza - Judgment of Offences and Legal Aid), 1977, by supplementing section 1a to the abovementioned section 2(a), as follows:

"In addition to any other law, Israeli courts are authorized to judge an Israeli for any action or omission done within the area if it were an offence according to security legislation in the area, and it is enlisted in the supplement".

The supplement shall include offences according to security legislation, which are not considered offences in Israel. With no appropriate legislation - it is impossible to prosecute. For example: conveying caravans in Judea, Samaria and Gaza without a permit, a violation of the regulations concerning conveyance of movable buildings issued by the power of the Order Concerning Transference of Goods; Order Concerning Unauthorized Buildings (Temporary Provision) (1539); entering a sealed military area, a violation of the order concerning security instructions; conveying flammable material within the area to A and B zones with no permit, delivering flammables to the area and conveying them inside it, without a permit according to Regulations Concerning Transference of Goods (Conveying Flammables into A & B Zones) (Judea, & Samaria), 2002, issued by the power of the Order Concerning Transference of Goods.

**12.5 Reform in Security Legislation**

I propose reform in security legislation, which these are part of:

A. Regarding evacuation of outposts - the existing legislation seems sufficient. At this time there is no need for alternative legislation.
B. Amending the punishment provision of the Order Concerning Unauthorized Buildings (Temporary Provision) 1539. A specific punishment shall be set for violating this order. There should be a substantial imprisonment punishment and a burdensome penalty.

C. Amending the Jordanian Cities Villages and Buildings Planning Law, Temporary Law 79 of 1966, so that building without permit is a criminal offence. An authoritative court is set and prosecutors authorized.

D. Amending the Jordanian planning and building law, in order to apply a similar arrangement as the Israeli need for "Form No. 4" as a precondition for connecting a building to water, electricity and telephone networks. Provisions as similar as possible to section 157a of the Planning and Construction Law, 1965 and to section 5 of the Planning and Construction Regulations (Permits for Electricity, Water and Telephone Services), 1981 shall be legislated.

E. Amending the Order Concerning Transference of Goods No. 1252, 1978 and  Regulations Concerning Transference of Goods (Caravan Conveyance), to allow confiscating a caravan placed on the ground or connected to infrastructure and removing it without the need for a judicial process, within a fixed period of time.

F. I further suggest supplementing conditions for a caravan conveyance permit, to the Order Concerning Transference of Goods No. 1252: (1) No caravan conveyance permit may be granted unless a valid building permit to place the caravan in its destination is presented; an aerial photography of the caravan's destination; a valid detailed plan; and a written approval by the local council engineer assuring the caravan will be placed according to the plan. (2) The petitioner shall clarify, in a written legal affidavit, the necessity for the caravan. (3) The applicant shall deposit an 18-month guarantee to insure the caravan arrives at its destination and stays there.

G. Legislation granting more extensive powers to handle illegal invaders to private Palestinian property, by amending the Order Concerning Removal of Invaders (1472).

H. Amending the Order Concerning Approval of Planning and Construction Proceedings (No. 1445) (hereinafter: "Building Procedure Approval Order"), which validated government resolution 150 of 1996, according to security legislation.

I. The Order Concerning Land Transactions (Judea & Samaria) (No. 25), 1967 shall be amended. Acquisition of land by Israelis in Judea, Samaria and Gaza territories shall require the written consent of the Head of the Civil Administration.

**12.6 Recommendations for the Attorney General**

Legal Measures

Ministry of Construction & Housing officials and others involved

I recommend delivering all the information gathered in this report to the Attorney General, in order to consider legal measures against State officials and others who were knowingly acted against the law, regarding the establishment of unauthorized outposts and the caravan affair in the Ministry of Construction & Housing, including all aspects of publishing the tender for caravan production, the winning bid, the conveyance of caravans into unauthorized outposts, and any other matter concerning the caravan affair.

As for the Assistant to Defense Minister - Settlement Affairs:

I recommend delivering all the gathered information concerning the function of the Assistant to Defense Minister - Settlement Affairs to the Attorney General, in order to consider legal measures against him.

Recommendation for Government Resolution to be Drafted by the Attorney General

I recommend the Attorney General draft a government resolution concerning budgeting a favored project: When a government office wishes to budget some special project out of special funds, and this project gives priority to one sector over others, the Ministry must set the criteria for such budgeting, and make them public.

Expanding the Jurisdiction of the Prof. Eyal Zamir Committee Regarding First registration

The Attorney General shall consider expanding the jurisdiction of the committee, to examine possible ways to prevent settlers who took unlawful possession of land from gaining title to it by labor and possession, according to sections 78 & 20 of the Ottoman Land Law.

## Conclusion

The reality revealed is difficult.

For years Israeli governments have dismantled of their roles, not formally but in fact, and left the scene for the executive echelon. Instead of the government deciding on establishing settlements in Judea, Samaria and Gaza, others took its place, beginning in the mid nineties:

The "engine" behind a decision to establish outposts are regional councils in Judea, Samaria and Gaza, settlers and activists, imbued with ideology and motivation to increase Israeli settlement in the Judea, Samaria and Gaza territories. Some of the officials working in the Settlement Division of the World Zionist Organization, and in the Ministry of Construction & Housing, cooperated with them to promote the unauthorized outposts phenomenon. These actions were apparently inspired by different Ministers of Housing in the relevant times, either by overlooking or by actual encouragement and support, with additional support from other Ministries, initiated either by officials or by the political echelon of each Ministry.

The result was that the executive echelon, so to speak, became the deciding echelon, with no authorization, in contrary to government resolutions, baring no political or public responsibility, which by nature of things rests upon the political echelon.

All of this with massive financing by the State of Israel, with no appropriate transparency, no criteria.
The establishment of unauthorized outposts violates standard procedure, good governing rules, and especially an ongoing bold law violation.

Furthermore, the State authorities speak two voices. Sometimes grant, and sometimes prevent. Rules have become flexible. One hand builds outposts, the other invests money and force to evacuate them.

These actions were not done by individuals only. The problem is State and public authorities took part in breaking the law. They are the ones who financed construction without a resolution by the political echelon, in contrary to government resolutions, with no legal planning status, sometimes not on State owned land, sometimes on private Palestinian property or on survey land.

State authorities and public authorities broke the laws, regulations and rules made by the State.

The IDF, who has sovereignty in Judea, Samaria and Gaza, and is responsible for peace and security, and the Israeli police, who is responsible of law enforcement in these territories - both fail to stand up to their missions. Law enforcement bodies cannot act against State authorities breaking the law. They cannot handle a mixed message, that the outposts are illegal but encouraged by the authorities.

The security concept, that wherever there is an Israeli person - IDF will be there to protect him, resulted in a very sad reality. Therefore, any settler who places his home wherever he chooses, even if unauthorized and against the law - gains the protection of the army. The outcome is that the settlers are the ones who set the army's deployment in the territories, not the army. Everyone is king. In order to protect one outpost, forces must be taken out of other places. The forces are not unlimited, and so the security level drops down.

The protection supplied by IDF to unauthorized outposts, its mere existence there, drags it unwillingly to give its "seal" to unauthorized outposts.

And as if all this is not enough, the law enforcement tools in Judea, Samaria and Gaza is lacking. The security legislation does not support law enforcing bodies with the necessary tools to handle law violations regarding unauthorized outposts. Long time needed legislation was not done, even though the bodies involved are well aware of it. A certain change appears, maybe, in the last few months.

The State of Israel is a democratic state. This is what the Declaration of Independence and the Basic Laws teach us. This is the glue that sticks all its citizens together, allows them to live together in one political entity.
Democracy and the rule of law are two inseparables. One cannot exist without the other.

The reality drawn up in this opinion shows that all of these deeds seriously endanger the principal of the rule of law. Even though the outposts are built in the Judea, Samaria and Gaza territories and not in Israel, the settlers and the authorities who take part in their establishment are Israeli. A continuing, bold, institutionalized law violation undermined the rule of law. When law violations become standard behavior it tends to spread into other areas.

The Jewish settlement in the Judea, Samaria and Gaza territories is a matter in great dispute in Israel. Some support it passionately, others oppose it. Settlement policy in the Judea, Samaria and Gaza territories is should be decided on by an elected government.

But any government policy must obey the law. All officials and politicians are governed by law.

The actions described are not a matter of political view. It is a matter of law enforcement, a question of the rule of law.

In order to maintain the democratic regime of Israel, urgent measures must be taken to change the reality I have described. It can no longer be accepted. It must be reformed, and I believe you have the power to do so.
I therefore suggest to implement my recommendations.

Talya Sason, Adv.

Cc:  Attorney General

Close

# EXHIBIT D



# Statement by the Press Secretary

**FOREIGN POLICY**

Issued on: **February 2, 2017**

★  ★  ★

"The American desire for peace between the Israelis and the Palestinians has remained unchanged for 50 years. While we don't believe the existence of settlements is an impediment to peace, the construction of new settlements or the expansion of existing settlements beyond their current borders may not be helpful in achieving that goal. As the President has expressed many times, he hopes to achieve peace throughout the Middle East region. The Trump administration has not taken an official position on settlement activity and looks forward to continuing discussions, including with Prime Minister Netanyahu when he visits with President Trump later this month."

# EXHIBIT E

# Press Briefing by Press Secretary Josh Earnest, 10/5/2016

James S. Brady Press Briefing Room

1:36 P.M. EDT

MR. EARNEST:  Good afternoon, everybody.  I apologize for keeping you waiting this afternoon.

You all had an opportunity to hear from the President a little bit earlier today who traveled to FEMA and got an update from officials at DHS, including the FEMA Administrator.  The President indicated that Hurricane Matthew is a very serious storm and that people should take it seriously.  The federal government is certainly undertaking an important effort to prepare for the storm, mobilizing personnel and resources, pre-staging them in strategically valuable locations so that we can mobilize a response in the event that the storm takes the worst possible track.

We want people to be mindful of taking this seriously, as well.  So there are essentially three things that we're encouraging them to do.  The first is to listen carefully to weather reports and to track this storm, particularly if you live in the Southeastern region of the country.

The second thing is we want people to go to Ready.gov and understand exactly what preparation they can undertake in advance of the storm to ensure that they and their family are safe.

And then the last thing -- and in some ways this is the most important thing -- we want people to listen very carefully to the advice and instructions that are provided by local officials.  Local officials are the ones who know their communities best.  They are getting up-to-the-minute information about the track of the storm and the intensity of the storm from scientists at the federal government, and they are making determinations about what steps people must take to ensure their safety and security.

And obviously we want to make sure that we're looking out for all the human lives that are involved.  And so we encourage people to listen carefully to the instructions that they receive from local officials in the days ahead.

So, with that, Nancy, do you want to get us started?

Q    Thanks, Josh.  Can you give us any sense of the scale of the classified information theft that was announced today at Justice?

MR. EARNEST:  Well, Nancy, this is -- there was a complaint that was made public today by my colleagues at the Department of Justice.  The existence of that complaint obviously is an indication that there is an ongoing criminal investigation.  That's going to limit quite sharply what I'm able to discuss from here.

Fortunately, the complaint that they released does include quite a bit of information about what they've uncovered thus far in the context of their investigation.  So for the facts of this case, I'd refer you to that complaint that has been unsealed.  But there's not much additional information that I can share from here to shed additional light on that investigation other than to point to the fact that this investigation is still ongoing.

Q    Is it troubling, though?

MR. EARNEST:  Well, I think anytime that information like this is released in the context of a criminal complaint, the federal government is reminded of how important it is to be vigilant about protecting the national security of the country and information that is rel-evant to our national security.  So this is certainly a situation that the Department of Jus-tice takes seriously, as evidenced by their complaint.  This is also a situation that President Obama takes quite seriously.  And it is a good reminder for all of us with secu-rity clearances about how important it is for us to protect sensitive national security information.

Q    Can you give us some sense of thoughts on the French Foreign Minister's efforts to restart U.S-Russia talks on the ceasefire in Syria?

MR. EARNEST:  Well, I know that there have been a variety of statements from diplo-mats around the world who are seeking to address the deeply troubling situation in Aleppo.  And I know that there has been an effort at the United Nations that the French

have been promoting to express the international community's grave concern about the situation there.

The United States, in fact, is participating in diplomatic conversations in Europe through the ISSG -- this is the International Syria Support Group.  This is a multilateral organization that's been formed to address the situation in Syria and try to promote international cooperation to confront the situation inside of Syria.

Obviously, there's a U.N.-led effort by Mr. de Mistura, the U.N. envoy.  He is trying to facilitate the kind of diplomatic conversations that could reduce violence inside of Syria. And the United States continues to be involved in a range of diplomatic efforts with other countries in the region that have deep concerns about the situation in Syria, and share the U.S. deep concerns -- the United States' deep concerns about the potential national security impacts of the chaos inside of Syria.

So there are extensive diplomatic conversations taking place in a variety of settings, and the United States is continuing to expend significant effort in diplomacy to reduce the violence in Syria, to expedite the provision of humanitarian assistance inside of Syria, and to facilitate the kind of political talks that would lead to a political transition inside of Syria.

Q    So the U.N. today released a pretty compelling satellite imagery from Aleppo showing recent devastation and damage there.  Is that the type of thing that the President would be receiving in his briefings?  And do you have any thoughts on --

MR. EARNEST:  Well, the President is certainly being regularly updated about the situation in Syria.  And the satellite imagery that was released by the United Nations illustrating the terrible impact of the bombing campaign of the Syrians and the Russians tragically is not particularly surprising.  There are a wide variety of anecdotal reports of cluster munitions, bunker busters, bunker buster bombs, and other incendiary explosive devices that are taking an extraordinary toll on the civilian population in Aleppo.  The widespread reports of the children that have been killed in Aleppo just in the last few weeks are gut-wrenching, to say nothing of the innocent men and women who have been killed in those military operations.

Ordinarily, you would be heartbroken to learn that this was the result of some sort of accident.  But it's clear that the Syrian regime, backed by the Russians, is engaged in a strategy of bombing those civilians intentionally to try to get them to bend to the will of

the Assad regime.  They are seeking to drive those innocent civilians out of their homes and out of their communities to accomplish a military and political objective.

It's why the United States has supported a range of diplomatic efforts, including at the U.N., to ensure that those who are responsible for these actions are held accountable.  So the images are deeply troubling.  And the President is regularly updated on this situation, but anybody who reads the newspaper isn't surprised by what those jarring images reveal.

Roberta.

Q    Reuters reported yesterday that the U.S. government directed Yahoo! to build a software program to scan arriving emails.  And I'm wondering if you could tell us why the government wanted to do this, and whether orders have been -- similar orders have been issued to similar companies looking to scan incoming traffic for certain words or characters, or build custom software to do that.

MR. EARNEST:  Well, Roberta, I appreciate the question.  As I think you would anticipate, I'm quite limited in what I can say because the report purportedly refers to intelligence programs, and I don't spend a lot of time discussing the intelligence programs here, and I certainly don't confirm the existence of individual intelligence programs or individual intelligence tools.

But let me try to respond to your question knowing that I can't discuss the details of the report, or even confirm that the report itself is accurate.  But let me just say that we have discussed -- what we have discussed in here many times -- and we discussed this a lot last summer as the United States Congress was working to implement a bunch of reforms championed by the President to ensure that we were protecting our national security and the civil liberties of the American people.  But what I can tell you and what we've discussed in the context of that debate is that the intelligence community has specific tools available to collect intelligence information, including the Foreign Intelligence Surveillance Act.  And collection under FISA is subject to rigorous oversight by all three branches of government.

Under FISA, activity is narrowly focused on specific foreign intelligence targets and does involve bulk collection or the use of generic keywords or phrases.  The United States only uses signals intelligence for national security purposes, and not for the purpose of indis-

criminately reviewing the emails or phone calls of ordinary people, and certainly not of law-abiding American citizens.

The reforms that the President has championed, both using his executive authority and in supporting the USA FREEDOM Act, does bring a measure of greater transparency to these programs, with obvious limits. But those reforms also include beefed-up oversight of the use of these tools. So in the context of FISA, we have previously discussed the existence of FISA courts, essentially federal judges who, in a classified setting, act independently to review requests from intelligence professionals about tools or tactics that they intend to deploy. Those judges obviously have a very important role in this process, and these are federal judges that are able to provide oversight.

In addition to that, within the executive branch there are independent inspectors general offices that have jurisdiction over these kinds of programs. These are attorneys who take very seriously the responsibility that they have to ensure that reforms are implemented and that the rules are followed.

There has also been an expedited schedule for our intelligence professionals reporting to Congress about their activities. And providing that information to the legislative branch also enhances oversight.

The President has also been determined to ensure that we are prioritizing self-reporting -- and again, within the constraints of classified programs. So, for example -- I'll just give you two examples. The first is, there's a Privacy and Civil Liberties Oversight Board that is a bipartisan agency within the executive branch, and earlier this year released its most recent recommendations assessment report. You'll recall that in 2014, they issued a report putting forward 22 suggested reforms. And they have on a regular basis -- I believe it's an annual basis -- been submitting public reports to update the American public on how effectively those reforms have been implemented.

In addition to that, the President has also mandated an annual schedule in which the Office of the Director of National Intelligence issues reports about the effectiveness of implementing reforms that balance our civil liberties with our national security needs. And there have been a couple of versions of that report that have come out. And I can tell you that the Office of the Director of National Intelligence will issue another of those annual reports before the President leaves office in January.

So there is a mechanism for the public -- again, within the constraints of our ability to discuss classified information -- to evaluate the effectiveness of the reforms that President Obama has championed to ensure that the civil liberties of law-abiding Americans are protected, even as we use powerful tools to protect our homeland security.

Q    So just to make sure I understand, you're not confirming the use of any of these tools that were reported on.  But if any tool was used, it would be subject to that kind of oversight that you described.

MR. EARNEST:  Let me just say that, in general, the tools that are used by the intelligence community to keep us safe are subjected to rigorous oversight by all three branches of government, particularly when these tools are approved in a FISA court.

Q    And the lead European regulator on privacy issues said today that they're very concerned about this report.  And I'm wondering whether U.S. officials have been able to give assurances to their counterparts about whether non-American citizens are caught up in the use of these kinds of tools, and whether any assurances -- whether the government was able to provide any assurances in this case.

MR. EARNEST:  Well, the United States has an important information-sharing relationship with intelligence agencies around the world, and a number of those agencies that are based in Europe are some of our closest partners.

I can't speak to any of the specific conversations that have taken place between U.S. intelligence officials and their foreign intelligence counterparts, but the principles of the reforms that the President initiated over the last couple of years has been rooted in the idea that the United States does not collects signals intelligence for the purpose of suppressing criticism or dissent.  The United States does not collect intelligence for the purpose of disadvantaging people based on ethnicity, race, gender, sexual orientation, or religion.  The United States does not collect intelligence information to provide a competitive advantage to U.S. companies or U.S. commercial sectors.  And in fact, this administration has made clear that we recognize the difference between what we are able to do with our intelligence capability and what the United States should do with our intelligence capability.

That is the intellectual bedrock of many of these reforms, particularly as it relates to some of the concerns that have previously been raised by foreign intelligence agencies. And, again, the President is quite proud of the success that we have had in instituting

reforms that certainly protect the privacy and civil liberties of the American people, but also do have a positive impact on the privacy and civil liberties of people outside the United States, as well.

But the President, at each step in implementing these reforms, has also gone to great lengths to make sure that we're using these tools effectively to protect our national security. And as the President of the United States, he certainly takes very seriously the responsibility that he has to prioritize U.S. national security.

Michelle.

Q   Thanks, Josh. The fact that these two thefts of information, both from the NSA -- two in just a couple of years -- involved contractors, does the White House think that that necessitates some greater scrutiny on the process of who these people are, how they come to get into that system?

MR. EARNEST: And when you say these two cases, you're talking about the case of Mr. Snowden as well, I assume.

Q   Mm-hmm.

MR. EARNEST: Well, Mr. Snowden is obviously somebody who has been charged with very serious crimes related to classified information and related to his failure to live up to the commitment that he made to protect that information.

Since 2013, the year that all of us heard of Edward Snowden for the first time, the federal government has taken a number of steps to enhance the protection and security of classified information, including guarding against unauthorized disclosures, especially intentional disclosures. Those steps include building up an effort at the Director of National Intelligence, called the National Insider Threat Task Force. This task force has essentially established government-wide minimum standards for insider threat programs for all agencies that handle classified information. This task force has also launched continuous evaluation programs within the intelligence community to ensure that the high standards that they have set are being adhered to.

There are also some more basic changes that have been made with regard to the way background investigations are conducted. For example, there's now a five-year reinves-

tigation requirement for all individuals with a security clearance. There's also been an effort undertaken to enhance the quality of background investigations. Part of this involves the creation of a National Background Investigations Bureau that will ensure that these background investigations are conducted more efficiently and more effectively.

Coincidentally or not, it is a coincidence. Just earlier this week, the new director of the National Background Investigations Bureau was announced. And that's an indication that they're moving forward on implementing these kinds of reforms.

One other reform that was promoted in the context of the review about what we could do to counter insider threats was reducing the number of people that have access to classified information. And just in the last couple of years, we've succeeded in reducing the number of people that hold classified clearances by 17 percent. So that's an indication of some tangible progress that we have made in ensuring that this information is well protected.

Q   So seeing two pretty high-profile cases in just three years, what's your confidence level then that there aren't more thefts and leaks out of what is supposed to be the most secure agency really in the country?

MR. EARNEST: Well, listen, the President has got a lot of confidence that the vast majority of people who serve this country in the national security arena, particularly our professionals in the intelligence community, are genuine American patriots. These are professionals who, in many cases, could pursue a rather lucrative private-sector career based on their specific skills and expertise, but have chosen to use those skills to serve the American people and to protect the United States of America and our allies. These people are patriots. And these are people who take very seriously the responsibility that they have to protect the United States of America and to protect the information that could endanger the United States of America.

So that said, we have a responsibility to those professionals and to the American people to be vigilant about ensuring that we are doing everything possible to protect this sensitive information and allow our intelligence professionals to do the important work that they're charged with to protect the American people.

Q   Okay, and other news. Did the President watch the debate last night? How much did he watch? What did he think of it?

MR. EARNEST:  I didn't have an opportunity to talk to him about it.  I know that he was planning to watch the debate.

We've talked in here a couple of times now about the warm feelings that the President has for Senator Kaine.  Senator Kaine is somebody who in the early days of then-Senator Obama's presidential campaign was among the first, if not the first, statewide elected officials to endorse President Obama's campaign.

That was a pretty good sign to the President that he could count on somebody like Tim Kaine to have his back when he needed it.  And throughout his campaign, Tim Kaine had the President's back.  In the earliest days of the presidency, the President asked then-Governor Kaine to serve as the chairman of the DNC.  He served in that role with distinction.  And while he served the Commonwealth of Virginia in the United States, President Obama has been able to work effectively with Senator Kaine and has been able to count on Senator Kaine having his back there, too.

And I think Senator Kaine was able to demonstrate publicly that when he makes a commitment to back you up, that that's exactly what he's going to do.  And that's a testament to his character, and it's a testament to his leadership.  It's a testament to his commitment to a whole set of principles and values that Secretary Clinton shares.  It's also a testament to why the President thinks he's such a good friend.

Q   Did Mike Pence win the debate last night?

MR. EARNEST:  I know there's been lots of analysis that's been done here, and I'll let others weigh in with their personal opinion.  I'm obviously more than a little biased.

Q   Fair enough.

MR. EARNEST:  Chris.

Q   One thing that didn't come up during the debate last night was Governor Pence's decision to sign into law a measure that was seen to enable anti-LGBT discrimination, a measure that you have criticized from the podium --

MR. EARNEST:  Yes.

Q   -- that was signed last year.  Would a question on Pence taking that action have been useful in highlighting his record?

MR. EARNEST:  I'm not going to second-guess the efforts of Elaine Quijano, who was the moderator last night.  She came prepared with a long list of very serious, direct questions for each of the candidates.  And I suspect based on the sharpness of her questions that that was almost certainly one of the questions that she had in her stack.  She probably just didn't get around to it.

But look, I'm not going to second-guess the moderators here.  They've got a very difficult job.  And the most important responsibility that they have is to be fair and ask tough questions.  And it seems to me that's exactly what Ms. Quijano did last night.

Q   Aside from whether or not the question was asked, do you think it's important that voters are reminded of Pence's record on signing this anti-LGBT law as evidence of the way that he would govern if elected to the number-two position at the White House?

MR. EARNEST:  The President certainly feels strongly that voters across the country should carefully consider the agenda, priorities, and record of the president and vice presidential candidates in this race.  So that is worthy of scrutiny.  And so again, I'm not going to second-guess the moderator in terms of which questions were asked.  But it certainly would have been a relevant and fair question to have been asked because his actions as governor should weigh on the decision that voters make, but ultimately it will be up to voters to decide how they factor that criteria into their decision.

Q   In your opinion, his decision to sign that law was a detrimental action?

MR. EARNEST:  Well, what I will say is that I've spoken out publicly with some rather sharp criticism of the law, in part because of the impact that that law has on the people of Indiana.

The business climate of the state of Indiana does not benefit from laws that open up potential customers or employees to being discriminated against.  And North Carolina has gotten some attention for the negative economic consequences of signing those kinds of bills into law.

I remember rather vividly when Governor Pence was on Mr. Stephanopoulos's show on one Sunday morning a year or two ago and trying to defend his decision to support this law.  And he struggled mightily to do so, in part because it's hard to make a case that that's good for the state.

But, again, in terms of what impact this has on people's decision in the presidential election, people are going to have to weigh the factors for themselves.  There are obviously a number of things to consider.  But it certainly would be legitimate in the mind of the President for somebody to consider that aspect of Governor Pence's record in determining whether or not to support the Republican presidential ticket this fall.

Go ahead, Lynn.

Q    Thank you so much.  On another topic.  Last year, Obama pulled for the Cubs once his White Sox were eliminated.  The Cubs now are in the playoffs this year.  I'd like to know what you can say about what Obama might be viewing or thinking about the Cubs.  And they play in the playoffs Friday and Saturday night, this weekend, when Obama will be in Chicago.  Do you know if Obama has any chance of maybe going to Wrigley Field, or watching it from Chicago?  Can you just reflect then on the President and the Cubs?

MR. EARNEST:  Well, the President is a loyal Chicago White Sox fan.  And in his mind, when it comes to evaluating baseball teams, that's the team that comes first.  But the President is also a champion of his hometown, and he certainly has been pleased to see the Chicago Cubs play so well this year.  It's been a long time coming, and Cubs fans have been waiting a long time for a team that looks like this.  And there's a reason that they are considered by just about everybody the favorites to win the World Series.

But the playoffs in baseball are exciting, and I know the President is looking forward to tracking their progress through the playoffs.

Q    Do you think there's a chance, though, that he might go to Wrigley?  And as you consider that answer, the Ricketts family that owns the Cubs, a wing of it, are conservative Republicans who are helping to bankroll efforts to elect President Trump.  Can you comment on that and what you make of that?

MR. EARNEST:  Well, I know there's at least one member of the family who's a pretty enthusiastic support of President Obama.  But I'm confident that the political leanings of the team's ownership would have no impact on the President's decision to attend a game.  The President has talked about how much fun he has had in taking in games at Wrigley Field in the past.  The vast majority of those were before anybody knew they were sitting next to somebody famous when he attended.  But I am not aware currently of any plans that the President has when he travels to Chicago to go to Wrigley Field.  But if that changes, we'll obviously let you know.

Mark.

Q   As long as you're on the issue of Chicago, can you now say whether the President will be casting his vote when he's in Chicago this weekend?

MR. EARNEST:  I don't have a more detailed update on the President's schedule.  Obviously, he is pretty enthusiastic about publicly demonstrating his support for Secretary Clinton's campaign.  We have indicated in the past that part of our conversations with the campaign have involved a discussion about the most effective way to leverage the time that the President can dedicate and support Secretary Clinton.  So that means ensuring that his trips often coincide with voter registration deadlines, or the starting of early voting.  But I don't have any updated -- a detailed update on his schedule.  But we'll be sure to keep you posted.

Q   I'd also like to ask about a State Department statement today, which used the phrase "strongly condemn" the Israeli government about its decision to advance a plan to create a new settlement in the West Bank.  I was struck by the phrase "strongly condemn."  That's something that the government usually uses to denounce acts of terrorism.  We're talking about a friend and a strategic ally.  Why isn't that an overly harsh way to describe the U.S. position?

MR. EARNEST:  Well, Mark, the recent announcement from the Israeli government does provoke strong feelings in the administration.  The fact is, every U.S. administration since 1967 -- Democratic and Republican alike -- has opposed Israeli settlement activity in the Occupied Territories.  This administration, on a number of occasions, unfortunately has publicly restated that view.  And our concern is based on our longstanding view that settlement activity and other efforts to change the facts on the ground in the West Bank and East Jerusalem undermines the goal of a two-state solution to the Israeli-Palestinian conflict.

Expanding these settlements only makes it harder to negotiate a sustainable and equitable peace agreement in good faith between the two parties.  It's also troubling, I would add, that in the wake of Israel and the United States concluding an unprecedented agreement on military assistance designed to further strengthen Israel's security, that Israel would take a decision contrary to its long-term security interest -- a long-term security interest that the United States is prepared to dedicate billions of dollars to protect.

The United States has long believed, and we continue to believe, that it's within the clear interest of Israel's national security to resolve the Israeli-Palestinian conflict in a way that allows a democratic and Jewish state of Israel to live side by side in peace and secu-rity, with a viable and contiguous Palestinian state.  And the announcement of these set-tlements makes that national security priority harder to achieve.

I think another aspect of this that's troubling is this announcement was made while the world was mourning the death of Shimon Peres.  Mr. Peres was a great champion of peace.  And the plans that were announced by the Israeli government fundamentally undermine the prospects for the kind of two-state solution that Mr. Peres dedicated his life to passionately supporting.

So one other thing about this, Mark, that distinguishes this announcement from so many others is the location.  This settlement's planned location is deep in the West Bank.  In fact, the settlement location is far closer to Jordan than it is to Israel.  And it would effectively link a string of outposts that could divide the West Bank and it would make the possibility of a viable Palestinian state all the more remote.

    So I think all of those factors -- the location of the settlement, the timing of the announcement, the recent announcement of the U.S. commitment to Israel's security -- all of that combined would explain why the United States is so disappointed and even sharply critical of this decision that's announced by the Israeli government.

Q   I understand the disappointment, but wouldn't a less vitriolic phrase be more appro-priate when dealing with a friend and a strategic ally.

MR. EARNEST:  Well, Mark, I think, in some ways, this is one of those situations where actions are more important than words.  And if there are people who are wondering about the U.S. commitment to Israel's national security, they have to look no further than the announcement from a few weeks ago that the United States was prepared to make the single largest commitment that we've made in our history to another country's security.  That decade-long commitment of, I believe it's $38 billion, I think it's an indi-cation of how strongly the United States feels about protecting Israel's national security and protecting Israel's qualitative military edge in the region.

Israel is the United States' closest ally in the Middle East.  That's based on our shared values and the longstanding bipartisan commitment to Israel's security that has endured for decades.

But -- well, as long as we're talking about actions, the actions of the Israeli government in announcing this settlement undermine the pursuit of peace.  And our concerns about that are rooted in the policy that's been championed by Democratic and Republican Presidents alike, which is that the pursuit of peace and the pursuit of a two-state solution is squarely within Israel's national security interests.  It also happens to advance the interests of the United States, as well.

Andrew.

Q   A follow up on that question.  Does the White House consider that Bibi broke his word on this?

MR. EARNEST:  Well, we did receive public assurances from the Israeli government that contradict this announcement.  And that's -- I guess when we're talking about how good friends treat one another, that that's a source of serious concern, as well.

Q   And is the timing annoying to you?  I mean, you just agreed on the MOU, the President was just in Israel for the funeral.

MR. EARNEST:  And the world was observing the -- the world was mourning the death of Shimon Peres, somebody who had dedicated a significant portion of his career to trying to achieve the kind of two-state solution that would resolve the Israeli-Palestinian conflict.  This kind of announcement from the Israelis only puts that kind of solution farther from reach.  And that is not good for Israel's national security.  It's not good for the security interests of the United States.  It's inconsistent with the public assurances that have been offered by the Israeli government.  And all that's the source of disappointment and deep concern here at the White House.

Rich.

Q   Josh, at the opening of the briefing, you gave a very detailed list and explanation of safeguards that the administration and federal law has for Americans' privacy.  Would the screening of all incoming emails violate those policies?

MR. EARNEST:  Well, Rich, let me try to answer that in a couple different ways.  Again, I can't -- as much as I would like to discuss publicly the details of this report, I'm just not going to be in a position to.  And that means that -- so that's going to limit my ability to answer your question as directly as I would like.

Case 1:18-cv-01884-RGA   Document 10-1   Filed 01/29/19   Page 132 of 145 PageID #: 224

But we have been quite clear, since the Obama administration initiated a set of wide-ranging reforms three years ago, that we draw a clear distinction between what capability the United States has and the capability that we should use; that this discretion should be exercised to protect civil liberties, to protect privacy without limiting those tools in a way that contradicts or undermines our national security.

The point is, we can do both.  And the fact is, we can do both.  And I think the observation that the President made is that failing to draw that distinction does undermine our national security.  The way that some of those tools were deployed prior to these reforms raised serious concerns around the globe and affected our ability to work with our intelligence agencies.  That's not a good thing.

So the judicious and effective use of these programs, consistent with the reforms that we've implemented, consistent with independent oversight among three different branches of government is good for protecting privacy and civil liberties of law-abiding American citizens.  It also happens to advance our national security interests.

That's why the President has not just pursued these reforms but also ensured that we built in mechanisms to report back to the public about how effective the implementation of these reforms has been.  So we've made important progress with regard to appropriately striking the balance between protecting civil liberties and protecting the United States of America.  But as we develop new tools and as innovations occur that give us new capabilities, it's important for our national security professionals to use these principles to guide their decisions as they appropriately strike this balance.

And, again, the President is pleased with the progress that we've been able to make over the last three years.  The truth is, the progress that we've made on this actually dates back even prior to the emergence of Mr. Snowden.  This administration had initiated a set of reforms in pursuit of these goals even before the alleged criminal acts of Mr. Snowden were disclosed.

So the President is proud of his record on these issues.  But the President would also be the first to acknowledge that the successful implementation of these reforms is going to require some vigilance on the part of our national security professionals.

Q    So he got it?

MR. EARNEST:  Well, again, I think the public reporting that we've gotten from the Director of -- of the Office of National Intelligence, the public reporting that we've gotten from the Privacy and Civil Liberties Oversight Board would indicate that we have been effective in implementing these reforms, in part because the Commander-in-Chief has made them a priority.

But again, it's going to require sustained vigilance.  And this is a challenge that the next President will have to also prioritize; that again, as the United States develops additional capabilities -- the United States has the best intelligence and national security apparatus in the world.  There's a reason that other countries around the world want to partner with the United States, want to find a way to improve their communication with the United States, because they understand how they can benefit from the kinds of capabilities that we have.

And the evolution and improvement of those capabilities is going to require the intelligence community, under the direction of policymakers, to make smart decisions about balancing the need to protect our basic constitutional rights and the need to protect the United States of America.

Q   How would the administration describe its relationship with the tech community in reference to this?

MR. EARNEST:  Well, I think I would acknowledge, as I think the tech community would, that there are some places where we don't see eye-to-eye about the most effective way for us to strike this balance.

I think what is undeniable is that the administration has significantly improved the way that we communicate with technology companies in Silicon Valley.  That's important because we know that the innovators and experts in Silicon Valley should be partners of the United States.

We know that the engineers and executives at technology companies didn't build these platforms so that terrorists would be more effective.  They didn't build these tools so that people who want to harm innocent people can be more violent.  In fact, they built these tools because they're committed to the potential impact they could have in making people freer to communicate or express their views, or to associate with people who share their opinions on a range of topics.

So there's a lot of common ground to be shared.  This administration, this government is certainly committed to protecting those kinds of rights to free speech and expression and association.

And we've also found that the innovation in the tech sphere has also been extraordinarily good for the U.S. economy.  We certainly don't want do anything that would inhibit the continued innovation of that technology.  We also want to make sure that those innovations aren't used by people who are seeking to do harm to the United States of America.

And so there is an opportunity for the United States government and tech companies here in the United States to effectively coordinate.  And we have -- there is one example.  Well, there are many examples.  But let me just cite one example of where the United States government and technology companies have become more effective at coordinating their efforts.

We know that extremists affiliated with ISIL use a wide range of social media tools to propagate their hateful ideology.  And there are documented cases where the propagation of that ideology through social media has radicalized people in far-flung corners of the world.  And the United States government has worked effectively with Twitter and other social media organizations to shut down the channels that are being used by those extremists.  That's a good thing.  And that's an indication of the kind of effective coordination between the U.S. government and technology.

I don't want to leave you with the impression that Twitter or any other social media company agrees on all these issues with the U.S. government.  They don't.  They probably disagree with us more often than they do agree.  But these are complicated issues.  And our ability to communicate with them and work through these challenges and identify common ground that will enhance the national security and the privacy of the American people is important.  And we have succeeded in doing that in a way that hadn't been done before.

Q    And finally, on Obamacare very quickly.  Do you think that former President Clinton's comments from a couple of days ago will hamper efforts to get people to sign up in this open enrollment season?

MR. EARNEST:  I don't think so, because I think people are making decisions based on a very specific consideration of what's best for their family and what's best for the pocketbook.

And the vast majority of people who go shopping on the marketplaces when the open enrollment period starts in November will find quality, affordable health care options available to them for less than a hundred dollars a month.  That's an indication -- that's one piece of evidence that the Affordable Care Act is succeeding in its mission in limiting the growth in health care costs -- certainly when you compare it to the explosive growth we saw in health care costs before the Affordable Care Act went into effect.  But it's also undeniably succeeding in expanding access to quality affordable health insurance to more Americans than ever before.

Margaret.

Q   Josh, the Russian government said today it was suspending an agreement with the U.S. on uranium research, and made a similar announcement about plutonium earlier in the week. Given that nuclear security is such a high priority for the administration, is the White House concerned that nuclear security is being used as a bargaining chip here by Vladimir Putin?

MR. EARNEST:  Well, again, I think you'd have to discuss with my Russian counterpart the true intentions of Mr. Putin in this particular policy decision.

What I can tell you is that it's certainly within the national interest of the United States of America for us to prioritize nuclear security.  And I think any impartial observer would conclude that it's within the national security interests of Russia for nuclear security to be prioritized.

There is an opportunity for the United States and Russia to work together in pursuit of those goals.  In fact, we have recently.  And we're hopeful that we'll be able to continue to do that moving forward, even in the midst of some vigorous disagreements on other issues.

Q   And you see this as related to those other issues?

MR. EARNEST:  Well, again, I will leave it to President Putin to explain exactly what his motive is and whether or not he believes that is somehow connected to other disagreements that he has with the United States.  He's obviously making a range of unilateral decisions, so I'll let him explain them.

What I will say is that the United States believes that these are important priorities, and we're hopeful that agreements that were reached by the Russian government -- or between the United States and Russian government that were rooted in each side's national interest will continue to be pursued, not just because of the explicit obligation that they have to pursue those agreements, but because of the clear national interest that they have in seeing those agreements thrive.

Q    Did you happen to notice that your face ended up on the Russian Embassy's Twitter feed, next to a weapons system, earlier today?

MR. EARNEST:  I only saw it because you helpfully retweeted it.  (Laughter.)  So thank you for that.

Q    I thought it was notable.

MR. EARNEST:  I see.

Q    Did you have a comment on why they would be posting you next to the line, "Every defensive measure necessary will be taken to protect our personnel stationed in Syria from a terrorist threat"?

MR. EARNEST:  I have no idea what message they were trying to send.  If they'd like better pictures, though, I'm happy to send some.  (Laughter.)

Q    Hopefully without an S-300.  (Laughter.)

On a more serious note, though, I do want to ask you -- the Syrian regime has announced that people should flee Aleppo, and they have offered safe passage, so to speak, to those who seek to do that.  Does the White House believe it's just too late to intervene to save those people in Aleppo?

MR. EARNEST:  Well, I think what's clear is that the Assad regime continues to pursue a strategy of bombing civilians into submission.  It's grotesque.  It's disgusting.  And there are many observers who have declared that it is a violation of international law.

The situation in Aleppo is one that is a source of deep concern.  And the willingness of the Russians to aid and abet the Syrians in carrying out this murderous campaign against innocent civilians raises a lot of questions about their credibility.  It certainly has iso-

lated them in the international community.  And it's something that we're deeply con-
cerned about.

Q   Does that concern translate into considering action this week, or some decisions to
take action in Aleppo?  Or have you ruled that out?

MR. EARNEST:  Well, the administration has, as I mentioned earlier, been working
through diplomatic channels at the U.N., through the ISSG, through our other bilateral
relationship with countries in the region to discuss the ongoing situation in Syria more
broadly, but also in Aleppo as well.  So there are a range of diplomatic discussions that
have taken place.  And those kinds of discussions will continue.

I'm not going to stand here and take options off the table for the Commander-in-Chief,
but as we discussed yesterday, there are significant consequences for using U.S. military
force against the Assad regime.  I would say the most important of those consequences
that we should be mindful of is dragging the United States into another ground war in
the Middle East.

So this is a situation that has been carefully considered by the President and his national
security team, including his military advisors.  And the President will listen carefully to
that advice as he makes decisions moving forward.

Q   John McCain had an op-ed today blasting the Syria policy of the administration as
having "failed miserably."  He said, "The administration still has no strategy to do any-
thing about it.  Its diplomacy is toothless, and there appears to be no plan B."  Is there a
plan B?

MR. EARNEST:  Well, I think the most notable thing about Senator McCain's op-ed is that
at least he was partially honest about his differences with the Obama administration.
Senator McCain advocated in that op-ed for going to war with Syria, for increasing our
military commitment and for sending U.S. military forces to Syria.

That's not the advice that the Commander-in-Chief is receiving from our military leader-
ship at the Department of Defense.  So to do so goes against the advice the President has
received from intelligence community and from the uniform military leadership at the
Pentagon.

It also would have grave consequences for our national security.  It would be expensive.  It would put at risk more American lives.  And it's unclear how a conflict like that would end.  This is a lesson that leaders in both parties should have learned after the ill-advised invasion of Iraq in 2003.

Q   You're talking about a ground conflict.  I think some of this had to do with using air-power.  At last night's debate, both candidates from both parties, including Tim Kaine, differed from the current Obama administration strategy and suggested using more air-power to have some sort of protected zone.  Are you also saying, in that detailed explanation you just gave, that even using military force in another form has been taken off the table or rejected?  Does it have all those same risks you just laid out?

MR. EARNEST:  Well, I think what is clear -- there's a letter that we'll send to you.  This is a letter that was prepared by then-Chairman of the Joint Chiefs of Staff, General Dempsey, in response to questions from the United States Senate about what sort of military options were available to the President.  In that letter, General Dempsey outlined the military commitment that would be required to establish a no-fly zone or a safe zone inside of Syria.

He pointed out the significant cost that that safe zone would cost in excess of a billion dollars a month.  He noted that it would require the deployment of thousands of U.S. military personnel on the ground to secure that area.  He noted that it would require significant air assets because it would have to include enforcing a no-fly zone above the area.  He noted that it could present to extremists or even to the Assad regime a large target because there was a concentrated area of refugees.  We know that the Assad regime and extremists have both targeted innocent people in their murderous campaign over the last few years.

We also know that many of those attacks don't come from the air, they come from the ground.  We also know that extremists could potentially use that safe zone to organize attacks in that area.  There's the danger of extremists infiltrating through refugee populations inside that safe zone.

So the United States wouldn't just be on the hook for protecting the air above that safe zone; the United States wouldn't just be on the hook for protecting the perimeter of that safe zone; the United States would be on the hook for policing the interior of that safe

zone.  It would require a substantial commitment of military assets.  It would require a substantial financial commitment.

And there might be some who would say, well, General Dempsey wrote that letter before the United States committed substantial military personnel to going after ISIL.  And I think the answer that I have in response is pretty direct.  Are you suggesting that we could divert our attention from ISIL and al Qaeda to start another war with the Assad regime in Syria?  That doesn't seem like it makes a lot of sense.  It certainly would go against the advice that General Dempsey has put forward.  I haven't spoken to General Dunford about it directly, but I am confident, based on his public statements that he agrees with the assessment that General Dempsey put forward.

But it does go back to a fundamental difference between the approach that's been pursued by the Obama administration and the approach that's pursued -- or advocated, at least by Senator McCain, which is the President doesn't believe that it's in our national interest to start another ground war in the Middle East.

So the President has demonstrated a willingness -- effective willingness -- to use military action to go after ISIL, to pressure their leadership, to support forces on the ground that are retaking territory that ISIL previously held.  But the President has done that in smart way to protect our national security without entangling us into the kind of ground war in the Middle East that would have long-term consequences for our national security.  And they aren't -- most of them are not positive.

Q    But the other half of the Syria policy is that the vacuum and war that involves Assad will only continue to feed the carnage and the terrorism, and the growth of extremists from there.  So that's the other half of the equation, right?

MR. EARNEST:  Yes.

Q    So what are your going to do to address that?  And not to divert attention, but to complete the policy that you've laid out.

MR. EARNEST:  And what we have been very clear about, Margaret -- and, again, this is the difference between the approach that's advocated by Senator McCain.  The administration does not believe that there is a military solution to that problem.  It's going to require tough, principled diplomacy, and that's exactly what we've been engaged in.

And again, Senator McCain did lay this out in his op-ed, and that's why I'm willing to give him partial credit for what he included in there.  He did note that the political failures of the Assad regime are the root cause, and those political failures must be addressed.  But the President does not believe that those political failures should be addressed by commencing a ground invasion by the United States military.  The President believes that we're going to have to work through diplomacy and we're going to have to find ways to work with our allies, and partners, and occasionally with even countries like Russia to figure out how we can reduce the violence, reduce the suffering, and initiate the kind of political talks that everybody acknowledges are necessary to bring about a transition in Syria that will address the root cause of this problem.

And I don't want to say that's even harder than it sounds -- because it sounds pretty complicated when I describe it -- but it's even more complicated than that.  And again, this is something that Secretary Kerry has been tireless and dogged in his pursuit of, but we have not succeeded in reducing that violence in a sustained way.  We have not succeeded in ensuring the sustained flow of humanitarian assistance there.  So we're continuing to work very diligently through the U.N., through other international bodies like the ISSG, but also through the use of our bilateral relationships to try to address the situation.

Karen.

Q    Yesterday, the Vice President call Governor Pence "qualified."  We've heard the President on many occasions talk about how Donald Trump is not qualified to be President.  What are the President's thoughts on Pence?  Does he share the Vice President's view?

MR. EARNEST:  I haven't heard the -- I haven't talked to the President about Governor Pence.  Obviously, I think it was evident from the debate that there are a number of vigorous differences that we have with him on a wide range of policies, both foreign and domestic.  But I haven't asked the President the direct question that you just posed.

Q    And later today, the First Lady is going to announce an expansion and preservation effort of the garden.  Can you talk a little bit more about that?  And also, has there been outreach from the White House from the East Wing to the transition teams about what would happen after January 20th?

MR. EARNEST:  I'm not aware of any discussions with the transition teams.  Presumably, this would be the kind of discussion that would take place after the voters have had their say.

Case 1:18-cv-01884-RGA   Document 10-1   Filed 01/29/19   Page 141 of 145 PageID #: 233

But you've heard the First Lady talk on a number of occasions that the White House Garden is a personal passion of hers.  And she had sought to use the White House Garden as an educational tool to talk to the public but also to kids about the benefits associated with eating healthy and how much fun it can be to be engaged in growing food, and eating healthy, and spending time outside.  These are all personal passions of hers, and it's something that I think has really sparked the imagination of people all across the country.  And I'm confident that in future houses she'll have an opportunity to talk about gardening and her passion for this topic.

Yes, sir.

Q   Thanks, Josh.  I wanted to ask you about Colombia.  The State Department confirmed today that Bernie Aronson was going to go back to Havana for this next round of talks.  I just wanted to get -- what are the White House expectations for his role?  Also, there's $390 million in the budget for Peace Colombia.  I wanted to know what is that money going to be spent on now?  As Marco Rubio has said, since the Colombian citizens voted against the plan, the U.S. shouldn't be spending the tax money on that plan that was rejected by Colombians.

   MR. EARNEST:  Well, as it relates to the activities of the special envoy, I'd refer you to the State Department who can give you a specific update.  I will say, in general, that his approach will be similar to the approach that he took in offering support to the negotiations that led to this agreement, and that is that he'll continue to encourage all sides to maintain a commitment to the ceasefire.  And fortunately, we have seen a public expressions of that commitment by all parties.  And we certainly -- Special Envoy Aronson will certainly be committed to trying to -- using the influence of the United States to facilitate the kind of agreement that can win the support of the Colombian people.

What exactly that process looks like is one that will be determined by President Santos, but you can certainly expect that Special Envoy Aronson and other U.S. officials will be supportive of that ongoing effort to complete negotiations around a peace agreement and build public support for it.

With regard to Peace Colombia, the United States is going to continue to remain engaged in the ongoing efforts of the Colombian people to end the longest-running civil conflict in the hemisphere.  And the United States, for more than a decade now, has been supportive of the Colombian government and the Colombian people as they've undertaken this

effort.  And this is -- the Peace Colombia effort is just the next stage of the support that we can offer.

And so now seems like a pretty bad time to withdraw our support and abandon the Colombian government and the Colombian people, particularly when you consider that all sides remain committed to peace.  All sides have abided by the ceasefire.  All sides have demonstrated a commitment to trying to figure out how to negotiate the kind of peace that will have the strong support of the Colombian people.  So that's what they're working on, and this administration is determined to support the Colombian people in pursuit of peace.

Q   Can you explain what the $390 million will be spent on under this new scenario that the Colombian citizens didn't support?

MR. EARNEST:  I'm not aware of any significant changes that will be made to this peace proposal based on the outcome of the plebiscite.  This is -- the United States government continues to be strongly supportive of the Colombian government and the Colombian people.  That includes not just through our vocal support of the peace process, but also providing them the kinds of resources that will strengthen their democracy, strengthen their economy, and enhance the security of communities all across the country.

Q   Can you address Marco Rubio's comments more directly, that the U.S. should not be spending taxpayer money on a plan that the Colombians didn't support?

MR. EARNEST:  Well, given the commitment by all parties to pursuing peace, now seems like a bad time to walk away from the Colombian people.  And that's not something that the President is going to do.

Jane.

Q   Thank you, Josh.  On North Korea.  For the implementation of U.S. individual sanctions against North Korea, recently the U.S. Treasury Department announced ongoing financial sanctions against the North Korea.  Do you have any detail on this?

MR. EARNEST:  I don't, but I encourage you to check with my colleagues at the Treasury Department who may be able to provide you some more specifics.

Q   Is there any additional sanctions, except the Chinese oil company?  Do you have any update?

MR. EARNEST:  I don't.  And the reason is simply that we refrain from discussing pub-
licly any plans we have to put in place additional sanctions.  And the reason for that is a
common-sense one:  We don't want to telegraph our intentions because we don't want to
give the potential targets of those sanctions the opportunity to take actions that would
evade the sanctions.

So we're not going to be in a position to talk publicly about what plans we may have in
the future, but for more detailed understanding of what kind of sanctions have already
been implemented, I'd encourage you to check with the experts at the Treasury Depart-
ment and they can work with that -- work through that with you.

Q    A THAAD missile deploy in South Korea.  Do you have any particular date for the
THAAD deploying in Korea?

MR. EARNEST:  I'm not aware of a deadline that has been set for the implementation or
the installation of the THAAD battery.  The United States will work in close coordination
with our allies in South Korea to determine the most effective location and date for the
installation of that system that will significantly enhance the safety and security of our
allies in South Korea.

Q    How did you convince China?  Because Chinese is opposing THAAD.

MR. EARNEST:  I think they'd probably tell you they're not convinced.  But the argument
that we have made that is rooted in fact is that the system is oriented to the threat that
South Korea faces from North Korea.  And it should in no way inhibit or destabilize the
situation with regard to China's capabilities.

And this is a -- there's been a more technical explanation that's been provided at a vari-
ety of levels by U.S. officials to their Chinese counterparts.  Chinese officials remain
unconvinced.  But South Korea has a legitimate threat that they need to counter, and
they're turning to the United States, one of their closest friends and allies in the world,
to offer up additional resources that can be used to protect their country.  And while the
threat from North Korea is so urgent, it makes sense that South Korea would look for a
way to further enhance their security.  And the United States is glad that we can be there
to support our ally in a time of need and that we can provide this sophisticated system to
enhance their national security.

Q    And when they continue (inaudible)?

MR. EARNEST:  Well, no.  We will maintain an open dialogue with the Chinese, and that will include regular offers of technical explanations about why this is something that they should not be unduly concerned about.

John Bennett, I'll give you the last one.

Q     Thanks, Josh.  Maybe we can go back to the baseball theme for a moment.

MR. EARNEST:  I'm happy to do that.  (Laughter.)

Q     Apologies in advance for the metaphor.  But the President is entering the campaign kind of in the ninth inning, seems kind of in a closing role.  Does he view it as -- does he view the race as it stands right now as a save opportunity, or does he think Secretary Clinton has a larger lead?

MR. EARNEST:  That's a creative way to ask that question.  Well, let me -- I'm trying to think of a way to respond to your question in the appropriate spirit.

Let me just say that I think the President views himself as a clean-up hitter.  He's got the biggest bat in the line-up.  He's the guy with the high approval rating.  He's the guy with the enormous influence among young people and African Americans and Hispanics and women who are likely to play an important role in determining the outcome of this race.  And the President has had a couple of opportunities to step to the plate, but he'll have many more in the five weeks that remain until Election Day to make a case while the whole stadium is watching.

And he's looking forward to that opportunity, and he feels like he's got a strong case to make in support of somebody that he has seen up-close be an effective, powerful advocate for middle class families and for the interests of the United States of America all around the globe.

Q     So he feels like he's got to go up swinging, like we saw last night in the late stages of --

MR. EARNEST:  Well, I think -- again, I think when the game is this important, you're not just going to walk up there and leave the bat on your shoulder.  The President is definitely going to go up there swinging, and that would be true regardless of the score.  And again, the President is looking forward to the opportunity.

Thanks.  See you guys.  We'll see you tomorrow.

END
2:49 P.M. EDT