# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMUEL SILBER; SIDNEY EDDY
STRULOVITS; SHERI LYNN
STRULOVITS; MOSHE GORDON;
DANIEL JACOB; TSOFIYA JACOB;
LEWIS WEINGER; MORIYAH
SHAPIRO; JONATHAN SHAPIRO;
INBAL NAZDARE LEVY; YAIR
SPOLTER; ERIC CHARLES MARX;
SUSAN LYNN MARX; ALON MADIEL;
DANIELLE MADIEL; GULIE MADIEL;
HOWARD RABIN; JEFFREY T.
SCHWARTZ; and DAVID TESLER,

     *Plaintiffs and Counterclaim Defendants,*

     v.

AIRBNB, Inc.,

     *Defendant,*

     and

ZIAD ALWAN; VILLAGE COUNCIL OF
JALUD; MUNICIPALITY OF
'ANATA; and RANDA WAHBE,

     *Intervenor-Defendants and
Counterclaim Plaintiffs.*

C.A. No. 1:18-cv-01884-RGA

## INTERVENOR-DEFENDANTS' ANSWER TO
## AMENDED COMPLAINT AND COUNTERCLAIMS

Misty A. Seemans, DE Bar # 5975
O.P.D. (Pro Bono; cooperating attorney
with Center for Constitutional Rights)
820 North French Street
Third Floor
Wilmington, Delaware 19801
mseemans@ccrjustice.org
(302) 577-5126

Diala Shamas (*pro hac vice* motion pending)
Maria LaHood (*pro hac vice* motion pending)
Katherine Gallagher (*pro hac vice* motion pending)
Astha Sharma Pokharel (*pro hac vice* motion pending)
Baher Azmy (*pro hac vice* motion pending)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor, New York, NY 10012
dshamas@ccrjustice.org; (212) 614-6426

Defendants and Counterclaim Plaintiffs in Intervention Ziad Alwan, Randa Wahbe, the

Palestinian village of Jalud and the Palestinian town of 'Anata (collectively, "Intervenors" and

"Intervenors/Counterclaim Plaintiffs") for their Answer and Counterclaims to the Amended

Complaint filed by Plaintiffs Samuel Silber, Sidney Eddy Strulovits, Sheri Lynn Strulovits,

Moshe Gordon, Daniel Jacob, Tsofiya Jacob, Lewis Weinger, Moriyah Shapiro, Jonathan

Shapiro, Inbal Nazdare Levy, Yair Spolter ( "Settler-Plaintiffs" and "Settler-

Plaintiffs/Counterclaim Defendants"), and Eric Charles Marx, Susan Lynn Marx, Alon Madiel,

Danielle Madiel, Gulie Madiel, Howard Rabin, Jeffrey T. Schwartz, and David Tesler ("Renter-

Plaintiffs"), who are not parties to the counterclaims, state as follows:

## INTRODUCTION TO INTERVENORS' ANSWER AND COUNTERCLAIMS

Settler-Plaintiffs' action against Defendant Airbnb, Inc. ("Airbnb") for purported

discrimination starts from a deeply flawed and ultimately unlawful premise: that they are the

rightful owners and possessors of the properties that Airbnb has decided to delist from its web

platform.  In fact, the properties Settler-Plaintiffs list for rent are in Jewish Israeli settlements,

unlawfully established on Palestinian land, that have displaced and dispossessed Intervenors

Alwan, the village of Jalud and the town of 'Anata—who possess a rightful claim to the land

upon which these properties are built.  Rather than being victims of discrimination by Airbnb as

they allege, Settler-Plaintiffs themselves violate the federal Fair Housing Act, 42 U.S.C. § 3601

et seq., by posting their settlement rental listings in the U.S. that indicate discrimination against

all Intervenors on the basis of national origin and religion.  The role of Settler-Plaintiffs Gordon,

Levy, Moriyah and Jonathan Shapiro, and Daniel and Tsofiya Jacob in the seizure and

occupation of Intervenors' land and financial profit therefrom violate the common law of

trespass and unjust enrichment.  The role of these Settler-Plaintiffs in the appropriation of and

1

settlement on Intervenors 'Anata and Jalud's land, as well as the ongoing forcible transfer of the residents of Intervenors 'Anata and Jalud from their land and the pillaging of their property constitutes well-established war crimes made actionable in U.S. courts through the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). Finally, the role of all Settler-Plaintiffs in furthering and participating in the discriminatory settlement enterprise that results in the severe denial of fundamental rights to Palestinians constitutes the crime against humanity of persecution under the ATS.

Indeed, several of Settler-Plaintiffs have relished their role in the ideological vanguard of Israel's settlement enterprise, embracing the project to force out—and keep out—Palestinians and broadly expand Israeli control over the occupied Palestinian territory. Having invoked the jurisdiction of this Court to assert—albeit misleadingly—a purported violation of their rights in order to pursue profit off of unlawfully seized land, Settler-Plaintiffs must be held to account under the law for their fundamentally illegal conduct. Intervenors accordingly seek appropriate judicial relief from those contributing to and responsible for discrimination, dispossession, and displacement.

## ANSWER TO AMENDED COMPLAINT

### NATURE OF THE ACTION

1.      No response is deemed required.

### PARTIES

A.      The Plaintiffs

2.      Intervenors deny that Plaintiff Samuel Silber is domiciled in Israel to the extent that he resides in a settlement in Palestinian territory that Israel has occupied since 1967. Intervenors further deny that Plaintiff Samuel Silber legally or validly owns residential property

2

in a settlement in occupied Palestinian territory.  Intervenors lack knowledge and information

sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 2.

3.      Intervenors deny that Plaintiff Sidney Eddy Strulovits is domiciled in Israel as he

resides in a settlement in Palestinian territory that Israel has occupied since 1967. Intervenors

further deny that Plaintiff Sidney Eddy Strulovits legally or validly owns residential property in a

settlement in occupied Palestinian territory.  Intervenors lack knowledge and information

sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 3.

4.      Intervenors deny that Plaintiff Sheri Lynn Strulovits is domiciled in as she resides

in a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further

deny that Plaintiff Sheri Lynn Strulovits legally or validly owns residential property in a

settlement in occupied Palestinian territory.  Intervenors lack knowledge and information

sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 4.

5.      Intervenors deny that Plaintiff Moshe Gordon is domiciled in Israel as he resides

in a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further

deny that Plaintiff Moshe Gordon legally or validly owns residential property in a settlement in

occupied Palestinian territory.  Intervenors lack knowledge and information sufficient to form a

belief as to the truth of the rest of the allegations contained in paragraph 5.

6.      Intervenors deny that Plaintiff Daniel Jacob is domiciled in Israel as he resides in

a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny

that Plaintiff Daniel Jacob legally or validly owns residential property in a settlement in occupied

Palestinian territory.  Intervenors lack knowledge and information sufficient to form a belief as

to the truth of the rest of the allegations contained in paragraph 6.

7.     Intervenors deny that Plaintiff Tsofiya Jacob is domiciled in Israel as she resides in a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny that Plaintiff Tsofiya Jacob legally or validly owns residential property in a settlement in occupied Palestinian territory.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 7.

8.     Intervenors deny that Plaintiff Lewis Weinger is domiciled in Israel to the extent he resides in a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny that Plaintiff Lewis Weinger legally or validly owns residential property in a settlement in occupied Palestinian territory.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 8.

9.     Intervenors deny that Plaintiff Moriyah Shapiro is domiciled in Israel as she resides in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny that Plaintiff Moriyah Shapiro legally or validly owns residential property in a settlement outpost in occupied Palestinian territory, which even lacks authorization under Israeli military law. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 9.

10.     Intervenors deny that Plaintiff Jonathan Shapiro is domiciled in Israel as he resides in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny that Plaintiff Jonathan Shapiro legally or validly owns residential property in a settlement outpost in occupied Palestinian territory, which even lacks authorization under Israeli military law. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 10.

11.     Intervenors deny that Plaintiff Inbal Nazdare Levy is domiciled in Israel to the extent she resides in a settlement in Palestinian territory that Israel has occupied since 1967. Intervenors further deny that Plaintiff Inbal Nazdare Levy legally or validly owns residential property in a settlement in occupied Palestinian territory.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 11.

12.     Intervenors deny that Plaintiff Yair Spolter is domiciled in Israel as he resides in a settlement in Palestinian territory that Israel has occupied since 1967.  Intervenors further deny that Plaintiff Yair Spolter legally or validly owns residential property in an illegal settlement in occupied Palestinian territory.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 13.

14.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 14.

15.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 15.

16.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 16.

17.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 17.

18.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 18.

19.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 19.

20.     Intervenors Plaintiffs lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 20.

B.      The Defendant

21.     Admitted by Intervenors.

## JURISDICTION AND VENUE

22.     Admitted by Intervenors.

23.     Paragraph 23 states legal conclusions to which no response is required.  To the extent a response is required, Intervenors deny that Plaintiffs seek appropriate relief regarding a discriminatory housing practice under the Fair Housing Act, and Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 23.

24.     Intervenors admit that 28 U.S.C. §§ 2201 and 2202 authorize declaratory and injunctive relief, and that Plaintiffs seek such relief, but deny that Plaintiffs are entitled to such relief.

25.     Admitted by Intervenors.

## FACTUAL ALLEGATIONS

26.     Intervenors admit that Airbnb operates an internet platform through which hosts list places for people to rent.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 26.

27.     Paragraph 27 states legal conclusions to which no response is required.  To the extent a response is required, Intervenors admit that Airbnb operates a service relating to the

business of renting residential dwellings. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 27.

28.     Paragraph 28 states legal conclusions to which no response is required. To the extent a response is required, Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 28.

29.     Intervenors admit that Airbnb generally charges a service fee for hosts when reservations are received. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 29.

30.     Intervenors admit that Airbnb operates in many countries around the world, including in the United States, and that listings for homes around the world are accessible in the United States, and that such homes can be rented from the United States. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 30.

31.     Intervenors admit that Airbnb has a nondiscrimination policy that is based on a commitment to two foundational principles—inclusion and respect—that apply to hosts and guests. Intervenors further admit that Airbnb's policy states that the "[t]he Airbnb community is committed to building a world where people from every background feel welcome and respected…." Intervenors further admit that the policy imposes rules on United States and European Union hosts prohibiting them from posting any listing or making any statement that discourages or indicates a preference for or against any guest on account of race, color, ethnicity, national origin, religion, sexual orientation, gender identity, or marital status. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 31.

32.     Intervenors deny that calls for Boycott, Divestment, and Sanctions are anti-Israel or anti-Semitic.  Intervenors also deny that territories in the West Bank are "disputed," as the West Bank is recognized by the international community to be Palestinian territory that has been occupied by Israel since 1967.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 32.

33.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 33.

34.     Admitted by Intervenors.

35.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 35.

36.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 36.

37.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 37.

38.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 38.

39.     Intervenors lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 39.

40.     Denied by Intervenors.

41.     Intervenors admit that Plaintiffs Samuel Silber, Sidney Eddy Strulovits, Sheri Lynn Strulovits, Moshe Gordon, Daniel Jacob, Tsofiya Jacob, Lewis Weinger, Moriyah Shapiro, Jonathan Shapiro, Inbal Nazdare Levy, and Yair Spolter are Jewish and Israeli, but deny their purported ownership of residential property in settlements in occupied Palestinian territory is

8

legal or valid. Intervenors also deny that Airbnb's policy and practice to delist these properties is discriminatory.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 41.

42.     Intervenors deny that Airbnb's policy and practice is discriminatory. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 42.

43.     Intervenors deny that Airbnb's policy and practice is discriminatory. Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 43.

44.     Denied by Intervenors.

<u>CLAIM FOR RELIEF</u>

<u>(VIOLATIONS OF THE FAIR HOUSING ACT)</u>

45.     Intervenors incorporate their responses to the foregoing allegations as if fully set forth herein.

46.     Intervenors admit that Airbnb operates an internet platform through which hosts list places for individuals to rent.  Intervenors lack knowledge and information sufficient to form a belief as to the truth of the rest of the allegations contained in paragraph 46.

47.     Paragraph 47 states a legal conclusion to which no response is required.  To the extent a response is required, Intervenors admit the allegations in paragraph 47.

48.     Intervenors deny that Airbnb's actions as alleged by Plaintiffs violate the provisions of 42 U.S.C. § 3606, but admit that paragraph 48 accurately states 42 U.S.C. § 3606 in pertinent part.

49.     Intervenors deny that Airbnb's actions as alleged by Plaintiffs violate the provisions of 42 U.S.C. § 3617, but admit that paragraph 49 accurately states 42 U.S.C. § 3617 in pertinent part.

50.     Denied by Intervenors.

51.     Denied by Intervenors.

## INTERVENORS' COUNTERCLAIMS AGAINST SETTLER-PLAINTIFFS

Intervenors-Counterclaim Plaintiffs Ziad Alwan, the Palestinian village of Jalud, the Palestinian town of 'Anata, and Randa Wahbe for their Counterclaims against Settler-Plaintiffs/Counterclaim Defendants Samuel Silber, Sidney Eddy Strulovits, Sheri Lynn Strulovits, Moshe Gordon, Daniel Jacob, Tsofiya Jacob, Lewis Weinger, Moriyah Shapiro, Jonathan Shapiro, Inbal Nazdare Levy, and Yair Spolter ("Settler-Plaintiffs"), allege as follows:

### NATURE OF THE ACTION

1.     Palestinian Intervenors Ziad Alwan, the village of Jalud, and the town of 'Anata are the rightful owners and/or claimants of land upon which the properties at issue in this case are located.  They bring this action for judicial relief against the Settler-Plaintiffs who, in collaboration with and/or with the support of the State of Israel, have seized, appropriated, and currently control Intervenors' land and prevent Intervenors from accessing it.  The properties that Settler-Plaintiffs list on Airbnb's platform are in illegally established and maintained Jewish Israeli settlements that are built on Palestinian land in territory that Israel has occupied since 1967.  The unlawful seizure and control of Intervenors' land—which Settler-Plaintiffs exploit for profit and personal gain—constitute trespass and unjust enrichment.

2.     Settler-Plaintiffs, dual Israeli and American citizens, (falsely) complain of discrimination by Airbnb because they will no longer be able to profit from using its booking

10

platform to list properties. The claim is all the more disingenuous as it proceeds from a willful

blindness to Settler-Plaintiffs' own blatantly discriminatory actions. The Settler-Plaintiffs have

chosen to occupy and settle on unlawfully seized land and displace Palestinians and are

motivated by or in furtherance of an ideological commitment to the broader Israeli settlement

enterprise, which forcibly displaces Palestinian peoples and populates Palestinian land instead

with Jewish people.  It is *this* conduct—and not Airbnb's attempt to reconcile its business

practices with basic human rights law and principles—which is clearly discriminatory.  Settler-

Plaintiffs themselves violate the Fair Housing Act by posting listings for these settlement

properties indicating discrimination against Intervenors and other Palestinians on the basis of

national origin and religion.

   3.  In addition, through their acts and omissions, Settler-Plaintiffs, acting with a

common purpose or in concert with, or with the acquiescence or encouragement of, the Israeli

authorities, violate clearly established international law.  The seizure or appropriation of

Palestinian property in the context of occupation (when not justified by military necessity), the

pillaging of Palestinian property and the forcible transfer of the civilian population from such

land, as well as direct or indirect transfer of parts of the civilian population of the Occupying

Power, Israel, into such territory constitute war crimes for which individuals can be held

accountable, including in U.S. courts.  Settler-Plaintiffs Moriyah Shapiro, Jonathan Shapiro,

Moshe Gordon, Daniel Jacob, and Tsofiya Jacob are liable to Intervenors Jalud and 'Anata for

their knowing and purposeful role in contributing to, furthering, and/or committing war crimes,

including by acting with a common criminal purpose, by aiding and abetting others, and/or

through a conspiracy under the Alien Tort Statute, 28 U.S.C. § 1350.

4.      As detailed below, the entire settlement enterprise—aided and abetted and otherwise directly advanced by Israeli citizens such as Settler-Plaintiffs—to annex Palestinian territory and occupy it for the exclusive use of Jewish Israelis is designed intentionally to dispossess, fragment, segregate, and discriminate against Palestinians.  Indeed, it represents a widespread and systematic attack on a civilian population, namely the non-Jewish, Palestinian population. Through their acts and omissions, in contributing to the intentional and severe denial of fundamental rights to Palestinians on the basis of their nation origin, ethnicity, and/or religion, all Settler-Plaintiffs are liable to Intervenors Jalud and 'Anata for their knowing and purposeful role in the perpetration of crimes against humanity: persecution under the Alien Tort Statute, 28 U.S.C. § 1350.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Intervenors' claims under 28 U.S.C. § 1331 (federal question jurisdiction) as Intervenors assert federal claims under the Fair Housing Act and 28 U.S.C. § 1350 (Alien Tort Statute).  This Court also has jurisdiction over Intervenors' state common law claims under 28 U.S.C. § 1367 (supplemental jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction).

6.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. § l391(b)(1) and (2).

## THE PARTIES

### Intervenors / Counterclaim Plaintiffs

7.      Ziad Alwan is a Palestinian and a United States citizen who resides in Chicago, Illinois.  He also holds West Bank residency.  His family is from Ein Yabrud, a Palestinian village located in the outskirts of Ramallah in the West Bank, Palestine. He is heir to his father's

land which was illegally seized by the State of Israel for the construction of the Ofra settlement. His family's ownership is evidenced by official registration documents.  The rental property that Settler-Plaintiff Inbal Levy claims to own and lists on Airbnb's platform is partially built on land belonging to Intervenor Alwan and his family.  All Settler-Plaintiffs' listings indicate discrimination against him on account of his national origin and Muslim religion.

8.      The Palestinian village of Jalud ("village of Jalud" or "Jalud"), which is formally represented by the Village Council of Jalud under Palestinian law, is located in the Nablus Governate in the West Bank, Palestine. The house that Settler-Plaintiffs Moriyah and Jonathan Shapiro have illegally built, which Moriyah Shapiro lists on Airbnb's site and claims to own, is located on Jalud's land.  Despite its location in what is recognized by international law as Palestinian territory, portions of the land of Jalud were illegally seized by Settler-Plaintiffs Shapiro, in coordination with the State of Israel, to build or expand the settlement outpost "Adei Ad."  As evidenced by official registration documents that predate the Israeli occupation, the land upon which the Shapiros built their house was registered in the name of the village *mukhtar*, or representative, which means it was registered for the collective benefit of the village of Jalud. Prior to its seizure, the land was used for the collective benefit of the residents of Jalud, for farming or grazing their livestock, which raised income for the village.

9.      The Palestinian town of 'Anata ("town of 'Anata" or "'Anata"), which is formally represented by the Municipality of 'Anata under Palestinian law, is located in the Jerusalem Governate in the West Bank, Palestine.  The houses that Settler-Plaintiffs Moshe Gordon and Daniel and Tsofiya Jacob list, have listed or seek to list on Airbnb's platform, and claim to own, are on 'Anata's land.  Despite its location in what is recognized by international law as occupied Palestinian territory, portions of 'Anata's land were illegally seized by the State of Israel and

allocated for the construction of the settlement of Kfar Adumim and its Nofei Prat neighborhood, where Settler-Plaintiffs Daniel and Tsofiya Jacob and Gordon have ltheir Airbnb properties.  As evidenced by official registry documents that predate the Israeli occupation, the land was registered as public land and was for the collective benefit of the village of 'Anata. Prior to the occupation, the land was used for the collective benefit of the residents of 'Anata and neighboring Palestinian villages for farming or for grazing their livestock, which raised income for the town.

10.     Randa Wahbe is a Palestinian and a United States citizen, residing in Somerville, Massachusetts, where she is completing her doctorate at Harvard University.  She also holds West Bank residency.  All Settler-Plaintiffs' listings indicate discrimination against her on account of her national origin and Christian religion.

## Settler-Plaintiffs / Counterclaim Defendants

11.     Upon information and belief, Settler-Plaintiff Samuel Silber is a dual citizen of Israel and the United States.  Upon information and belief, he claims to own, has listed, and seeks to continue to list a property on Airbnb that is located in the settlement of Rehelim and is on land that belongs to residents of the Palestinian village of As-Sawiya in the West Bank, and that was illegally seized by Israeli authorities.

12.     Upon information and belief, Settler-Plaintiffs Sidney Eddy Strulovits and Sheri Lynn Strulovits are dual citizens of Israel and the United States.  Upon information and belief, they list and claim to own a property on Airbnb in the settlement of Karnei Shomron that is on land that belongs to residents of the Palestinian village of Deir Istiya in the West Bank, and that was illegally seized by Israeli authorities.

14

13.     Upon information and belief, Settler-Plaintiff Moshe Gordon is a dual citizen of Israel and the United States.  He claims to own, has listed, and seeks to continue to list a property on Airbnb in the settlement of Nofei Prat that is on land that belongs to the residents of the Palestinian town of 'Anata in the West Bank, and which was illegally seized by Israeli authorities.

14.     Upon information and belief, Settler-Plaintiffs Daniel and Tsofiya Jacob are dual citizens of Israel and the United States.  Their Airbnb property in the settlement of Nofei Prat is on land that belongs to the residents of the Palestinian town of 'Anata in the West Bank, and which was illegally seized by Israeli authorities.

15.     Upon information and belief, Settler-Plaintiff Lewis Weinger is a dual citizen of Israel and the United States.  Upon information and belief, he lists and claims to own a property on Airbnb that is located in the settlement of Tekoa, and which is on land that belongs to the residents of the Palestinian village of Taqu' in the West Bank, and which was illegally seized by Israeli authorities.

16.     Upon information and belief, Settler-Plaintiffs Moriyah and Jonathan Shapiro are dual Israeli and United States citizens.  They list and claim to own a property on Airbnb that is located in the settlement-outpost of Adei Ad, which stands on land that belongs to the Palestinian village of Jalud in the West Bank, and which was illegally seized by Settler-Plaintiffs Shapiro, in conjunction with the State of Israel.

17.     Upon information and belief, Settler-Plaintiff Inbal Nazdare Levy is a dual citizen of Israel and the United States.  She lists and claims to own a property on Airbnb that is located in the Ofra settlement, on land that belongs to Intervenor Alwan and his family in the Palestinian village of Ein Yabrud, and which was illegally seized by Israeli authorities.

15

18.     Upon information and belief, Settler-Plaintiff Yair Spolter is a dual citizen of Israel and the United States.  Upon information and belief, he lists and claims to own a property on Airbnb, which is located in the settlement of Modi'in Illit, and the guest house stands on land that belongs to the residents of the Palestinian village of Kharbata.

### Non-Parties to the Counterclaims

19.     Renter-Plaintiffs, all of whom are United States citizens and four of whom are domiciled in the United States, allege to be individuals who seek to use or continue to use Airbnb, including from their domiciles in Maryland and New York, to rent property in Israeli settlements in occupied Palestinian territory that was unlawfully seized and is unlawfully allocated to or claimed by citizens of the Occupying Power (Israel), such as Settler-Plaintiffs.

20.     Defendant Airbnb, Inc. ("Airbnb") is a Delaware corporation that provides an internet platform through which hosts can list and individuals can rent places to stay.

### FACTUAL ALLEGATIONS IN SUPPORT OF INTERVENORS' COUNTERCLAIMS AGAINST SETTLER-PLAINTIFFS

21.     Settler-Plaintiffs Levy, Daniel and Tsofiya Jacob, Gordon, and Jonathan and Moriyah Shapiro's Airbnb properties are located on land belonging to Palestinian Intervenors Alwan, the town of 'Anata, and the village of Jalud.  Palestinian residents of the West Bank, including Intervenors Alwan and Wahbe, as well as residents of Intervenors 'Anata and Jalud, are prohibited from renting or accessing Settler-Plaintiffs' Airbnb rentals on account of their national origin and religion.  Settler-Plaintiffs have unlawfully obtained possession of the properties they claim to own.  They maintain access to, and claim ownership over, their properties under discriminatory and unlawful conditions.  By listing their settlement properties on Airbnb's platforms, Settler-Plaintiffs seek to profit from land that they have unlawfully appropriated or whose unlawful appropriation they have furthered, which they continue to

possess unlawfully and occupy through participation in a discriminatory regime, and which they make available on discriminatory conditions.

**The Legal Framework Governing Settler-Plaintiffs' Listed Properties**

22.     In 1967, Israel began a military occupation of the West Bank (including East Jerusalem) and Gaza, and has since been the Occupying Power, as recognized by international consensus, including the United States. *See, e.g.,* S.C. Res. 465, U.N. Doc. S/RES/465 (Mar. 1, 1980); S.C. Res. 2334, U.N. Doc. S/RES/2334 (Dec. 23, 2016); G.A. Res. 64/92, U.N. Doc. A/RES/64/92 (Jan. 19, 2010); Human Rights Comm., 112th Sess., Oct. 7-31, 2014, Concluding Observations on the Fourth Periodic Rep. of Isr., U.N. Doc. CCPR/C/ISR/CO/4/ (Nov. 21, 2014).

23.     Since that time, Israel has unlawfully pursued the settlement enterprise—an aggressive policy of seizing lands owned, either individually or collectively, by Palestinians, and allocating them for the use and enjoyment of Israelis.  Israeli authorities, in concert with individual Israeli settlers and settler organizations, have seized almost 250,000 acres of Palestinian land. *See* Rep. of the Indep. Int'l Fact-Finding Mission to Investigate the Implications of the Israeli Settlements on the Civil, Political, Economic, Social and Cultural Rights of the Palestinian People Throughout the Occupied Palestinian Territory, Including East Jerusalem, submitted pursuant to resolution 19/17 (2012) to the Human Rights Council, 22d Sess., Feb. 25-Mar. 22, 2013, ¶ 63, U.N. Doc. A/HRC/22/63 (Feb. 7, 2013), *available at* https://unispal.un.org/DPA/DPR/unispal.nsf/5ba47a5c6cef541b802563e000493b8c/0aed277dcbb2bcf585257b0400568621 ("H.R.C. Settlement Report"); *see also id.* at ¶¶ 18-30.  There are more than 620,000 Israeli settlers living in the occupied Palestinian West Bank, including East Jerusalem. *See Statistics on Settlements and Settler Population*, B'Tselem (Jan. 16, 2019),

https://www.btselem.org/settlements/statistics.  There are approximately 2.8 million Palestinians living in the West Bank.

24.     The pursuit, establishment, and expansion of the settlement enterprise has been based on the widespread seizure of land and resources from Palestinians, as well as their displacement.  Indeed, as detailed below, the Israeli settlement enterprise in the West Bank reflects a policy of territorial annexation, in violation of the general principle of international law that territory cannot be acquired by force. *See* U.N. Charter art. 2, para. 4.  This policy is marked by Israel's intentional fragmentation and dispersal of Palestinian communities into non-contiguous zones and the allocation or alteration of their lands for the exclusive use and enjoyment of Israeli citizens.

25.     Here is a map from the U.N. Office for the Coordination of Humanitarian Affairs from January 2012 showing the land in the West Bank that Israel has allocated to settlements:



26.     The Israeli settlement enterprise violates several rules of international law, including the prohibitions on: an occupying power forcibly transferring a protected population out of or within the territory it occupies, or transferring parts of its civilian population, directly or indirectly, into such territory; appropriating civilian property without military necessity; and pillage.  The establishment and expansion of settlements requires the development of settlement infrastructure, including separate road networks, the extension of water resources and electricity grids that only benefit the settlements, military checkpoints, and the closure of Palestinian access to vast swaths of territory under the guise of security.  The resulting extensive land seizures and closures result in the displacement, both internally and externally, of the Palestinian population. Acquisition of territory by force is clearly prohibited by international law.  An important corollary of this prohibition is the duty of third states to not recognize the conqueror's sovereignty, and not treat the acquisition of the territory as legal.  This has been consistently and unequivocally the position of the international community, including the United States.

27.     Treaties to which the United States, Israel, and the State of Palestine are all parties reflect the fundamental principle of law that territory cannot be acquired by force, and contain certain obligations of the occupying power.  Under the Hague Regulations of 1907, an occupying power must hold public property in usufruct, on behalf of the sovereign or the benefit of the occupied population, and must not pillage or alter its character, unless alterations are done for the benefit of the local population and in accordance with the local law; nor is the occupying power allowed to confiscate private property.  Convention (IV) Respecting the Laws and Customs of War on Land and its Annex: Regulations Respecting the Laws and Customs of War on Land, arts. 42, 43, 46, 47, and 55, Oct. 18, 1907, 36 Stat. 2277, *available at* https://www.loc.gov/law/help/us-treaties/bevans/m-ust000001-0631.pdf ("Hague Regulations of

1907"); *see also* Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) art. 47, Aug. 12, 1949, 75 U.N.T.S. 287, *available at* https://ihl-databases.icrc.org/applic/ihl/ihl.nsf/Treaty.xsp?action=openDocument&documentId=AE2D398352C5B028C12563CD002D6B5C. The Hague Regulations of 1907 and the Fourth Geneva Convention are recognized as forming part of customary international law.

28.     The applicability of the Fourth Geneva Convention and the Hague Regulations of 1907 to the occupied Palestinian territory was affirmed by the International Court of Justice, *see* Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, 2004 I.C.J. 136, ¶¶ 78, 101 (July 9), *available at* https://www.icj-cij.org/files/case-related/131/131-20040709-ADV-01-00-EN.pdf ("I.C.J. Advisory Opinion on the Wall"), and has been recognized and consistently reaffirmed *inter alia* by the United Nations Security Council, General Assembly, and Human Rights Council, by the International Committee of the Red Cross, and by States, including the United States.

29.     Under the Fourth Geneva Convention, Palestinians living under occupation are "protected persons," for whom Israel bears certain obligations. *See, e.g.,* Fourth Geneva Convention arts. 2, 47, and 49.

30.     In addition to unlawful acquisition of territory by force, the establishment of and expansion of settlements in the occupied Palestinian territory, and the resulting displacement of the local Palestinian population, contravenes fundamental principles of international humanitarian law and human rights law.  This includes the Hague Regulations of 1907, the Fourth Geneva Convention, and the 1977 Additional Protocol I to the Geneva Conventions of 12 August 1949, which has been recognized to reflect customary international law.  Protocol

Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), Dec. 12, 1977, 1125 U.N.T.S. 3, *available at* https://ihl-databases.icrc.org/ihl/INTRO/470 ("Additional Protocol I"). *See also* Rome Statute of the International Criminal Court art. 8, paras. 2(a)(vii) and 2(b)(iii), July 17, 1998, 2187 U.N.T.S. 90, *available at* https://treaties.un.org/doc/Treaties/1998/07/19980717%2006-33%20PM/English.pdf ("Rome Statute").

31.     The illegality of the Israeli settlement enterprise has been consistently recognized and repeatedly condemned.  That Israel, as the Occupying Power, and certain of its citizens disagree with that legal conclusion does not nullify this finding of law or convert a legal conclusion into a policy disagreement.

32.     Article 49 of the Fourth Geneva Convention sets out with specificity the prohibition on both transfer of the Occupying Power's civilian population into the occupied territory, and the forcible transfer or deportation of a protected occupied civilian population. This provision provides that the "Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies."  It also prohibits the "[i]ndividual or mass forcible transfers, as well as deportations of protected persons from occupied territory."  *See also* Addition Protocol I art. 85, para. 4(a).  These provisions have attained the status of customary international law.

33.     The appropriation of land (publicly and privately owned), and the appropriation, destruction, or even significant alteration of property required to build and expand settlements, which only benefit the Israeli population and are not justified by military necessity, is also clearly established and defined as a violation of international humanitarian law. *See* Hague

Regulations of 1907 arts. 46 and 55; Fourth Geneva Convention art. 53. *See also* Rome Statute art. 8, paras. 2(a)(iv) and 2(b)(xiii).

34.     Forcible transfer and the extensive appropriation of property not justified by military necessity and carried out unlawfully and wantonly are also recognized as grave breaches of the Geneva Convention. Fourth Geneva Convention art. 147.  *See also* 18 U.S.C. § 2441(c) (War Crimes Act).

35.     The pillaging of a town or a place is a war crime. *See* Fourth Geneva Convention, art. 33. *See also* Rome Statute art. 8, para. 2(b)(xvi).  Pillage occurs when, in the context of an international armed conflict (including occupations), property is intentionally appropriated without the consent of the owner for private or personal use. *See* INT'L CRIMINAL COURT, ELEMENTS OF CRIMES, art. 8, para. 2(b)(xvi) (2011), *available at* https://www.icc-cpi.int/nr/rdonlyres/336923d8-a6ad-40ec-ad7b-45bf9de73d56/0/elementsofcrimeseng.pdf.

36.     The settlement enterprise negatively and profoundly affects nearly every aspect of Palestinian life and as such, constitutes a widespread or systematic attack against the civilian population.  Thus, the enterprise also entails numerous other international law violations, including pillaging Palestinians' natural resources, restrictions on their freedom of movement, and denying their access to health, education, and development opportunities.  Moreover, settlements and their expansion are often the cause for significant violence directed at the Palestinian population by settlers, often under the protection or with the participation of the Israeli military, aimed at intimidating Palestinians from continuing to farm their nearby lands or access their resources. *See generally* HUMAN RIGHTS WATCH, SEPARATE AND UNEQUAL: ISRAEL'S DISCRIMINATORY TREATMENT OF PALESTINIANS IN THE OCCUPIED PALESTINIAN TERRITORIES (2010), *available at* https://www.hrw.org/report/2010/12/19/separate-and-

unequal/israels-discriminatory-treatment-palestinians-occupied ("Separate and Unequal"); *Settler Violence: Absence of Law Enforcement*, B'TSELEM (Nov. 11, 2017),

https://www.btselem.org/settler_violence.  This intentional and severe denial of fundamental

rights of Palestinians due to their identity, when committed as part of a widespread or systematic

attack on a civilian population, constitutes the crime against humanity of persecution. *See* Rome

Statute art. 7, para. 1(h).

37.      International law imposes certain obligations on third parties, including States and

business enterprises that engage in dealings with occupied territories.  Such obligations include

respecting and ensuring respect for the provisions of the Geneva Conventions. *See* Fourth

Geneva Convention art. 1.

38.      In December 2016, the United Nations Security Council adopted a resolution that

reiterated the unlawfulness of the establishment of settlements, and called on States to

"distinguish, in their relevant dealings, between the territory of the State of Israel and the

territories occupied since 1967." S. C. Res. 2334, U.N. Doc. S/RES/2334 (Dec. 23, 2016).  The

distinction is one that is territorial and that flows from fundamental principles of humanitarian

law, and not one that is based on any religious or national origin identity.

39.      As recognized in the United Nations Guiding Principles on Business and Human

Rights, businesses have the responsibility to respect human rights, which necessarily entails the

obligation to avoid causing or contributing to human rights abuses, and explicitly mandates that

businesses "address adverse human rights impacts with which they are involved." Spec. Rep. of

U.N. Secretary-General John Ruggie, Rep. on the issue of human rights and transnational

corporations and other business enterprises, Annex: Guiding Principles on Business and Human

Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework, submitted

to the Human Rights Council, 17th Sess., May 30-June 17, 2011, 11, U.N. Doc. A/HRC/17/31

(Mar. 21, 2011), *available at* https://undocs.org/A/HRC/17/31 ("UN Guiding Principles").

40.     In accordance with their obligation to respect the protections and provisions

enshrined in the Geneva Conventions and core human rights treaties and principles, businesses

are expected to undertake steps to identify and mitigate their contributions to human rights and

international law violations. *See, e.g.,* UN Guiding Principles 13, 15, and 17; *see id.* Principle 7

(addressing responsibilities and operations in conflict-affected areas).

41.     Businesses that fail to mitigate their contributions to human rights violations and

instead, knowingly provide practical assistance that has a substantial effect on the commission of

the violation, or otherwise facilitate, exacerbate, or contribute to the violation, can be found to be

in breach of their obligations under human rights law, and complicit in the violations.  *See, e.g.,*

UN Guiding Principles 22 and 25.  Accordingly, businesses should avoid or seek to review or,

when necessary, terminate business activity where severe negative human rights consequences

cannot be avoided or mitigated.

**The Settlement Enterprise**

42.     Israeli settlements in the occupied Palestinian territory are built with the purpose

of annexing territory that Israel began occupying in 1967.  Israeli authorities and settlers, acting

jointly, in coordination and/or otherwise pursuant to the shared purpose of the settler enterprise,

build infrastructure and take control of large swaths of land for occupation by Jewish residents.

They then encourage the settlement of Jewish Israelis in the occupied West Bank, as well as

Jewish global migration into the West Bank.  They encourage this transfer through a range of

mechanisms: (i) building infrastructure; (ii) encouraging Jewish migrants to Israel to move to

settlements; (iii) sponsoring economic activities; (iv) supporting settlements through

development projects; and (v) seizing Palestinian land.  *See* H.R.C. Settlement Report at ¶ 20.

The promotion of visitors and the promotion of settlement tourism in the West Bank is part and

parcel of this enterprise. AMNESTY INTERNATIONAL, DESTINATION: OCCUPATION: DIGITAL

TOURISM AND ISRAEL'S ILLEGAL SETTLEMENTS IN THE OCCUPIED PALESTINIAN TERRITORIES

(2019), *available at*

https://www.amnesty.org/download/Documents/MDE1594902019ENGLISH.PDF ("Destination:

Occupation"); *see generally*, HUMAN RIGHTS WATCH & KEREM NAVOT, BED AND BREAKFAST ON

STOLEN LAND: TOURIST RENTAL LISTINGS IN WEST BANK SETTLEMENTS (2018), *available at*

https://www.hrw.org/report/2018/11/20/bed-and-breakfast-stolen-land/tourist-rental-listings-

west-bank-settlements#.

43.     The settlement enterprise is explicitly intended to benefit Jewish individuals—

whether they are Jewish-Israelis, or Jewish individuals from anywhere in the world—and

discriminates against anyone who is not Jewish.

44.     In 1948, Israel was established as a state for the Jewish people and more than

700,000 Palestinians were displaced. Steven Glazer, *The Palestinian Exodus in 1948*, 9 J.

PALESTINE STUD. 96, 104 (1980), *available at* https://www.palestine-

studies.org/jps/fulltext/38640.  In 1950, Israel passed the "Law of Return," declaring that "Every

Jew has the right to come to this country as an oleh [immigrant]." Law of Return, 5710-1950, SH

No. 51 p. 159 (Isr.), *available at* https://www.jewishvirtuallibrary.org/law-of-return.  In 2018,

the Israeli Knesset (parliament) passed the Basic Law: Israel as the Nation State for the Jewish

People—a law with constitutional status that affirms that Israel is a nation state for the Jewish

people, despite 20% of Israeli citizens being non-Jewish Palestinians. Basic Law: Israel – The

Nation State of the Jewish People, 5778-2018 (Isr.), *available at*

https://knesset.gov.il/laws/special/eng/BasicLawNationState.pdf.  The law also confirms that "[t]he State views the development of Jewish settlement as a national value, and shall act to encourage and promote its establishment and strengthening." *Id.* at ¶ 7.

45.     Israel's 1967 occupation of Palestinian territory was considered by some to provide "an opportunity 'to realize the vision of the Whole Land of Israel.'" B'TSELEM, LAND GRAB: ISRAEL'S SETTLEMENT POLICY IN THE WEST BANK 13 (2002), *available at* https://www.btselem.org/sites/default/files/sites/default/files2/publication/200205_land_grab_eng.pdf ("Land Grab").  The first settlement, Kfar Ezyon, was established in 1967 in the West Bank as a result of pressure by a group of settlers.  *Id.* at 11.  By the end of 1967, the then-head of the Ministerial Committee on Settlements began to prepare a strategic plan, the "Alon Plan," advocating "the establishment of a string of Israeli settlements ensuring a 'Jewish presence' and constituting a preliminary step leading to formal annexation." *Id.* at 12.  Over the years, successive Israeli government initiatives have resulted in the establishment and expansion of settlements throughout the West Bank. *Id.* 14-17.  The settlement enterprise has historically been driven by settlers seeking to maintain a permanent Jewish hold on the West Bank. *See* IDITH ZERTAL & AKIVA ELDAR, LORDS OF THE LAND: THE WAR OVER ISRAEL'S SETTLEMENTS IN THE OCCUPIED TERRITORIES, 1967-2007 (2007); *see also* Allison Kaplan Sommer, *How a Group of Jewish Terrorists Ended up in Israel's Halls of Power*, HAARETZ (July 5, 2018), https://www.haaretz.com/israel-news/.premium.MAGAZINE-how-a-group-of-jewish-terrorists-ended-up-in-israel-s-halls-of-power-1.6244028 (linking the Jewish Underground terrorist organization with the leadership of the settler movement).

46.     Israeli government leadership has fully admitted that there is a "settlement enterprise" driven by the State and the settlers themselves.  In 2013, Prime Minister Benjamin

Netanyahu said, "We will not stop, even for a moment, building our country and becoming stronger, and developing … the settlement enterprise." Agence France Presse, *Israel to Free Palestinian Prisoners and Build More Settlements*, BUSINESS INSIDER (Dec. 26, 2013, 5:32 AM), https://www.businessinsider.com/israel-to-free-palestinian-prisoners-and-build-more-settlements-2013-12. The settlement enterprise is furthered by the number of settlers in Israeli government and legislative positions.  For example, Uri Ariel, the former general secretary of Amana, became Israel's Minister of Construction in 2013. Amana is a settlement development organization that was originally formed in the 1970s as the settlement-building arm of Gush Emunim, a movement committed to establishing Israeli settlements in occupied Palestinian territory, and later grew independent.

47.     Central to this settlement enterprise, the Israeli government has systematically seized Palestinian territory to build settlements, in violation of the general principle of law prohibiting the acquisition of territory by force.

48.     One of the primary tools Israel uses to seize Palestinian land in the occupied West Bank is to declare it "state land," followed by the allocation of that land for the use of Jewish settlers.  These lands—including those at issue in this litigation—have private Palestinian ownership or were lands that were public Palestinian lands.  However, once declared "state land," Israel allocates it for the development of settlements intended to solely benefit Israelis. *See* B'TSELEM, UNDER THE GUISE OF LEGALITY: ISRAEL'S DECLARATIONS OF STATE LAND IN THE WEST BANK (2012), *available at* https://www.btselem.org/publications/summaries/201203_under_the_guise_of_legality. 99.3% of the land that Israel has allocated in the West Bank was allocated to settlers or settlement infrastructure. *See Settlements Data: Lands*, PEACE NOW, http://peacenow.org.il/en/settlements-

watch/settlements-data/lands (last visited Mar. 12, 2019); *Information Sheet – Allocation of State Land in OPT*, Ass'n for Civil Rights in Isr. (Apr. 23, 2013),

https://law.acri.org.il/en/2013/04/23/info-sheet-state-land-opt/.  One of the primary agencies tasked by the Israeli authorities with implementing the settlement enterprise is the Settlement Division of the World Zionist Organization, a quasi-state institution whose mandate is to represent Jewish people around the world. Land Grab at 21.  The Settlement Division's mandate is to "establish and strengthen Jewish settlement in the periphery," a reference to the West Bank. *Central Region*, Hityashvut.org.il, http://www.hityashvut.org.il/PageCat.asp?idc=11 (last visited Mar. 16, 2019); *see also* Land Grab at 20-22.

49.     In 2017, the Israeli Knesset (parliament) passed a settlements regularization law which allows Israel to expropriate private Palestinian land in the West Bank and to "regularize," or authorize, the Israeli settlements built on those private lands under Israeli law. Law for the Regularization of Settlement in Judea and Samaria, 5777-2017, SH No. 2604 p. 394 (Isr.), *available at*

https://www.adalah.org/uploads/uploads/Settlement_Regularization_Law_English_FINAL_0503 2017.pdf.  Beyond this legislative support, Israeli settlers and the Israeli settler movement benefit from significant state funding, military protection and other resources for settlement planning, development, construction, security, maintenance, and expansion.

50.     In addition to the loss of their land, the settlement enterprise is discriminatory against Palestinians, and severely circumscribes Palestinian daily life.  By military order, Israel prohibits Palestinian residents of the West Bank—including Intervenors—from entering settlement boundaries without a special permit, declaring such areas a closed military zone.  No such permit is required for residents of Israel, residents of the West Bank who are Israeli citizens

or "eligible to immigrate to Israel under the Law of Return"—in other words, Jewish—or anyone

with a valid Israeli visa.  *See* Order regarding Security Provisions (Judea and Samaria Area) (No.

378), 5730-1970 – Proclamation regarding Closure of an Area (Israeli Settlements) (Judea and

Samaria), 5762-2002 (Isr.), *available at*

https://www.hrw.org/sites/default/files/report_pdf/israel1118_web_0.pdf (*see* p. 25-26); *see also*

https://www.nevo.co.il/law_word/Law70/zava-0199.pdf (last visited Mar. 15, 2019) (Hebrew

text) ("I.D.F. Order").

     51.    Palestinians with West Bank residency, including Intervenors, could be

prosecuted under Israeli military law if they tried to enter settlements without a special permit.  If

a Palestinian resident of the West Bank were to try to enter a settlement without a permit to

access an Airbnb property, they would likely be turned back by armed guards who do not permit

Palestinians to enter settlements.  Intervenors and other Palestinians are therefore both physically

and legally prohibited from accessing Settler-Plaintiffs' listed properties on account of their

national origin and religion.

     52.    The settlements are part of a much broader system of closures and restrictions that

severely limit Palestinians' ability to move freely and safely in the West Bank.  This includes a

network of roads that are built to connect the Israeli settlements to Israel and that are often

forbidden to Palestinian cars, which are marked by differently colored license plates.  These

Israeli-only roads bypass Palestinian towns and villages, which must rely on a separate road

network.  Roads for Palestinians are controlled and obstructed by Israeli military check-points, at

which Palestinians are often harassed and humiliated.  Settlements are typically accompanied by

a heavy military presence, subjecting Palestinians to regular military searches at checkpoints, and

their towns and villages to frequent night-raids by the Israeli military.  There is a direct

correlation between these raids and proximity of the Palestinian town to a settlement or settlement road. WOMEN'S CENTRE FOR LEGAL AID AND COUNSELING, ISRAELI MILITARY NIGHT-RAIDS ON PALESTINIAN RESIDENCES IN THE WEST BANK AND EAST JERUSALEM 6-8 (2015), *available at* http://www.wclac.org/english/userfiles/NIGHT%20RAIDS.pdf.

53.     Israeli authorities also impose an elaborate permit regime wherein Palestinian residents of the large areas in the West Bank under full Israeli administrative control must seek permits to build their homes, or fix their village or town's infrastructure.  Palestinians whose farmlands are in closed military zones or beyond Israeli military checkpoints or fences must seek special military permits from the Israeli military to access their land to tend or harvest their crops—permits which are only granted on a limited basis. *See generally* B'TSELEM, ACCESS DENIED: ISRAELI MEASURES TO DENY PALESTINIANS ACCESS TO LAND AROUND SETTLEMENTS (2008), *available at* https://www.btselem.org/download/200809_access_denied_eng.pdf.

54.     In furtherance of its settlement enterprise, Israel has also erected a wall (in places, in the form of a fence or electric wires), in the occupied Palestinian territory, including in and around East Jerusalem (the "Annexation Barrier"), which the International Court of Justice found violated international law and must be dismantled.  I.C.J. Advisory Opinion on the Wall at ¶ 163. The Court found that the planned route of the wall would encompass "some 80 per cent of the settlers" living in the occupied Palestinian territory (¶ 119), and that "the wall and its associated régime create a 'fait accompli' on the ground." *Id. at* ¶ 121.  The Court also concluded that Israel's settlements in the occupied Palestinian territory (including East Jerusalem) "have been established in breach of international law." *Id.* at ¶ 120.

55.     Israeli settlements, including Settler-Plaintiffs' Airbnb properties, are inherently discriminatory.  Settler-Plaintiffs are able to possess, build on, and rent out these settlement

properties because they are Jewish.  Settler-Plaintiffs' Airbnb properties are made available to guests under inherently discriminatory conditions.

56.     Settler-Plaintiffs' Airbnb listings each name the settlements where the properties are located: Rehelim, Karnei Shomron, Nofei Prat, Tekoa, Adei Ad, Ofra, and Modi'in Illit.  The listings incorrectly state that the properties are located in Israel; they are in fact located in settlements in the occupied Palestinian territory of the West Bank.  Any Palestinian reading the listing will know that they are in settlements and therefore not available for them to access. Moreover, any ordinary reader, Palestinian or not, looking to rent in that area and who would likely have some familiarity with the region would be aware that the settlement properties being advertised are, as stated by Settler-Plaintiffs, "owned predominately, if not exclusively, by Jews and/or Israelis," Am. Cpt., D.I. 6, at ¶ 35, and even more so now that Plaintiffs have brought and publicized litigation based on that premise.

57.     Additionally, some of the Settler-Plaintiffs' listings explicitly evidence the settlements' discriminatory reality, especially when read and understood in the context of the settlement enterprise.  Settler-Plaintiff Yair Spolter indicates in his Airbnb listing that the property is in Modi'in Illit, which he states "is a religous [sic] Jewish city in the center of Israel." Settler-Plaintiff Moriyah Shapiro has indicated in her Airbnb listing that the property is in a "special neighborhood of Shiloh, called Adei-Ad."  She indicates that "Adei-Ad is a Jewish, very religious neighborhood" and "our neighborhood is Jewish religious."  Settler-Plaintiff Shapiro also indicates in her listing that "[c]roses [sic] are forbidden."

58.     The discriminatory advertisements premised on an unlawful claim to Palestinian land are deeply offensive and stigmatizing to Intervenors: they reinforce the fact that Palestinians, including Intervenors, are excluded from their ancestral land and rendered unequal

through the collaboration of the State and individual settlers because of their national origin and religion.

## Settler-Plaintiffs' Role in the Settlement Enterprise

59.     The establishment and expansion of settlements is the result of a symbiotic relationship between settlers and the Israeli authorities.  The settlement enterprise necessarily depends on the knowing and willful collaboration of individual Israeli citizens such as Settler-Plaintiffs, who choose to reside in settlements with knowledge of the displacement of Palestinians that the settlements require, and in many cases, with the purpose of aiding in the settlement enterprise.

60.     The Israeli government and settlers such as Settler-Plaintiffs act jointly, in coordination and/or pursuant to a common purpose to illegally seize and settle Palestinian land. Individual settlers work closely with a range of Israeli state, quasi-state and non-state actors for the acquisition, construction, and licensing of buildings, including agencies whose sole purpose is the expansion and maintenance of Israel's hold on the West Bank.

61.     Although a core feature of occupation in international law is its temporary nature (along with the inviolability of the rights of the occupied population), the properties that Settler-Plaintiffs unlawfully occupy, have built on, and seek to rent out embody the opposite goal: a permanent hold of Israeli settlement in Palestinian territory.  Indeed, Settler-Plaintiff Moriyah Shapiro has noted that "we're here to stay"; and Settler-Plaintiff Yair Spolter has described the settlement of Modi'in Illit as being "in the center of Israel."

62.     Settler-Plaintiffs, like hundreds of thousands of other settlers, have been encouraged, induced, assisted, and protected by the State of Israel—the Occupying Power—and its agencies and officials in seizing, occupying, and profiting from Palestinian land, in

contravention of clearly established international law.  Their participation in the settlement

enterprise is knowing, voluntary, and intentional.

63.     Settlers have also been a necessary part of the planning and execution of the

settlement enterprise at every stage: settlements are often established by individuals, like Settler-

Plaintiffs Moriyah and Jonathan Shapiro, who built their house, which the State then supported

financially and administratively; the State provides funding and subsidies to settlers to operate

their businesses in settlements as part of comprehensive plans to strengthen the development of

settlements, as it did for Settler-Plaintiff Inbal Levy, who applied for and received this state

funding; the State, through its military commander, allocates Palestinian property for the benefit

of settlers, like Settler-Plaintiffs Gordon and Daniel and Tsofiya Jacob—without whom the

allocation could not be completed, as they are the ones moving onto and settling on the

unlawfully seized property, purchasing houses there and making alterations to it; and settlers like

Settler-Plaintiff Silber work with settler organizations like Amana to purchase a house below

market value and move into an empty settlement in order to populate the area, and separately pay

such organizations to further expand settlement construction.

64.     Moreover, all Settler-Plaintiffs financially benefit because the Palestinian land on

which they have settled has been unlawfully seized and their presence is subsidized by the state

or settlement agencies.  They further benefit by listing their rentals and thereby promoting

settlement tourism, which in turn promotes Jewish migration to the settlements and furthers the

settlement enterprise.

65.     Most settlements are formally recognized and administered under Israeli law,

even though they are prohibited by international law.  The Israeli government has initiated,

approved, planned, and funded settlements in the occupied West Bank, and has introduced a

number of financial benefits and incentives to encourage Israelis to move to these settlements.

66.     There are also "outposts," which the State of Israel has not officially authorized,

but has supported through funding, construction, infrastructure, and military support.  Notably,

many settlements were originally established as unauthorized outposts, and were later

retroactively authorized by Israel. There exists no distinction in international law between

"settlements" and "outposts"—both are unlawful.

67.     An official Israeli government investigation into the status of outposts found that

settlements built with no formal Israeli Government authorization were established with the

knowledge, encouragement, and tacit agreement of Government Ministers, including the Prime

Minister, and public authorities. H.R.C. Settlement Report, Annex I: Timeline – Israeli

Settlements in the Occupied Palestinian Territory, at 37 (citing Memorandum from Talya Sason,

Adv., to Office of the Prime Minister of Isr., Summary of the Opinion Concerning Unauthorized

Outposts (Mar. 10, 2005), *available at*

https://mfa.gov.il/mfa/aboutisrael/state/law/pages/summary%20of%20opinion%20concerning%2

0unauthorized%20outposts%20-%20talya%20sason%20adv.aspx ("Sason Report")). *See also*

Yesh Din, The Road to Dispossession: A Case Study – The Outpost of Adei Ad (2013),

*available at* http://adeiad.yesh-din.org/MaslulHanishul_Eng_LR.pdf ("Road to Dispossession")

(describing, through a case study of Adei Ad, how individual settlers and the state collaborate to

achieve the dispossession of Palestinians).

68.     Outposts are a fundamental pillar of settlement expansion in the West Bank:

settlers, with the encouragement and tacit agreement of Israeli state actors, build outposts

unauthorized by Israeli administrative or military law, typically on hilltops; a chain of outposts

then create a bloc of land under Israeli control with the intention of eventually connecting them to larger settlements.  In this way, the settlers and the State create large, contiguous settlement zones, allowing them to control broader swaths of territory and prevent Palestinians from accessing them.

69.     Individual settlers' direct contribution to violations of international law is particularly well-illustrated through the example of settlement outposts such as Adei Ad, which is occupied by Settler-Plaintiffs Moriyah and Jonathan Shapiro: As citizens of Israel, the Occupying Power, they have settled and built a house in occupied Palestinian territory, and expressed doing so for the purpose of claiming that territory—the very conduct that the prohibition in the Fourth Geneva Convention was intended to prevent.  For these settlement outposts, Israel has not formally seized or allocated the land to settlers, but allows individual settlers to maintain possession of the land, and provides funding, services, and protection to them.

70.      Indeed, in 1998, Israel's foreign minister Ariel Sharon explicitly stated the degree to which the State's annexation of land depends on settlers: "Everybody has to move, run and grab as many [Palestinian] hilltops as they can to enlarge the [Jewish] settlements because everything we take now will stay ours... Everything we don't grab will go to them." *See In Quotes: Ariel Sharon*, BBC NEWS (Jan. 11, 2014), https://www.bbc.com/news/world-middle-east-11576714. The call was heeded by many settler leaders, including those who created Adei Ad in 1998.

71.     Even settlers who might not be ideologically committed to the settlement enterprise know about the resulting displacement, discrimination and persecution of Palestinians, as they witness and engage with indicia in their daily lives: many access their settlements

through security gates or security checkpoints that Palestinian West Bank residents are prevented from passing; they travel on roads that Palestinians are excluded from, and that bypass Palestinian towns by design.  Settlers see Palestinian villages and towns as they drive through the West Bank, many of which are blocked from the settler road network by physical barriers and checkpoints.  They see the Annexation Barrier built on Palestinian lands (as is the case with Intervenor 'Anata), and they drive through Israeli military checkpoints that regularly stop and search Palestinian residents from the West Bank, and prohibit them from accessing other parts of the West Bank, including East Jerusalem.  They live in Jewish-only communities, which Palestinians West Bank residents are barred by law from entering without special permits.  To the extent Settler-Plaintiffs see Palestinians in their settlements, they are there only as permit-bearing day laborers, arriving in the mornings and leaving in the evenings.

72.     Israeli settlers are also on notice about the dispossession and displacement of and discrimination against of Palestinians as a result of the settlement enterprise.  Palestinians regularly file claims in Israeli courts seeking to halt or challenge Israel's expropriation of their lands; they have brought various legal challenges, including at least to Adei Ad, Ofra, Modi'in Illit, and Rehelim.  Nofei Prat settlers have sought enforcement of demolition orders.  Official government investigations have also been widely covered. *See, e.g.,* Sason Report.

73.     Prominent Israeli, Palestinian, and international human rights organizations have thoroughly covered and publicized the illegality and harmful and discriminatory impacts the settlement enterprise has on the Palestinian population.  *See, e.g.,* Separate and Unequal; B'Tselem, By Hook and By Crook: Israeli Settlement Policy in the West Bank (2010), *available at* https://www.btselem.org/publications/summaries/201007_by_hook_and_by_crook. At the international level, there have also been decades of coverage and condemnation of the

Israeli settlement enterprise. *See, e.g.,* H.R.C. Settlement Report, Annex I: Timeline – Israeli Settlements in the Occupied Palestinian Territory, at 37; AL-HAQ, SETTLING AREA C: THE JORDAN VALLEY EXPOSED (2018), *available at* www.alhaq.org/publications/publications-index/item/settling-area-c-the-jordan-valley-exposedcategoryid10.

74.    Settler-Plaintiffs have benefitted from particularized Israeli state assistance to develop the tourism industry in the settlement economy, and actively promote their settlement properties as rental properties and tourist destinations, including through Airbnb.  Settlement tourism, which Settler-Plaintiffs promote including through their listings, is important to the settlement enterprise by providing economic support, as well as political and ideological promotion.  This is evidenced by the State's aggressive support of settlement tourism.

75.    For example, the Prime Minister's Office has announced subsidies for the "establishment, conversion and expansion" of hotels, bed and breakfasts, and guest rooms in settlements in the West Bank.  Israel has designated 90 settlements as "national priority areas," which allows businesses to benefit from reductions in the price of land, grants for the development of infrastructure, and preferential tax treatment.  In June 2016, Israel announced an additional program of "special financial aid" with specific provisions to support the development of the tourism industry in settlements.  The Yesha Council, an umbrella body for Israeli settlement municipal councils, boasted that during a holiday in 2018, some 300,000 people visited various "tourist sites, routes, museums, festivals, wineries and archeological sites." *See generally,* Destination: Occupation.  Thus, Settler-Plaintiffs' active promotion of Israeli settlement tourism furthers the goal of the settlement enterprise of *de facto*, if not *de jure*, annexation of the West Bank into Israel.

76.     The Settler-Plaintiffs' knowing and willful conduct in the occupied Palestinian territory, acting jointly or with a common purpose with the officials of the State of Israel who facilitate, encourage, direct and/or condone the settlement enterprise, or otherwise facilitating the enterprise themselves, violates peremptory norms of international law.  This conduct occurs through various component actions: in purchasing or leasing property from the State or its agencies, in altering or seizing property, in the very act of their settlement in the occupied Palestinian territory, in living on the property and renting it, in representing that such property is "in Israel," and in participating in a discriminatory scheme that preferences and furthers the interest of Jewish individuals through financial incentives, infrastructure, services, and resources provided to settlers and settlements, while inhibiting and denying Palestinians' fundamental rights.

### The Airbnb Properties on Land Belonging to Intervenors
### Alwan, Jalud and 'Anata

77.     On November 19, 2018, Airbnb announced that it had developed a framework for evaluating how it should treat listings in occupied territories, and concluded that it "should remove listings in Israeli settlements in the occupied West Bank that are at the core of the dispute between Israelis and Palestinians."  Airbnb stated that it would continue to make available listings of properties in Israel, as well as in settlements in East Jerusalem and the Golan Heights. *Listings in Disputed Regions*, AIRBNB.COM (Nov. 19, 2018), https://press.airbnb.com/listings-in-disputed-regions/.

78.     On January 17, 2019, Airbnb announced that, in applying its framework, it would further delist properties in South Ossetia and Abkhazia, which it also defined as "disputed territories" as they are considered Russian-occupied Georgian territory by the majority of United Nations member states.  Airbnb found these areas to fall under its criteria for "disputed

territories," because listings in these areas "could be implicated in ongoing tensions" and have "a direct connection to the larger conflict" in each region. *Framework for Evaluating Listings in Disputed Areas*, Airbnb.com (Jan. 17, 2019), https://press.airbnb.com/framework-for-evaluating-listings-in-disputed-areas/.

79.     Airbnb's decision to delist settlement properties is in accordance with international law and international standards relating to the responsibility of businesses to respect human rights.  There are significant legal consequences that flow from allowing Israeli settlers to list their properties for rent on Airbnb's platform.  Doing business in or with settlements contributes to international humanitarian law violations and human rights abuses.

80.     Settler-Plaintiffs' listing on the platform of Airbnb, a United States corporation, are accessible in the United States, including in this jurisdiction, and target travelers around the world, including in the United States.  All Settler-Plaintiffs have United States citizenship, all Renter-Plaintiffs have United States citizenship, and four of the Renter-Plaintiffs who want to rent settlement properties through Airbnb are domiciled in Maryland and New York, and upon information and belief, access the listings from the United States.  Intervenors Alwan and Wahbe are United States citizens domiciled in the United States.

81.     Intervenors have been injured and continue to be injured and suffer damage due to Settler-Plaintiffs' unlawful activities on their lands.

<u>Intervenor Jalud's Land is Occupied by Settler-Plaintiff Moriyah Shapiro
& The Settlement of Adei Ad</u>

82.     Jalud is a small village with some 700 residents.  It is one of the most ancient villages in the Nablus area, and is now also one of the poorest due to the establishment of

settlements on substantial portions of its land that limit Palestinian residents' access to arable farm land that was once theirs.

83.     Settler-Plaintiffs Moriyah and Jonathan Shapiro built the house that Moriyah Shapiro lists on Airbnb as a bed and breakfast on land that belongs to the Palestinian village of Jalud, and which residents of Jalud are prohibited from accessing.

84.     Jalud's rights to the land on which Settler-Plaintiffs Moriyah and Jonathan Shapiro built the bed and breakfast is evidenced through a document known as "*ikhraj qeid*," which establishes that the land is registered in the name of the village's representative, to be used for the villagers' collective benefit.

85.     Settler-Plaintiff Moriyah Shapiro is a prominent, outspoken member of the violent settlement-outpost of Adei Ad, which is part of the network of hilltop outposts connected to the settlement of Shilo.  She is a leader of the Shilo settler community, and has frequently boasted being among the "founding families" of Shilo. Michele Chabin, *'Here to Stay' in Shilo*, N.Y. JEWISH WEEK (Oct. 13, 2016, 12:01 PM), https://jewishweek.timesofisrael.com/here-to-stay-in-shilo/. "My family is one of the founders of the new village."  Her father, United States citizen Ira Rappaport, was a founder of Shilo, and was reportedly appointed leader of Shilo after he was found guilty of planting a car bomb that maimed two Palestinian officials.  Jake Wallis Simons, *Meet the Settlers: The Battle for the Hilltops*, TELEGRAPH (2013), https://www.telegraph.co.uk/meetthesettlers/chapter3.html (last visited Mar. 12, 2019) ("Meet the Settlers: The Battle for the Hilltops").

86.     Settler-Plaintiff Moriyah Shapiro is directly implicated in the theft of Intervenor Jalud's land, and in the ongoing forcible transfer of Jalud's population from the village.  On her bed and breakfast's website, she highlights that she and her family "decided to build our home in

the Adei Ad neighborhood in the Shilo Valley." *Who We Are*, SHALVAT EMEK,

https://shalvatemek.wixsite.com/shalva/about_us (last visited Mar. 17, 2019).

87.     The creation of Adei Ad in 1998 was in response to former Minister Ariel

Sharon's call to "grab" Palestinian land to prevent it from use by Palestinians.  The outpost was

built on a mix of private and public Palestinian land, without legal planning status under Israeli

law.  An Israeli human rights organization issued an in-depth study of the outpost of Adei Ad,

using it as a case study that "illustrates how the existence of an outpost leads Palestinian farmers

in the adjacent villages to lose the ability to cultivate their land." Road to Dispossession at 11.

88.     Plaintiff Shapiro's Airbnb posting is discriminatory.  It states that the property is

in Shilo and Adei Ad, known to the ordinary person looking to stay in the region, and certainly

the ordinary Palestinian, to be in a Jewish Israeli settlement.  It explicitly stated that "our

neighborhood is Jewish," and that "Croses [sic] are forbidden."

89.     Settler-Plaintiffs Shapiro are knowingly, and purposefully, depriving the residents

of Jalud of their property and their fundamental rights and driving the settlement enterprise.

Settler-Plaintiff Moriyah Shapiro has publicly claimed her direct involvement in settlement

expansion, saying, "we're building another settlement and this area will grow." Meet the Settlers:

The Battle for the Hilltops (embedded video of interview with Moriyah Shapiro).

90.     The settlement of Shilo is near an archeological site in the West Bank, at which

Plaintiff-Settler Moriyah Shapiro works, and which she promotes.  According to Amnesty

International, this heritage site has been identified by the State of Israel and settler organizations

as one of the most important visitor attractions in the West Bank, and receives Israeli state

funding. Destination Occupation at 52.

91.     Her statements, and her work as a historical site manager and in the promotion of settlement tourism, demonstrate her knowing and purposeful promotion of the broader settlement project as well as her monetization of it.  She has recalled that when the settlement was first established, settlers rejoiced that Palestinian land was "ours again." Meet the Settlers: The Battle for the Hilltops (embedded video of interview with Moriyah Shapiro).

92.     The Adei Ad settlement outpost, and by extension the Shapiros' house, was built without a permit and without an approved master plan.  Adei Ad was established in 1998, reportedly with the equivalent of a roughly $400,000 grant from Israel's Housing and Construction Ministry. Tovah Lazaroff, *After Violence, Court Asked to Halt Legalization of Adei Ad Outpost*, JERUSALEM POST (Feb. 4, 2019, 9:48 PM), https://www.jpost.com/Arab-Israeli-Conflict/After-violence-court-asked-to-halt-legalization-of-Adei-Ad-outpost-579669.   Upon information and belief, Settler-Plaintiffs Moriyah and Jonathan Shapiro built the house that she lists on Airbnb in 2003.

93.     The establishment of Shilo and the Adei Ad outpost partially on Jalud's land has resulted in severe restrictions on the Palestinian villagers' access to their farmlands.  Palestinians in Jalud have lost approximately 4,000 acres of their village land.  Road closures and the designation of vast swaths of lands as closed military zones, which the Palestinian residents and landowners cannot access, have cut the residents off from each other and their lands.  Humanitarian agencies have documented the resulting inability of the residents to continue their traditional agricultural practice and productivity.  They have stopped being able to cultivate their traditional crops, and many Palestinian residents of the village of Jalud have left the village to seek employment elsewhere, significantly reducing the village's population.  The Israeli army

started to prevent villagers from planting on their lands in 2000, and a number of families left for

nearby cities. Destination Occupation at 53; Road To Dispossession at 139-141.

94.     Due to its being under full Israeli military and administrative control – and

occupation, the sitll accessible part of the village of Jalud is not connected to running water and

its Palestinian residents draw water from wells and a spring located in the village.  To

supplement their supply, the residents of Jalud are forced to buy water from tankers at very high

prices.

95.     The settlement of Adei Ad is a no-entry zone for Palestinians, including the

residents of Jalud.  It is also among the most violent settlements in the West Bank.  Residents of

Jalud and their property are regularly subjected to violent attacks by residents of Adei Ad and

other nearby outposts.  Settlers also steal crops, and otherwise intimidate farmers. Road To

Dispossession at 90-118, 144-146.  Although Adei Ad consists of fewer than fifty families, the

United Nations Office for the Coordination of Humanitarian Affairs has traced at least twelve

attacks on Palestinians to the settlers from this outpost. *See High level of violence by Israeli*

*settlers; rise in Israeli fatalities*, U.N. OFFICE FOR COORDINATION OF HUMANITARIAN AFFAIRS IN

OCCUPIED PALESTINIAN TERRITORY (Nov. 16, 2018), https://www.ochaopt.org/content/high-

level-violence-israeli-settlers-rise-israeli-fatalities. In early 2019, settlers from the outpost of

Adei Ad reportedly attacked Palestinian farmers, killing one.  In 2015, settlers from the outpost

of Adei Ad reportedly attacked staff from the United States Consulate who were there to

investigate reports of settler violence against a neighboring village.

96.     Even under Israeli law, Adei Ad was established without authorization, and has

not been retroactively authorized for civilian settlement.  Nevertheless, it enjoys full de facto

legitimacy and substantial support from the State of Israel.  Israeli state agencies ratified the

settlement by carrying out infrastructure work, paving access roads, purchasing caravans, and connecting the outpost to electricity and water, and other services.  Adei Ad founders have understood from military officials that they will enjoy military support, and from other Israeli government officials that they would provide for the settlers' material needs. *Id.* at 44-46.

97.     In 2014, Jalud and three Palestinian villages petitioned the Israeli High Court demanding the court to order removal of the outpost, not only because it was built without authorization under Israeli law, but also because it was a hub for severe violence directed at the Palestinian residents of the area in an effort to drive them from their land.  In response, the State announced that it would authorize the outpost of Adei Ad.

98.     In 2018, despite the Israeli government's public assurances that it would not build new settlements, reports revealed that Israel planned to construct additional settlement units in the Amichai settlement (which abuts Adei Ad).  The expansion is reportedly planned in order to accommodate the settlers that the government had "evacuated" from another nearby settlement outpost of Amona. Yotam Berger, *Israel Seeks to Triple Size of Isolated West Bank Settlement in Order to Legalize Outpost*, HAARETZ (Aug. 8, 2018, 1:20 AM), https://www.haaretz.com/israel-news/israel-plans-to-expand-settlement-to-include-illegal-outpost-1.6360619.

99.     The State of Israel is undertaking a process of retroactive legal authorization of Adei Ad, although the nearby villages, including Jalud, and human rights organizations continue to challenge this move.  In 2018, the Israeli High Court ordered a freeze on all construction in Adei Ad and sharply criticized the State's conduct regarding the outpost.

100.     The village of Jalud only learned about the identity of Settler-Plaintiffs Shapiro as the individuals who occupied their property, and their rental of the listed property, upon their filing of the Complaint in the present action.

<u>Intervenor Alwan's Land is Occupied by Settler-Plaintiff Inbal Nazdare Levy
and the Settlement of Ofra</u>

101.    Intervenor Ziad Alwan, along with his mother and his siblings, is the rightful

owner of the land that was illegally seized by settlers when they first established the illegal

outpost of Ofra in 1975, and where Plaintiff Levy now operates her bed and breakfast.

102.    Intervenor Alwan is heir to the land that is registered in his father's name.  He

recalls his father used to plant grains on that particular tract of land.  Alwan was a young boy

when his family lost access to the land due to the establishment of the settlement of Ofra.

103.    The settlement of Ofra was one of the first settlements in the West Bank,

established in 1975 by a group of settlers who trespassed on private Palestinian land, and

illegally squatted the structures that were previously there—a few abandoned military barracks

that the Jordanian military had built.  Alwan recalls his father telling him that he was offered

money by the settlers who told him that, since they had taken it anyway, he should take their

money.  His father refused, making clear the appropriation was without his consent, and the

family continues to hold rightful title to the land, as evidenced by a "*tabu*" document that is

regarded as definitive proof, even by the Israeli authorities.  The offer of compensation after

seizing property is a common technique that settlers have employed when they are concerned

that the Israeli military has records of Palestinian private ownership and their construction is

illegal even under Israeli law.

104.    Settler-Plaintiff Levy is knowingly, and purposefully, participating in the

settlement enterprise. The compound that Settler-Plaintiff Inbal Levy lists on Airbnb, which is

called "Kedem Ofra," is located in the pre-existing structures that were unlawfully settled by the

first settlers of Ofra, and which are located in part on Intervenor Alwan's land.

105.     Upon information and belief, Settler-Plaintiff Inbal Levy's renovation and conversion into a bed and breakfast was financed by the Israeli State, which has prioritized the development of tourism infrastructure in settlements.  Ms. Levy obtained a grant as part of an Israeli government effort to preserve the "original houses built in Ofra," and reports that she did so with "the agreement and encouragement of the settlement secretary."  Destination: Occupation at 24, n. 41; *Dream and Initiate*, DKATOM.CO.IL (Oct. 10, 2018), https://www.dkatom.co.il/index.php?module=BizMiniste&id=431&pna. *See also A List of Our Projects and a Description of the Project,* LANDMARKS.GOV.IL, https://landmarks.gov.il/%D7%A8%D7%A9%D7%99%D7%9E%D7%AA-%D7%94%D7%9E%D7%99%D7%96%D7%9E%D7%99%D7%9D-%D7%A9%D7%9C%D7%A0%D7%95-%D7%95%D7%AA%D7%99%D7%90%D7%95%D7%A8-%D7%94%D7%A4%D7%A8%D7%95%D7%99%D7%99%D7%A7%D7%98 (last visited Mar. 17, 2019).

106.     Levy boasts about her luxurious complex in the Ofra settlement.  Her post on Airbnb and listings on other sites advertise a hot tub, a beautiful location, recent renovations, and other amenities.

107.     Yet Levy's settlement is surrounded by a wall, a military base, and high security that makes even walking the lands adjacent to the settlement—let alone the Kedem Ofra compound—inaccessible for Palestinians, including Intervenor Alwan and his family.

108.     Palestinian farmers, including those in Alwan's family, who own the lands surrounding the built-up area of Ofra are denied access to their farmlands and must seek special

permits from the Israeli military.  Those permits are granted on a very limited basis and do not permit them to adequately care for their crops or their olive groves.

109.    As a result of the seizure of and denial of access to their lands, including the land that Levy has her bed and breakfast on, the Alwan family lost almost all of their agricultural lands.  No longer able to find a future for their children or make a living off their lands, the Alwan family stopped farming.  The Alwan family moved to the United States, where Intervenor Alwan and his family live in Chicago, and he supports his family by spending long days on the road, driving a truck.

110.    Although Intervenor Alwan's children have never been able to access their family's lands, he teaches them that the land in Palestine belongs to the Alwan family.

111.    Intervenor Alwan, like other Palestinians with West Bank residency, is not able to access the guesthouse that Settler-Plaintiff Inbal Levy built on account of his national origin and religion.

112.    Intervenor Alwan only learned the identity of Settler-Plaintiff Inbal Levy as the person who occupied his property, and rented it out on Airbnb, because of her filing of the Complaint in the present action.

113.    Settler-Plaintiff Levy's Airbnb advertisement indicates that the property is in Ofra, known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian, to be in a Jewish Israeli settlement.

114.    These advertisements are stigmatizing as they signal that Palestinians, including Intervenor Alwan, are unequal merely because of their national origin and religion.  They further add insult to Intervenor Alwan's injury of being excluded from large parts of his own homeland, and his property.

48

<u>Intervenor 'Anata's Land is Occupied by Settler-Plaintiffs Jacob and Gordon, and the Settlement of Nofei Prat</u>

115.    The town of 'Anata is located on the outskirts of East Jerusalem.  It has a population of approximately 14,000.  Historically, the village was a farming community.

116.    Due to its proximity to Jerusalem and the planned Israeli settlement expansions to the east of Jerusalem, the town of 'Anata's historical lands have been particularly targeted for the expansion of settlements and settlement infrastructure.

117.    The town has lost approximately 180 acres of its historical land to the settlement of Nofei Prat, which is part of the settlement of Kfar Adumim.  Nearby settlements of Almon and Alon are all also built on 'Anata's lands.  Palestinians with West Bank residency, including the residents of 'Anata, are unable to access Nofei Prat.

118.    Nofei Prat's founders built the settlement as part of an expansion of Kfar Adumim deliberately in an attempt to circumvent international pressure to stop building new settlements by locating it on land that is technically within the jurisdiction of an existing settlement, but at a location that is slightly set apart from that settlement.  Nofei Prat was built illegally by Amana and has operated independently since 1997.

119.    Also on 'Anata's land, Israel has built a portion of its Annexation Barrier separating the town's lands from its residents, a military base to protect the settlements, and bypass roads to exclusively serve the settlers.

120.    The town of 'Anata suffers from congestion and overcrowding as a result of the settlement enterprise, including Nofei Prat. 96.2% of 'Anata's land is under Israeli military administrative control, including the area on which Plaintiffs Gordon and Daniel and Tsofiya Jacob's Airbnb properties are located.  Palestinians are required to seek special permits from the Israeli Civil Administration (part of the Israeli military) to build on lands that fall within Israel's

49

control, as the Occupying Power, yet the Israeli military rejects more than 90% of the requests it receives from Palestinians.  As a result, the population cannot expand and grow, or plan for basic infrastructure and services.  The Israeli military has demolished buildings under the pretext of unlicensed construction, or to make way for the building of the Annexation Barrier.

121.    Due to the loss of access to their lands and restrictions on movement, many 'Anata residents have abandoned their traditional lifestyles of farming and herding livestock.  A 2011 survey shows that 20% of the village's population work as laborers for Israelis, and only 4% continue to work in the agriculture sector, even though 'Anata has historically been an agricultural community.

122.    Both Settler-Plaintiffs Gordon and Daniel and Tsofiya Jacob's Airbnb properties are located on land that was registered as public land and that was for the collective benefit of the town of 'Anata through the process of land registration undertaken by the Jordanian state before the Occupation of 1967.  Israeli authorities unlawfully allocated it for the exclusive use of Jewish Israelis, rather than for the benefit of the local Palestinian population, the residents of the town of 'Anata.

123.    Upon information and belief, Settler-Plaintiffs Daniel and Tsofiya Jacob's house was built between 2011 and 2013, and Settler-Plaintiff Gordon's house between 2000 and 2003.

124.    The extension of Kfar Adumim through Nofei Prat is part of the larger expansion of settlements towards the east of Jerusalem, which has resulted in the decimation of Bedouin communities that have inhabited the area since well before the Israeli occupation; the creation of an enclave separating the north of the West Bank from the southern parts; and the completion of the severance of Palestinian residents of the West Bank's access to East Jerusalem, which is also occupied.

125.    The Nofei Prat settlement, where Settler-Plaintiffs Gordon and Daniel and

Tsofiya Jacob live, has recently gained prominence as it sought to implement an Israeli Civil

Administration order to demolish all of the Khan Al Ahmar Palestinian Bedouin community's

structures, including a school, which are also part of 'Anata's lands. *Impending Destruction of

Khan al-Ahmar Village*, PEACE NOW (May 16, 2018), http://peacenow.org.il/en/impending-

destruction-khan-al-ahmar-village.  The individual settlers of Nofei Prat have reportedly

volunteered to identify and report Palestinian structures that they deem to be illegally built on

their land.

126.    In sharp contrast, in her Airbnb posting, Settler-Plaintiff Tsofiya Jacob posts that

her home is "located on the edge of the desert, with a breathtaking panoramic view […] offering

tranquility and relaxation and an escape from daily tumult."  Settler-Plaintiff Gordon and Jacob's

advertisements both indicate that the Airbnb properties are in the settlement of Nofei Prat,

known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian,

to be in a Jewish Israeli settlement.

127.    Settler-Plaintiff Tsofiya Jacob has reportedly stated that she chose to move to the

settlement because she believes it to be "a homeland, as part of Israel."

128.    The town of 'Anata and its residents have brought multiple legal challenges to the

seizure of their lands in Israeli national courts.

129.    Intervenor 'Anata only learned the identity of Plaintiffs Gordon and Daniel and

Tsofiya Jacob as the individuals who are occupying the particular property in Nofei Prat, and of

their rental of the listed property, because of their filing of the Complaint in the present action.

**Settler-Plaintiff Weinger and the settlement of Tekoa**

130.    Palestinian residents of the village of Tuqu' own the land upon which the settlement of Tekoa was established.  The Tekoa settlement is located south of Bethlehem in the West Bank and is part of the larger block of settlements known as Gush Etzion.  The residents of Tuqu' suffer from continued settler attacks.  In 2004, settlers from Tekoa reportedly beat a Palestinian shepherd who was taking his sheep to graze, resulting in multiple injuries and bone fractures.  In 2007, Tekoa settlers reportedly set fire to about 400 olive trees belonging to residents of Tuqu'.  In 2015, Israeli settlers living in Tekoa reportedly detained a sixty-year-old Palestinian man and his son from Tuqu' while they were working on their land near the Tekoa settlement.

131.    In the Tekoa settlement, Settler-Plaintiff Weinger boasts a luxurious "private villa," "a swimming pool, a large grass play area and a bonfire pit." Settler-Plaintiff Weinger views his listing as promoting a positive perspective on Israeli settlements: "People come to stay here and are wowed because they didn't think that this is what a West Bank settlement looks like."

132.    The entrance to the Tekoa settlement is a gate that is guarded by a checkpoint which screens Palestinians and prohibits them from entering.  Palestinians with West Bank residency, like Intervenors Wahbe and Alwan, and the residents of Jalud and 'Anata, are prevented from entering Tekoa without a special permit.

133.    Weinger's advertisement indicates that the property is in Tekoa, known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian, to be in a Jewish Israeli settlement.

<u>Settler-Plaintiffs Strulovits and the Settlement of Karnei Shomron</u>

134.    Upon information and belief, Settler-Plaintiffs Sidney Eddy Strulovits and Sheri

Lynn Strulovits list an Airbnb rental property that is located on lands that belong to the village of

Deir Istya, and that is located in the Israeli settlement of Karnei Shomron.

135.    The settlement of Karnei Shomron was established in 1978.  The particular

property that Settler-Plaintiffs Strulovits have their Airbnb on is land that was seized by the State

of Israel by declaring it "state land" in November 1981, and subsequently illegally designating it

for expansion of Jewish settlements.

136.    Deir Istya residents owned the land in the Wadi Qana area, and used it for farming

and for residence.  The spring and stream in the Wadi, known for its natural beauty, were a

common destination for the villagers.  For years, Karnei Shomron discharged its wastewater into

the nearby spring.  In the 1990s, nearly fifty families living in the area were forced to move due

to the pollution.  The pollution, the Israeli state's water drilling, and the resulting inability to

irrigate crops have resulted in Palestinian farmers abandoning or changing their crops in the

Wadi area. *Wadi Qana – From Palestinian agricultural valley to settlements' tourism park*,

B'TSELEM (Apr. 23, 2015), https://www.btselem.org/settlements/wadi_qana.

137.    The head of the local council of the settlement of Karnei Shomron is actively

involved in the establishment of new settlement outposts and the expansion of Karnei Shomron

on additional lands, as well as the development of Karnei Shomron as a tourist site, and the

development of the region for "young couples from all over Israel." Zafrir Rinat, *Israeli Settlers*

*Who Build in West Bank Nature Reserves Now Facing Trial*, HAARETZ (Dec. 28, 2018, 2:23

AM), https://www.haaretz.com/israel-news/israeli-settlers-who-build-in-west-bank-nature-

reserves-now-facing-trial-1.6787328.

138.     Because of their Palestinian identity, residents of Deir Istya, and Intervenors Alwan and Wahbe, cannot enjoy "all the comforts of home" and the "basically quiet neighborhood" that Plaintiffs Strulovits advertise in their listing on Airbnb.  Palestinian residents of the West Bank, including Intervenors Wahbe and Alwan, and the residents of Jalud and 'Anata, are prevented from accessing the settlement of Karnei Shomron without a special permit.

139.     Strulovits' advertisement indicates that the property is in Karnei Shomron, known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian, to be in a Jewish Israeli settlement.

### Settler-Plaintiff Samuel Silber and the Settlement of Rehelim

140.     Upon information and belief, Settler-Plaintiff Samuel Silber has listed and seeks to continue to list a rental property that is located on land that belongs to the Palestinian village of As-Sawiya, and which is located in the Israeli settlement of Rehelim.

141.     In 2008, construction began on the Rehelim outpost, with no master plan, and no building permits.  Soon thereafter, the village of As-Sawiya, on whose lands the outpost was being constructed, filed a petition with the Israeli High Court requesting an injunction to prevent the already-constructed homes from being occupied, and seeking a judicial order to stop them from being occupied.  They prevailed, and the court ordered that none of the homes be sold.

142.     Six months later, in 2009, the Rehelim secretariat informed a family that it was essential that they move into their settlement house to then bring other families in, so that the status of the houses would not change, as they were supposed to be occupied.  Chaim Levinson, *High Court Petition Calls to Indict Israeli Settler Leaders*, HAARETZ (June 27, 2016, 6:43 PM), https://www.haaretz.com/israel-news/.premium-high-court-petition-calls-to-indict-israeli-settler-leaders-1.5402088.

143.     Settler-Plaintiff Silber knowingly and purposefully participated in the settlement enterprise.  He moved into his house in Rehelim in 2010, when all the houses in Rehelim outpost were empty, and *after* the Israeli High Court had issued an order halting sales and declaring the outpost unlawful.  He reportedly obtained the house significantly below market value, and upon information and belief, knew that it had been built illegally under Israeli law. Chaim Levinson, *Israel's AG Pushing to Try Violators for Illegal Construction in West Bank*, HAARETZ (Feb. 7, 2014, 3:14 AM), https://www.haaretz.com/.premium-ag-cracks-down-on-illegal-construction-1.5319787?=&ts=_1545172557261.

144.     Upon information and belief, Plaintiff Silber, like all residents of an Amana project, pays monthly dues to Amana that go toward investment in settlement construction in the occupied West Bank that is illegal even under Israeli law. *Id.*

145.     Silber's house was built on the lands of the Palestinian village of As-Sawiya. As-Sawiya has fought the construction and sale of settlement houses on its lands.  Silber submitted legal testimony in a proceeding that resulted from this legal challenge, and therefore knows of the legal proceedings brought by As-Sawiya village, and knows of Amana's illegal activities. *Id.*

146.     Rehelim is the site of devastating violence.  Recently, five Israeli students at a yeshiva in Rehelim were reportedly arrested in connection with the October 2018 murder of a 47-year-old Palestinian woman and mother of eight, Aisha Rabi.  Ms. Rabi was reportedly struck in the head with a large stone as she sat in the passenger side of a car.  Jacob Magid, *Prosecution to Indict Israeli Teen for Palestinian Woman's Killing*, TIMES OF ISR. (Jan. 15, 2019, 4:04 PM), https://www.timesofisrael.com/prosecution-to-indict-israeli-teen-for-palestinian-womans-killing/.

147.     Silber's advertisement for his rental property indicates that the property is in Rehelim, known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian, to be in a Jewish Israeli settlement.

148.     Palestinian residents of the West Bank, including Intervenors Wahbe and Alwan, and the residents of Jalud and 'Anata, are prevented from accessing the settlement Rehelim without a special permit.

### Settler-Plaintiff Yair Spolter and the Settlement of Modi'in Illit

149.     Settler-Plaintiff Yair Spolter's house is in the settlement of Modi'in Illit.  Upon information and belief, it is on land that belongs to the Palestinian village of Kharbata, which is located near Ramallah.  Israel declared part of the land the settlement is on as "state land" in 1982 and declared additional land "state land" in 1991.

150.     The village of Kharbata historically had an agricultural economy, producing major crops of olives, wheat, and barley.  However, the encroachment of Modi'in Illit as well as Israel's Annexation Barrier have limited the village's access to land.  In 2012, labor for Israel was the largest sector of employment, at 35% of the population, with agriculture employing only 20% of the village.  The Kharbata village council is among 16 Palestinian villages that have petitioned the Israeli Supreme Court to challenge the 2017 Regularization Law that retroactively legalizes settlements built on private Palestinian land.

151.     Settler-Plaintiff Spolter's house is in the neighborhood of Kiryat Sefer.  Kiryat Sefer was established in 1994.  In 2008, Modi'in Illit's designation was changed from a "local council" to that of a municipality following approval by the Interior Ministry and the Israeli military's Central Commander.  In 2018, the population of Modi'in Illit was nearly 73,000, making it the largest Israeli settlement in the West Bank.  During the 2009 settlement freeze

declared by Israel, Modi'in Illit had the highest rate of construction, representing 30% of all housing units built, which was double the amount approved by the government in direct violation of the freeze.  Private Palestinian land has been taken to expand the settlement, which extends beyond the bounds of its approved outline plan and jurisdictional area, and illegal construction is "common practice." Letter from Jessica Montell, Exec. Dir., B'Tselem, to Ophir Pines-Paz, Minister of the Interior of Isr., (Nov. 4, 1005), *available at*

https://www.btselem.org/download/20051104_modiin_ilit_letter_eng.pdf.

152.    Settler-Plaintiff Spolter is an active supporter of the settlement of Jewish Americans in Israel.  He advertises to Americans, describing himself and his wife as "really friendly, American hosts."  He also has written publicly on the importance of Jewish-American emigration to Israel, noting that "[w]e are living in a unique era of Jewish history, when the mitzvah of yishuv Eretz Yisroel is within our grasp."  He also refers to his home as being in the "center of Israel," even though it is entirely within the occupied Palestinian territory.

153.    Settler-Plaintiff Spolter advertises a "clean, comfy, convenient suite" that he reportedly built or purchased in 2018.  Spolter's advertisement indicates that the property is in Modi'in Illit, known to the ordinary person looking to stay in the region, and certainly the ordinary Palestinian, to be in a Jewish Israeli settlement.

Intervenor Randa Wahbe Cannot Access Settlement Properties

154.    Intervenor Randa Wahbe is a Christian Palestinian resident of the West Bank and a United States citizen.  She is a PhD student in Anthropology at Harvard University.  Wahbe's mother is from the Palestinian town of Birzeit, which is surrounded by Israeli-only roads, a part of which were built on her family's lands.  Wahbe's father is from Jerusalem, which she is not permitted to enter, so she cannot visit her relatives there or see the religious sites.

155.    Wahbe cannot travel on certain highways in the West Bank that are reserved exclusively for Israelis, despite them being on Palestinian lands.  She also has to cross checkpoints in order to visit her family members and conduct her fieldwork.

156.    Wahbe cannot access the settlements, including all of Settler-Plaintiffs' Airbnb properties, on account of her national origin and religion.  She has been denied entry to settlement jurisdictional boundaries as well as Jerusalem, on account of her West Bank residency.  Palestinian entry to Israeli settlements and settlement jurisdictional boundaries without a special permit is prohibited, as they are "closed military zones."  If Wahbe were to enter, she could be prosecuted under Israeli military law.  Even if Wahbe were to present her United States passport to the Israeli military at a checkpoint, it would not contain an Israeli entry stamp and therefore would prompt the soldiers' verification of her status as a West Bank resident.

157.    Wahbe's inability to access areas that have been seized for settlers' use only has harmed her ability to conduct research and travel in her own homeland.  She has had to use special "Palestinian-only" entrances to military courts when her research and job required her to observe proceedings, despite those courts being within the occupied West Bank.

158.    Wahbe was deeply offended, disturbed, and distressed upon seeing Settler-Plaintiffs' discriminatory advertisements.

159.    These advertisements are stigmatizing as they signal that Palestinians, including Intervenor Wahbe, are unequal merely because of their national origin and religion.  They further add insult to Intervenor Wahbe's injury of being excluded from large parts of her homeland.

160.    Wahbe has used the Airbnb platform in the past, when she has traveled internationally, but she would be unable to use it in settlements in her own homeland.  Settler-

Plaintiff Moriyah Shapiro's Airbnb listing, which has indicated that "[c]roses [sic] are

forbidden," is discriminatory towards Intervenor Wahbe.

## COUNTERCLAIMS FOR RELIEF

## COUNT 1: VIOLATIONS OF THE FAIR HOUSING ACT, 42 U.S.C. § 3604(C)

(On behalf of all Intervenors against all Settler-Plaintiffs)

161.    All proceeding paragraphs are hereby incorporated by reference as if fully set

forth herein.

162.    Settler-Plaintiffs publish advertisements for properties that are located in illegal

and discriminatory Israeli settlements in the occupied Palestinian West Bank.

163.    Settler-Plaintiffs allege that those properties are "dwellings" within the meaning

of 42 U.S.C. § 3602(b).

164.    Intervenors Alwan and Wahbe are Palestinian residents of the West Bank.

Intervenor Alwan is Muslim, and Intervenor Wahbe is Christian. Intervenors 'Anata and Jalud

are a Palestinian village and town.

165.    All Intervenors are "aggrieved persons" within the meaning of 42 U.S.C. §

3602(i).

166.    Settler-Plaintiffs' advertisements violate 42 U.S.C. § 3604(c) which reads in

relevant part:

> it shall be unlawful… [t]o make, print, or publish, or cause to be made,
> printed, or published any notice, statement, or advertisement, with respect to
> the sale or rental of a dwelling that indicates any preference, limitation, or
> discrimination based on race, color, religion, sex, handicap, familial status,
> or national origin, or an intention to make any such preference, limitation, or
> discrimination.

167.    All Settler-Plaintiffs' advertisements indicate discrimination based on national

origin and religion in violation of 42 U.S.C. § 3604(c).  The advertisements clearly indicate that

the properties are in particular Jewish Israeli settlements.  Silber advertises property in Rehelim;

the Strulovits' advertise property in Karnei Shomron; Gordon and Tsofiya Jacob advertise

property in Nofei Prat; Weinger advertises property in Tekoa; Moriyah Shapiro advertises

property in Adei Ad; Levy advertises property in Ofra; and Spolter advertises property in

Modi'in Illit.

168.    As Settler-Plaintiffs know, and as any ordinary reader knows, especially any

ordinary Palestinian reader, Palestinian residents are restricted from entering Israeli settlements

and can be prosecuted under Israeli military law for doing so, in addition to risking being

subjected to violent attack.  Therefore, by indicating that the properties are in such settlements,

these advertisements indicate discrimination based on national origin and religion.

169.    Settler-Plaintiff Shapiro's advertisement further indicates "our neighborhood is

Jewish…." In the context of settlements in the occupied West Bank, this explicitly indicates

discrimination against Palestinians in violation of 42 U.S.C. § 3604(c).

170.    Settler-Plaintiff Moriyah Shapiro's advertisement also indicated that "croses [sic]

are forbidden" on the property, which indicates discrimination against Christians, including

Intervenor Wahbe.

171.    Settler-Plaintiff Spolter's advertisement indicates that the property is in "a

religious [sic] Jewish city in the center of Israel." In the context of settlements in the occupied

West Bank, this explicitly indicates discrimination against Palestinians in violation of 42 U.S.C.

§ 3604(c).

172.    All Settler-Plaintiffs' advertisements indicate discrimination against Intervenors

Alwan and Wahbe on account of their national origin and religion.  Intervenors Alwan and

Wahbe were deeply offended, disturbed, and distressed upon seeing the discriminatory advertisements.

173.    Settler-Plaintiffs' discriminatory listings encourage non-Palestinian individuals from around the world to stay in and fund illegal rental properties on occupied Palestinian territory, thereby contributing to the Israeli settlement enterprise's presence on Intervenors Alwan, Jalud, and 'Anata's land.  The listings thereby contribute to the continued occupation of those Intervenors' land, and the continued displacement of those Intervenors and the residents of Jalud and 'Anata.

## COUNT 2: WAR CRIMES UNDER ALIEN TORT STATUTE, 28 U.S.C. § 1350

(On behalf of Intervenors 'Anata and Jalud against Settler-Plaintiffs Moriyah Shapiro, Jonathan Shapiro, Gordon, Daniel Jacob, and Tsofiya Jacob)

174.    All proceeding paragraphs are hereby incorporated by reference as if fully set forth herein.

175.    At all times relevant to the acts and omissions set forth herein, as a matter of law, there exists a situation of occupation by Israel, such that provisions of international humanitarian law operable in international armed conflicts apply. The conduct took place in the context of and was associated with the international armed conflict, which includes military occupation.

176.    The acts and omissions of Settler-Plaintiffs constitute war crimes in violation of the law of nations, as reflected in treaty law, including the 1907 Hague Regulations and the 1949 Geneva Conventions, and customary international law, and as incorporated into U.S. domestic law, including in 18 U.S.C. § 2441 (c) (War Crimes Statute).

177.    Settler-Plaintiffs' acts and/or omissions were knowing, deliberate, and/or purposeful.

178.    Through their acts and omissions, Settler-Plaintiffs have knowingly and purposefully aided and abetted, conspired and, acting with a common criminal purpose, otherwise participated in or contributed to the commission of:

(a)    the transfer of a part of the population of the Occupying Power, Israel, into the occupied Palestinian territory;

(b)    the forcible transfer of part of the civilian Palestinian population of the occupied territory within or outside the territory;

(c)    the appropriation of property, not justified by military necessity and carried out unlawfully and wantonly; and

(d)    pillage.

179.    This Court has jurisdiction to hear claims of war crimes brought by Intervenors under the Alien Tort Statute, 28 U.S.C. §1350.

180.    The acts and omissions of Settler-Plaintiffs Moriyah and Jonathan Shapiro, Gordon, and Daniel and Tsofiya Jacob have caused and are causing serious and foreseeable injury to Intervenor 'Anata and Intervenor Jalud.

### COUNT 3: CRIMES AGAINST HUMANITY UNDER THE ALIEN TORT STATUTE, 28 U.S.C. §1350

(On behalf of Intervenors 'Anata and Jalud against all Settler-Plaintiffs)

181.    All proceeding paragraphs are hereby incorporated by reference as if fully set forth herein.

182.    Crimes against humanity are universally proscribed and clearly defined under international law.  Crimes against humanity are the commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population.

183.    Persecution, as a crime against humanity, is universally proscribed and clearly defined as the intentional and severe deprivation of fundamental rights contrary to international law, based on the identity of the group, including on the basis of national, ethnic, or religious grounds.

184.    The intentional seizure of Intervenors' property, displacement of Palestinians, and occupation by Israeli citizens—and the corresponding deprivation of Intervenors' fundamental human rights through the operation of the discriminatory settlement regime—on the basis of ethnic or national origin, and religious status, constitutes persecution.

185.    Settler-Plaintiffs' acts and omissions were knowing, deliberate, and/or purposeful.

186.    Settler-Plaintiffs' acts and omissions as participants in the settlement enterprise were committed as part of a widespread or systematic attack against the Palestinian civilian population, and were committed with knowledge of that attack.

187.    The acts and omissions of Settler-Plaintiffs constitute the crime against humanity of persecution in violation of the laws of nations.

188.    Through their acts and omissions, Settler-Plaintiffs have aided and abetted, conspired and, acting with a common criminal purpose,  otherwise participated in or contributed to the commission of the severe denial of the fundamental rights of Intervenor 'Anata and Intervenor Jalud, on the basis of national origin, ethnicity, and/or religion.

189.    Through Settler-Plaintiffs' acts and omissions, Intervenor 'Anata and Intervenor Jalud have suffered and continue to suffer severe deprivation of their fundamental rights, including the rights to:

(e)    equality and non-discrimination;

(f)    freedom of movement;

(g)    property;

(h)    arbitrary or unlawful interference with privacy, family and home;

(i)    right to livelihood;

(j)    enjoyment and use of natural resources;

(k)    freedom from pillage; and

(l)    to be free from forcible transfer.

190.    Settler-Plaintiffs' acts and omissions caused and are causing serious and foreseeable injury to Intervenors 'Anata and Intervenor Jalud.

## COUNT 4: TRESPASS AND CONTINUING TRESPASS

(On behalf of Intervenor Alwan, Jalud, and 'Anata against Settler-Plaintiffs Levy, Moriyah Shapiro, Jonathan Shapiro, Gordon, Daniel Jacob, and Tsofiya Jacob)

191.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

192.    As heir to the land deeded to his father, Alwan has the legal right to possess the property in Ofra that Settler-Plaintiff Levy entered onto and continues to occupy and list on Airbnb.

193.    Settler-Plaintiff Levy has entered onto Alwan's land, has renovated preexisting structures, has placed chattel on Alwan's land, and has listed the property for rent on Airbnb without consent or permission from Alwan or his family members, who have been prevented from accessing or benefitting from their land.

194.    The land that Settler-Plaintiffs Moriyah and Jonathan Shapiro entered onto, built a house on, placed chattel on,  and make available for renters is registered in the name of the village representative of Jalud, and Jalud has the legal right to possess and use this property.

64

195.     The village of Jalud did not give consent or permission to Settler-Plaintiffs Moriyah and Jonathan Shapiro to enter onto its land, build a house on it, or rent it out, and the villagers of Jalud have been excluded from accessing or benefitting from the village's land.

196.     The land that Settler-Plaintiffs Gordon and Daniel and Tsofiya Jacob have entered onto and continue to occupy is registered as public land and that is for the public benefit of the residents of the town of 'Anata, and 'Anata has the legal right to possess this property.

197.     Settler-Plaintiffs Daniel and Tsofiya Jacob have erected structures on and placed chattel on 'Anata's land.  Upon information and belief, Settler-Plaintiff Gordon has also made alterations and placed chattel on 'Anata's land.

198.     The Municipality of 'Anata did not give Settler-Plaintiffs Gordon or Daniel and Tsofiya Jacob permission to enter onto its land, make alterations to it, place chattel on it, or rent it out, and has been prevented from accessing or benefitting from its land.

199.     Settler-Plaintiffs Levy, Moriyah and Jonathan Shapiro, Gordon, and Daniel and Tsofiya Jacob are strictly liable for entering and occupying the land of Intervenors Alwan, Jalud, and 'Anata, respectively and for building structures on it, altering it, and placing chattel on it.

### COUNT 5: UNJUST ENRICHMENT

(On behalf of Intervenors Alwan, Jalud, and 'Anata against Settler-Plaintiffs Levy, Moriyah Shapiro, Jonathan Shapiro, Gordon, Daniel Jacob, and Tsofiya Jacob)

200.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

201.     Settler-Plaintiffs Levy, Moriyah and Jonathan Shapiro, Gordon, and Daniel and Tsofiya Jacob have profited off of the lands that are the property of Alwan, the village of Jalud, and the town of 'Anata by either occupying them as residential property and/or by renting them out for profit.

202.     Alwan, the village of Jalud, and the town of 'Anata have been prevented from using, developing, farming, renting, accessing, enjoying, or otherwise benefitting from their lands in the settlement's jurisdictional boundaries, including the lands that Settler-Plaintiffs Levy, Moriyah and Jonathan Shapiro, Gordon, and Daniel and Tsofiya Jacob occupy.

203.     Settler-Plaintiffs Levy, Moriyah and Jonathan Shapiro, Gordon, and Daniel and Tsofiya Jacob profiting off of those properties which Alwan, the village of Jalud, and the town of 'Anata have the legal right to possess, utilize, and benefit from results in unjust enrichment to Settler-Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Intervenors pray for judgment against Settler-Plaintiffs as follows:

a.     For declaratory relief against all Settler-Plaintiffs, holding their actions constitute unlawful discrimination under the Fair Housing Act, and crimes against humanity;

b.     For declaratory relief against Settler-Plaintiffs Daniel and Tsofiya Jacob, Moriyah and Jonathan Shapiro, Moshe Gordon, and Inbal Levy, holding their actions to constitute war crimes, trespass and unjust enrichment;

c.     For injunctive relief enjoining all Settler-Plaintiffs from undertaking further actions that constitute war crimes, crimes against humanity, and unlawful discrimination, including further listing their properties for rent on any online platform within this Court's jurisdiction;

d.     For injunctive relief against Settler-Plaintiffs Daniel and Tsofiya Jacob, Moriyah and Jonathan Shapiro, Moshe Gordon, and Inbal Levy, enjoining them from taking further action that constitute trespass and unjust enrichment;

e.      For compensatory damages in an amount to be proven at trial;

f.      For punitive damages in an amount to be proven at trial;

g.      For reasonable attorneys' fees and costs of suit; and

h.      For such other and further relief as the Court may deem just and proper.

Dated: March 18, 2019

Diala Shamas (*pro hac vice* motion pending)
Maria LaHood (*pro hac vice* motion pending)
Katherine Gallagher (*pro hac vice* motion pending)
Astha Sharma Pokharel (*pro hac vice* motion pending)
Baher Azmy (*pro hac vice* motion pending)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
dshamas@ccrjustice.org
(212) 614-6426

/s/ Misty A. Seemans
Misty A. Seemans, DE Bar # 5975
O.P.D. (Pro Bono; cooperating attorney with Center for Constitutional Rights)
820 North French Street
Third Floor
Wilmington, Delaware 19801
(302) 577-5126
Email: mseemans@ccrjustice.org